## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

PROSKAUER ROSE LLP,

Plaintiff,

- against -

JONATHAN O'BRIEN,

Defendant.

Case No. _____

---

## COMPLAINT

Plaintiff Proskauer Rose LLP ("Proskauer" or the "Firm"), by its undersigned attorneys, for its Complaint against Jonathan O'Brien ("Mr. O'Brien"), alleges as follows:

## <u>NATURE OF THE ACTION</u>

1.      This is an action for theft of Proskauer's trade secrets and other confidential and proprietary information.

2.      Proskauer is an international law firm, comprised of approximately 800 attorneys (including approximately 289 partners) and 650 non-lawyer employees.  Mr. O'Brien was, until recently, Proskauer's Chief Operating Officer.

3.      In or about November of this year, Mr. O'Brien hatched a plot to steal the Firm's valuable confidential information.  In late December, he resigned from the Firm after having completed the theft.

4.      Mr. O'Brien was a crafty plotter.  In  November of this year, Mr. O'Brien created a shopping list of secret and sensitive information that he intended to steal, including, among other things: (i) proprietary operational reports, models, and analyses; (ii) software and programming

1

tools the Firm had developed to create proprietary reports and data matrices; (iii) other proprietary know-how; (iv) each partner's practice information, clients, financial performance, compensation, evaluations, and other highly confidential and competitively sensitive data; (v) the financial performance, profitability, and other key metrics of each department, practice group, and office; (vi) confidential strategies for lateral partner acquisitions; (vii) client metrics; (viii) critical, forward-looking strategic planning, including planning for 2023 and recession planning; and (ix) vast amounts of other valuable confidential information.

5.     Mr. O'Brien knew this information would be highly useful to Proskauer's competitors, as it would enable them to effectively target and recruit Proskauer's partners, practice groups, and clients.  The information would also enable Mr. O'Brien to hit the ground running on behalf of another firm, whether as an employee or a consultant.  He would not have to expend time, effort, and resources creating effective analytical, modeling, and other systems and methods if he simply lifted them wholesale from Proskauer.

6.     To bring his plot to fruition, Mr. O'Brien exploited his authority as Chief Operating Officer to override the Firm's controls.  Proskauer's computer and information systems are programmed to prevent copying files and data onto removable storage media, like USB drives ("thumb drives," in common parlance).  That key security measure is intended to prevent the theft of information concerning the Firm and its clients.  Mr. O'Brien overrode that security measure, telling an information technology employee that Mr. O'Brien needed to copy files to a removable USB drive to provide information to an outside Firm consultant.  Based on that explanation, Mr. O'Brien was granted an exception to this security measure.  Mr. O'Brien had never before requested an exception to this security measure during the seven years it has been in place.

7.      Mr. O'Brien's proffered reason for the exception was a lie.  The outside consultant had in fact received all requested information via email.  The consultant never requested, and never received, a thumb drive from Mr. O'Brien or anyone else at the Firm.

8.      Having secured the ability to easily copy data on false pretenses, Mr. O'Brien proceeded to steal the Firm's proprietary and confidential information, copying large amounts to a USB drive on December 5, 2022.  He did so again on Friday, December 16, 2022, after his annual bonus was deposited into his bank account earlier that same day.

9.      In that December 16 theft, Mr. O'Brien created a compressed ".zip" file, falsely labeled "2022 tax documents."  Mr. O'Brien orchestrated the copying of more than a thousand files into that .zip file, including some of the Firm's most confidential and sensitive information. All (or nearly all) of the copied material had nothing to do with taxes.  After copying that .zip file to a second USB drive, he deleted every file on his personal network drive to try and cover up his theft.

10.     Mr. O'Brien's plot also included an effort to delete massive amounts of his email. For several years, Mr. O'Brien had been subject to a litigation hold, meaning that his emails could not be deleted as they might be evidence in potential litigation.  In December 2022, Mr. O'Brien overrode the Firm's controls to remove his litigation hold.  Circumventing the Firm's General Counsel, who is responsible for instituting and removing litigation holds, Mr. O'Brien directed one of the Firm's e-Discovery consultants to lift his litigation hold.  She complied.  When a hold is lifted, all emails older than one year are instantaneously deleted.

11.     Mr. O'Brien also manually deleted thousands of other emails.  The result:  Mr. O'Brien not only wrongfully spirited the Firm's proprietary information out of the Firm, he also

deleted a large amount of other data by secretly lifting his litigation hold without proper authorization and then by manually purging thousands of his remaining emails.

12.    On Tuesday, December 20, Mr. O'Brien gave notice that he would leave the Firm's employ, effective January 6, 2023, and he would be on vacation in Mauritius from December 22 through January 4.

13.    Mr. O'Brien's vacation schedule left essentially one day for transition.  Asked whether he would permit a greater amount of time to aid in the transition, Mr. O'Brien responded that he was an employee at will and could leave whenever he wished, adding "I owe the Firm nothing."

14.    When questioned, Mr. O'Brien refused to tell the Firm where he would be working following his departure.  But he did confide in one of his direct reports, the Chief Professional Resources Officer, that when the Firm's management found out where Mr. O'Brien had landed, they would be very angry.  It is a fair inference that Mr. O'Brien will join a competing law firm, or work as a consultant to law firms that compete with Proskauer.  The huge, vital trove of proprietary information that Mr. O'Brien misappropriated would be highly useful to Proskauer's competitors, which would make Mr. O'Brien more valuable – whether as an employee or a consultant.  Dissemination of that highly sensitive information would also be very damaging to Proskauer.

15.    Proskauer first uncovered evidence of Mr. O'Brien's theft on the evening of December 20, 2022 and has worked expeditiously to determine the extent of the data theft and how Mr. O'Brien perpetrated his scheme.

* * * * *

16.     Mr. O'Brien enjoyed a position of unique power and authority—the power to (i) access the most confidential and personal information of the Firm; (ii) participate in and influence the most sensitive financial, compensation, strategic and other competitive planning of the Firm; (iii) establish (and override) critical systems; and (iv) otherwise sit at the center of trust in a firm with tens of thousands of clients, thousands of employees and hundreds of partners.  He did so not just in any business entity, but in a law firm – where there is the most solemn obligation to preserve confidences and to safeguard the secrecy of all protected information.

17.     There is no benign explanation for Mr. O'Brien's conduct, and no legitimate purpose for which he could use the materials he stole.  That is why the Firm's policies (which Mr. O'Brien was in charge of administering) strictly prohibit his conduct.  That is why the Firm's systems are set up to prevent it.  And that is why he needed to override those systems by abusing his authority and taking advantage of his subordinates' trust.

18.     The information stolen by Mr. O'Brien reflects some of the most sensitive personal, professional, confidential, and proprietary information of the Firm.  While industry surveys report the gross revenues, expenses, profits and profits per partner of competitive law firms, they do not reflect any of the past or future strategies of the firms, their individual partner compensation, or any of the client information underlying those gross revenues because no law firm would allow such information to be disclosed.

19.     With rare exceptions, Proskauer partners do not have access to all the information Mr. O'Brien stole, including the proprietary systems and methods by which it was calculated, preserved, and administered, some of which was developed over years and at great expense and all at the center of the Firm's ability to operate and preserve its ecosystem of culture, internal trust, and external obligation of confidence to its clients.

20.     The legal industry is in an era of intense competition for partner talent and clients. The methods by which partners are compensated and the processes for doing so are highly confidential and would be of great value to a competitor.  They also are deeply personal and the threat to disclose such information could be used to pressure, intimidate, and extort partners and the Firm.

21.     Proskauer's financial systems record detailed financial information about individual clients.  That information is at the essence of the Firm's duty to preserve and protect client confidences.  There is almost no limit to how such data could be abused.

22.     Indeed, Mr. O'Brien's conduct was so brazen and malicious that it rises to a criminal law violation.

23.     Proskauer is nearing its 150th anniversary as law firm.  The Firm is unaware of any employee (much less an officer) ever acting in such a corrupt, debased, and illegal manner.  Mr. O'Brien's wrongful scheme must be stopped and remedied with great dispatch to forestall the harm he has caused and intends to continue to cause.

## THE PARTIES

24.     Proskauer Rose is an international law firm with its principal place of business at Eleven Times Square, New York, NY 10036.

25.     Mr. O'Brien is a British citizen who resides in both New York, New York and Verplanck, New York.  Since 2015, he has been employed by the Firm, first as Chief Financial Officer and, since 2017, as the Firm's Chief Operating Officer.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, because this action seeks to enforce rights and remedies secured under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836, *et seq*.

27.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the New York law claims in this action.

28.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred in this judicial district.

## FACTS

### Background

29.     Proskauer is led by the Firm's Chair.  This is an elected position voted on by the Firm's partners at fixed intervals.  The Chair works closely with the Firm's Managing Partner. The Chair and Managing Partner meet regularly with the Firm's seven-member Executive Committee ("EC") (which includes the Firm's Chair and six partners, who are elected by the Firm's partners and serve three-year staggered terms).

30.     Meetings of the EC are held regularly and attendance, particularly during discussion of the Firm's most confidential matters, is typically limited to EC members, the Chair, the Managing Partner, the Firm's General Counsel, and since 2017, Mr. O'Brien in his capacity as COO.  The EC is responsible for many critical governance, policy, and strategic issues, including the allocation of Firm profits among the partners, recommendations for the election of lateral partners, promotion of Firm associates to partner, and the Firm's strategic planning.  Access to much of the information Mr. O'Brien stole has been restricted to Mr. O'Brien, the Chair, the Managing Partner, and members of the EC.  In certain cases, access has been restricted to just Mr. O'Brien, the Chair, and the Managing Partner.

### Mr. O'Brien

31.     In his role as the Firm's COO, Mr. O'Brien was responsible for all of the Firm's business support activities, including finance and financial strategy, accounting, taxes, benefit

plans, professional resources, business development, real estate, operations, and information services. He reported directly to the Firm's Chair and served on many of the Firm's most important committees, including the Benefits Committee (of which he was the Chair), Business Development Committee, Personnel Practices Committee, Retirement Plan Committee, and Crisis Management Committee (of which he was also the Chair).

32.     In addition to attending all EC meetings, Mr. O'Brien also had daily morning management meetings with the Chair and Managing Partner, during which the day's business was discussed, as well as short and long range financial, staffing, and strategic planning.

33.     Mr. O'Brien's tenure as COO has spanned the tenures of two Proskauer Chairs and, during this time, he has been privy to (or participated in) nearly every meaningful strategic decision. In fact, Mr. O'Brien has been responsible for producing the financial analyses, projections, and backup data that the Chair, Managing Partner, and EC review in order to make these decisions. As one of the three key senior members of management, Mr. O'Brien had unfettered access to all Firm systems, records, and resources pertaining to the Firm's finances, operations, and strategic planning.

34.     Mr. O'Brien had a team of approximately 650 direct and indirect reports, including, among others, the Firm's Chief Financial Officer, Chief Real Estate and Facilities Officer, Director of Human Resources, Chief Marketing Officer, Chief Information Officer, and Director of Internal Audit.

35.     Mr. O'Brien was required to comply with – and expressly acknowledge – the Firm's policies. As Proskauer's COO, Mr. O'Brien also owed Proskauer fiduciary duties.

36.     In light of Mr. O'Brien's extraordinary misconduct as set forth herein, the Firm's EC has voted to terminate Mr. O'Brien's employment upon the filing of this action.

**Mr. O'Brien's Deception and Misappropriation**

**Mr. O'Brien's Steal List**

37.     By November 14, 2022, Mr. O'Brien had a detailed plan to steal Proskauer's most sensitive business information.  Mr. O'Brien created a list of the types of Proskauer materials he planned to steal, which he saved as "List.txt" on his Firm computer.  Despite his later efforts to cover his tracks, Proskauer recovered a copy of the file, last modified on November 14, 2022:

```
o       All FP&A reports
o       Firm financials
o       Department financials
o       Practice financials
o       Office financials
o       Full black book disclosure
•       Policies
•       Finance Portal Docs
•       Business of Law
•       Cash Flow
•       Expense Report — full GL
•       PPP Forecast
•       Billing Rates
•       Black Book Binder (already printed)
•       CCM reports
•       Lateral Partner P&L
•       Lateral Partner Template
•       Client Ops — SPD, Countdown, Collections projs, B&C shortfall by day
•       Pricing AFA guide
```

38.     These categories of materials are among the most confidential, competitively sensitive, and valuable materials Proskauer maintains.

39.     The first item on Mr. O'Brien's list of materials to steal is "All FP&A Reports," which refers to the regularly-generated reports of Proskauer's financial planning and analysis personnel (the "FP&A Group").  The FP&A Group is responsible for regularly creating 127 distinct types of reports, access to which is strictly limited to senior Firm personnel.  These reports constitute the broadest swath of the Firm's confidential performance and projection data.  The materials in these reports include, among other things, lawyer productivity reports, projections,

budgets, profit analyses, and performance data, all of which provide detailed insight not only into the Firm's actual financial performance, but also into how Firm management evaluates its performance and plans for the Firm's future.

40.     The FP&A Reports are distinct from the "firm," "department," "practice," and "office" financials on Mr. O'Brien's list, which provide confidential financial information about those different business units and offices.

41.     The "Black Book Binder" is a detailed set of highly-confidential and proprietary records relating to Proskauer partner compensation and allocation of the Firm's profits.  The binder details, among other things, a three-year report of a variety of financial, productivity, and other performance metrics on a partner-by-partner basis.  Partners do not have access to many aspects of this reporting, which is shared in its entirety only with the EC.  The "Black Book" information is among the most protected, confidential information the Firm keeps.

42.     Other materials on Mr. O'Brien's list included highly sensitive and proprietary information about the Firm's strategic planning and initiatives.  For example, the "Pricing AFA Guide" is a detailed memorandum outlining the Firm's strategy and policies with respect to alternative fee arrangements.  The "Lateral Partner P&L" and "Lateral Partner Template" include information about the Firm's assessment and recruiting of lateral partner candidates, including the metrics and other criteria the Firm considers in evaluating prospective lateral partners and the questionnaire the Firm developed to help evaluate lateral partner candidates.

43.     The listed materials also include sensitive, confidential information related to the Firm's client relationships, profitability and profit margins, cash on hand, and financial forecasts.

44.     While all of these materials are securely kept electronically on Proskauer's systems, Mr. O'Brien's list reveals that he had "already printed" a hard copy of the highly confidential

"Black Book Binder."  Mr. O'Brien also had hard copies of other confidential materials.  For example, in advance of partnership meetings, Mr. O'Brien received hard copies of the confidential materials to be presented at those meetings, including confidential financial performance and lawyer productivity data.

**Mr. O'Brien Lies**

45.    After creating his list of files to steal, Mr. O'Brien began compiling those files in a single cache, to facilitate downloading the materials from the Firm's computer system.  On Tuesday, November 29, 2022, Mr. O'Brien used his Firm computer to create a Personal Storage Table ("PST") file, "Saved.PST."  A PST file is used to store copies of emails, calendar events, and other items within an email server.  That same day, Mr. O'Brien populated this file with approximately 34 gigabytes of emails, attachments, and other largely confidential information from his Proskauer mailbox.  At the time, the 34 gigabytes represented approximately a third of the 100+ gigabytes in his Outlook mailbox.

46.    Having compiled significant amounts of the Firm's most confidential and proprietary information and data, Mr. O'Brien then proceeded to implement his plan to circumvent the Firm's security measures and download it.  To protect Proskauer's and its clients' data, since 2015 Proskauer has programmed its systems to prevent the use of removable media, such as thumb drives, to copy data from the Firm's systems.  The Firm also has a procedure for granting exceptions to this data security measure when needed for legitimate business reasons.

47.    As COO, Mr. O'Brien was aware of this data security measure and other Proskauer information security measures and policies.  He also knew he had no legitimate reason to seek an exception for use of removable media.  Indeed, prior to December 2022, Mr. O'Brien had never

requested or received such an exception in connection with any of his work at Proskauer during the seven years the measure was in place.

48.     Mr. O'Brien used deceit to conceal his wrongful plan to steal confidential Firm information.   In November and December 2022, Mr. O'Brien and others at Proskauer were working with a business consultant pursuant to an agreement which, among other things, preserves the confidentiality of materials exchanged with the consultant.   In fact, the Firm provided confidential information to the consultant pursuant to this confidentiality agreement.   Mr. O'Brien used this consulting engagement as a cover for his theft.

49.     On December 5, 2022, Mr. O'Brien called Kevin Polakoff, the Firm's Director of Technology Support (and one of Mr. O'Brien's reports), and asked Mr. Polakoff to grant him an exception to the system restriction that prevents copying data to removable media.

50.     Mr. O'Brien falsely represented to Mr. Polakoff that he needed to download information to a thumb drive in order to provide it to an external consultant.   However, Proskauer's consultant never asked Mr. O'Brien to send information on a thumb drive or any portable storage device, nor has the consultant ever received a thumb drive or any portable storage device from Mr. O'Brien or anyone else at the Firm.   All the information the consultant received was sent through email.

51.     Based on Mr. O'Brien's false representation, and having no reason to suspect wrongdoing by the Firm's COO (and his ultimate supervisor), Mr. Polakoff submitted a "Policy Exception" request on Mr. O'Brien's behalf, which his team granted.   Because Mr. O'Brien was the Firm's COO, Mr. Polakoff's team treated Mr. O'Brien's request as fully authorized and compliant – just as Mr. O'Brien expected they would.

52.     Later that day, on December 5 at 4:08 pm, Mr. O'Brien copied "Saved.pst" (containing 34 megabytes of data) from his Firm computer to a Kingston USB thumb drive.

53.     Now armed with an efficient way to steal the Firm's confidential information, Mr. O'Brien expanded the scope of this theft.  Three hours later, at 7:08 pm, he copied more than 100 additional files to the thumb drive.  The files included many items from his list of materials to steal and a number of materials from that list were organized by subject matter into a series of thirty-one folders:



54.     These folders would have taken hours of time to create, and contain the Firm's "crown jewels."  They include the Firm's confidential, valuable, and proprietary financial analyses, and they also include the systems, frameworks, and know-how needed to successfully run the large law firm that employed him as an officer, a billion dollar enterprise.

55.     The pilfered materials include a number of proprietary methodologies the Firm developed through significant effort and expense to maintain and enhance its position in the highly competitive market for legal services.  For example, the "CCM" folder includes the Firm's own recently developed proprietary methodology for evaluating profitability, including by office, department, and practice group.  The documents in that folder include templates, partner training and presentation materials, presentations to the EC relating to the Firm's methodology, profitability benchmarks, and documents detailing the Firm's actual profit margins for 2022.  It includes material reflecting each of Proskauer's clients that generated over $50,000 in revenue (and associated margins) which is in effect the Firm's client list and constitutes competitively sensitive information.  The "Comp Models" folder includes the Firm's own compensation models that account for, among other things, the effects of bonuses and other variables on the Firm's financials.  "Budget," "Cash Flow," and "Recession Deck" contain detailed information about the Firm's assumptions, expenses, financial projections, and plans for changes in economic conditions, including strategic and contingency planning for a potential economic recession in 2023.

56.     Many of these folders contain "how to" tools and templates that would be useful to someone looking to replicate the Firm's proprietary operational reports, models, and analyses elsewhere.  For example, Mr. O'Brien singled out reporting packages for two specific lawyers, both of whom are regarded as very strong performers.  The "Promotions" folder contains the "promotion package" for one of these lawyers as prepared for the EC to evaluate individual partner promotion prospects.  The "Reports" folder contains the other lawyer's 2022 annual performance, reflecting numerous Firm performance metrics.

57.     This batch of stolen files also contains documents reflecting the Firm's proprietary strategic and financial analyses.  For example, the "AmLaw and PPP" folder includes analyses of

14

the Firm's performance in widely publicized, industry-wide rankings, compared to a select few of the Firm's competitors, and detailed strategies for improving the Firm's relative performance.  The "Dept Financials," "Final Numbers," "Firm Financials," "Office Financials," and "Practice Financials" folders contain detailed business projections and other confidential financial information about those different business units.  Of note, among the documents stolen by Mr. O'Brien is a presentation detailing the content and functionality of a secure website called the "Partner Portal," which the Firm uses to safeguard certain confidential information distributed to the partnership.

58.    Clear evidence of the value of this confidential information, and the steps the Firm takes to protect it, appears in one of the many documents in the "Policies" folder Mr. O'Brien stole.  Specifically, Proskauer's "Internal Financial Data Disclosure Policy," which is itself "proprietary information of Proskauer Rose LLP," begins by noting the following:

> Finance teams are routinely requested to deliver internal financial information to partners, other lawyers, and administrators of the Firm.  Due to the highly sensitive nature of this information, strict protocols regarding access rights are necessary.  This is to not only protect the privacy of the Firm, to safeguard its financial data, but to protect the privacy and confidentiality of individuals and various associations within the Firm (e.g. individual partners, departments, practices, etc.).

59.    The Internal Financial Data Disclosure Policy further highlights just how limited access to much of the information stolen by Mr. O'Brien is.  This policy includes a matrix that describes which groupings of Proskauer employees have access to certain categories of internal financial information.  Only the Firm Chair, Managing Partner and COO/CFO have "unlimited access" to all of Proskauer's internal financial data.

**Mr. O'Brien Improperly Removes Litigation Hold**

60.     Mr. O'Brien was subject to a "litigation hold."  A litigation hold preserves data relating to actual or potential litigation, and, among other things, prevented Mr. O'Brien from successfully deleting any emails or other information from his Proskauer Outlook mailbox.  If a litigation hold is not in place, a Proskauer user's email inbox is subject to ordinary document retention policies, under which emails older than one year are automatically deleted unless the user takes steps to archive them.

61.     Seeking the ability to destroy many of his emails, Mr. O'Brien had his litigation hold lifted—but not through proper means.

62.     On December 5, 2022, less than an hour after he copied the PST file to his thumb drive, Mr. O'Brien e-mailed a senior eDiscovery consultant who ultimately reports to him, and asked her to release him from his litigation hold.

63.     Only the Firm's General Counsel is authorized to lift a litigation hold, as Mr. O'Brien knew from his years as COO.  Mr. O'Brien, however, studiously avoided the Firm's General Counsel in seeking to lift his hold.

64.     In connection with his request to lift the litigation hold, the eDiscovery consultant reminded Mr. O'Brien that emails older than one year not saved or archived would be deleted once the hold was lifted, and asked Mr. O'Brien if he had stored everything he needed which fell into that category.

65.     Mr. O'Brien assured the eDiscovery consultant that he had saved what he needed.  Mr. O'Brien deceptively represented to the consultant that he was "on a clean-up mission," creating the misimpression that he was advancing the Firm's interests and complying with its policies rather than deleting emails both automatically and manually.

16

66.     The next morning, based on Mr. O'Brien's deceitful representation, the litigation

hold was lifted.  Everything over a year old in Mr. O'Brien's Outlook mailbox—approximately 80

gigabytes of emails and attachments—was instantly deleted.  After the litigation hold was lifted,

Mr. O'Brien also manually deleted more than 2,000 emails from his Outlook mailbox.

**More Theft and More Lies**

67.     On December 7, 2022, Mr. O'Brien learned he would be receiving a sizable year-

end bonus.  But, as COO, he knew that, as with all other employees, that money would not be

deposited in his bank account until December 16.  So he waited until then to make his next move.

68.     Bonuses for Firm personnel were paid by ACH direct deposit in the early morning

hours on December 16.  Later that day, at around 10:44 am, Mr. O'Brien and other subordinates

working at his direction created a compressed ".zip" file containing 1,138 files of Proskauer's

proprietary data.  While Proskauer's forensic review of Mr. O'Brien's actions is ongoing, the .zip

file appears to have contained all of the materials in the thirty-one folders he copied on December

5, plus eight additional top-level folders: Business of law, Charitable, Compass, Expenses,

Forecast, Surveys, Timetables.Notes, and Year-End:



69.     This file was falsely labeled "2022 tax documents.zip."  In fact, this voluminous

trove of proprietary and confidential operational and business strategy materials had nothing to do

with Proskauer's 2022 taxes or Mr. O'Brien's own personal taxes.

70.     Among the new folders of confidential information collected by Mr. O'Brien, the

"Compass" folder was key.  The 833 files in this folder reveal how Proskauer performs all of its

financial planning and analysis.  Not only does the folder contain confidential and proprietary

reports, many of which are described above, it also contains hundreds of files with proprietary

code and reusable scripts that the Firm itself had created, at tremendous effort and expense, to

make its financial reporting more effective, efficient, and useful.

71.     Other notable documents in these new folders include proprietary processes, tools, and "know-how" that the Firm's finance team uses to close out the Firm's fiscal year and various templates for tracking a host of partner-specific metrics.  Amongst its peer firms, Proskauer has one of the most efficient billing and collection cycles, inuring to the Firm's profitability, and the materials taken by Mr. O'Brien provide a roadmap for how to replicate it elsewhere.  The additional folders created and downloaded by Mr. O'Brien also included various files reflecting Proskauer's expenses, including the Firm's capital expenditures, capital account balances, and capital expense planning for fiscal year 2023.

72.     The other thirty-one folders also contained documents that were not in the first set that Mr. O'Brien stole on December 5.  For example, the "Dashboards" folder contains information relating to newly-created, proprietary software tools (which we refer to as "Dashboards") developed in 2022 and, in some cases, not yet fully completed or made available to Firm partners. These Dashboards were developed over many months by Firm personnel in our Finance group, using significant know-how and resources.  They are tools unique to the Firm's business and are valuable management tools.  The Dashboard file Mr. O'Brien stole contains folders entitled "Backup Codes", "Data Model", "Executive Dashboard User Guide", "Lawyer Performance Dashboard", "Lawyer Performance Dashboard Outstanding Items," and "Power BI Executive Dashboard", which appears to be a Microsoft file for the code used to create one or more of the Dashboards.  He stole software code, data models, user guides, the Microsoft creation tool, and a list of outstanding items for the Dashboard under development.  There is no reasonable conclusion other than Mr. O'Brien intends to use this proprietary tool for the benefit of his new employer.

73.     Also on December 16, Mr. O'Brien contacted Mr. Polakoff to request another exception to the Firm's removable media policy.  Mr. O'Brien again lied to Mr. Polakoff as to

why, this time telling Mr. Polakoff that he had forgot to include a folder in the materials he had earlier prepared for the consultant.  This was a complete fabrication.  Mr. O'Brien's new .zip file, disguised as "tax" information, contained more than a thousand files and numerous folders that were not the materials he copied to the first thumb drive on December 5.  And these materials were never sent to or intended for the consultant.

74.     Mr. O'Brien subsequently copied the "2022 tax documents.zip" file to a second USB thumb drive, a Verbatim "Store-N-Go."  Based on the Firm's review of its logs showing employee activity, Mr. O'Brien was actively assisted in his improper activities by several other Proskauer employees over whom he had supervisory authority, at least one of whom is an information technology specialist.  In recruiting Proskauer's personnel to join his corrupt scheme, Mr. O'Brien breached his fiduciary duties to the Firm and caused his subordinates to breach their fiduciary duties as well.

75.     Days later, during the morning of December 20, Mr. O'Brien told the Firm's Chair and Managing Partner that he would be leaving the Firm effective January 6, 2023.  He also told the Firm's Managing Partner that he would be leaving the country the very next evening (December 21, 2022) to take paid vacation in Mauritius until the evening of January 4, 2023, and completing his employment at Proskauer immediately upon his return.

76.     Despite having been asked by the Firm's Chair and Managing Partner, Mr. O'Brien refused to disclose where he would be working next.  But the next day, on December 21, Mr. O'Brien told the Firm's Chief Professional Resources Officer that the Firm's management would be "mad" when it found out where he would be working next, and that Mr. O'Brien did not know whether he would ever return to the office.  Upon information and belief, Mr. O'Brien is currently in Mauritius.

**Mr. O'Brien Knew His Conduct Violated Firm Policies and Was Otherwise Wrongful**

77.     Mr. O'Brien knew what Proskauer's policies required, including the Firm's "Computer and Communications Use and Data Protection Policy" (the "CCUDP Policy").  That policy governs employees' use of the Firm's technology resources, such as the systems and devices that connect to the Firm's network, and the Firm's connection methods, such as its wireless networks.  The policy also details the Firm's safeguards to protect Firm, client, lawyer, and employee data.  As COO, Mr. O'Brien personally reviewed and approved annual changes to the CCUDP Policy.

78.     Under Section 8.3 of the CCUDP Policy, Confidential Information includes, among other things, (i) "firm trade secrets, methodologies, business strategies, business plans, information about clients, and other competitor-sensitive information," (ii) Firm personnel and client lists, (iii) Firm development programs and unpublished marketing materials, (iv) Firm financial, operational, and accounting information, (v) other nonpublic information relating to the business operations of the Firm, and (vi) data that the Firm is obligated to keep confidential pursuant to an agreement.

79.     Section 9.1 of the CCUDP Policy states that the Firm's Confidential Information (as defined in the CCUDP Policy and including information related to "the internal business of the Firm") should "not be accessed in the absence of a legitimate business need or Firm objective" and that Confidential Information (i) should not be disclosed to third parties, and (ii) "should be kept within the Firm's secured Technology Resources, or its secured office premises, or its authorized offsite storage facilities" or "stored on a mobile device or removable media without encrypting Highly Sensitive Information using firm-approved encryption software and protocols."

80.     Mr. O'Brien is also required to comply with—and expressly acknowledge—a host of other policies, including, among others, the Firm's Compliance Policy.  That policy sets forth

rules with respect to the confidentiality of client affairs and compliance with applicable laws and regulations. It states that all client information, "whatever its source," should not be disclosed to any person other than persons in the Firm engaged in the representation of those clients. It also instructs personnel that the duty to preserve "continues after a lawyer or employee is no longer associated with the Firm."

81.     In addition, as an officer of the Firm, Mr. O'Brien plainly knew it would be highly improper for a Firm employee to take Proskauer's trade secret information for his or her own use, including use with a Firm competitor. Indeed, Mr. O'Brien was responsible for supervising the Firm personnel charged with protecting Proskauer's most sensitive information and data from being stolen or otherwise misused. In short, Mr. O'Brien not only knew he was violating multiple Firm policies he was charged with administrating, he knew he was breaching the relationship of trust the Firm had with him as a Firm officer.

**Proskauer Has Implemented Robust Data Protection Systems**

82.     Consistent with the Firm's data protection policies, it has implemented a robust system of measures to maintain secrecy of its confidential information. That system of controls has earned the Firm two prestigious certifications from the International Organization for Standardization ("ISO"). In 2015, Proskauer became one of the first law firms to receive the ISO 27001 certification, which provides an international methodology for the implementation, management, and maintenance of information security. In 2021, the Firm became one of the few law firms to receive the ISO 27701 certification, which provides specific requirements for establishing, implementing, maintaining, and continually improving data privacy systems.

83.     All users of Firm technology resources are uniquely identified and authenticated before being granted access to Firm information. Those resources include, without limitation,

desktops, laptops computers, and mobile devices, including iPhones and iPads.  Firm passwords have a required complexity and must be changed on a periodic basis.  When employees remotely access the Firm's network and files outside the office, the user IDs and passwords are augmented with an additional, second factor authentication to further authenticate the identity of the user accessing the system.

84.     Firm employees are provided with Firm-issued workstations (either desktops or laptops), and the Firm monitors the status and usage of those workstations on an ongoing basis. Since 2020, Mr. O'Brien has utilized four workstations: (i) a Firm desktop in his New York office, (ii) a Firm laptop in his Manhattan apartment, (iii) a Firm laptop in his home in upstate New York, and (iv) an additional Microsoft Surface laptop that the Firm was testing for potential use by its employees.

85.     Proskauer implements detailed policies and technical controls to try to ensure that electronic communication with clients and any other third parties with regard to the Firm's business and client matters are transmitted only through the Firm's technology resources.  Firm computers and laptops must run Firm-approved antivirus software and any other protective software the Firm designates to protect against viruses, worms, Trojan horses, spyware, malware, key logging software and other harmful code.

86.     To further protect Proskauer's confidential information, the Firm's technology resources are continually monitored.  Intrusion Detection Systems ("IDS") are used to provide 24/7 monitoring and audit records of unauthorized attempts to access the technology resources, as well as login failures, use of privileged accounts, changes to access modules or file permissions, modification to installed software or the operating system, and changes to user permissions or

privileges.  Security logs are maintained for at least twelve months.  Access to security logs are restricted to only authorized personnel from the Firm's Information Systems Department.

87.     While employees must satisfy all of those authentication requirements to even connect to the Firm's system, doing so does not grant them access to all Firm data.  Instead, the Firm has also implemented a system of restrictions to control and monitor employees' access and information rights.

88.     Firm data are primarily stored across three main platforms, all residing in the Firm's network: (1) Filesite, (2) the R Drive, and (3) Sharepoint.

    a.  <u>Filesite</u>.  Filesite is a document management system.  It is an "open" system, which means access is generally not restricted unless a client asks that the Firm restrict its information, or users take steps to restrict access to individual files or folders.

    <u>R Drive</u>.  The "R Drive" is a shared, network drive used by many of the Firm's departments, including business services teams such as Finance and Human Resources.  It is a restricted environment in which access to any particular folder must be affirmatively granted to a specific, authorized and authenticated user.  Because employees do not have access to materials on this drive absent such a grant, the folders and files are generally not password protected.  Some materials on the R Drive are password protected due to the sensitive nature of the information.

    b.  <u>Sharepoint</u>. Sharepoint is a system the Firm uses to host internal "portals," which are used as another way for different departments and groups within the Firm to share information across specific authorized and authenticated users.  Like the R Drive, employees do not have access unless it has been specifically granted to them,

and some materials within Sharepoint may also have additional access restrictions

such as password protection or restrictions on downloading, saving, or printing.

89.     By virtue of his role as the Firm's COO, Mr. O'Brien had the requisite permissions

to access the most sensitive of these repositories.  In the ordinary course, Mr. O'Brien also saved

and accessed documents on his desktop, which, for backup purposes, is continuously replicated to

the Firm's "H Drive," another network drive.

## COUNT I

### VIOLATION OF THE DEFEND TRADE SECRETS ACT
### 18 U.S.C. § 1836, *ET SEQ.*

90.     Proskauer repeats, re-alleges, and incorporates by reference paragraphs 1 through

89 above as set forth fully herein.

91.     As set forth above, Proskauer owns various trade secrets within the meaning of the

DTSA, 18 U.S.C. § 1839(3), which are critical to the success of its business, including, without

limitation, the information described in paragraphs [37-45, 52-59, and 68-72] above

92.     Proskauer's trade secrets relate to Proskauer's legal services used in interstate and

foreign commerce.

93.     Proskauer's trade secrets derive independent economic value from not being

generally known to, and not being readily ascertainable through proper means by, another person

who can obtain economic value from the disclosure or use of the information.  Proskauer's trade

secrets give it a competitive advantage over other law firms who do not have access to that trade

secret information.  Proskauer's trade secrets are valuable and crucial to its business functions and

competitive position as a law firm.  The trade secrets Mr. O'Brien has misappropriated are of

enormous potential value to a competing law firm or law firm consultant.  For example, they would

allow Mr. O'Brien to replicate many of Proskauer's methods and practices for running the business

of a large law firm.  As another example, they would give a competing law firm an unfair advantage in trying to lure Proskauer attorneys away from the Firm or target Firm clients. Disclosure or use of Proskauer's trade secret information to other law firms would risk destroying that competitive edge.  Proskauer has taken countless steps and made efforts that are reasonable under the circumstances to maintain the secrecy of its trade secrets by, among other things, designing and implementing the extensive information security measures described in paragraphs 77-89] above, and requiring adherence to and acknowledgement of policies (including its CCUDP Policy and Compliance Policy) as conditions of continued employment at the firm.

94.     Mr. O'Brien's actions as described herein constitute a misappropriation within the meaning of the DTSA, 18 U.S.C. § 1839(5).

95.     Mr. O'Brien misappropriated Proskauer's trade secrets by acquiring them while knowing he had acquired them by improper means, including theft, misrepresentation, and breaches and inducement of breaches of duties to maintain the secrecy of Proskauer's trade secret information.   In wrongfully acquiring Proskauer's trade secrets, Mr. O'Brien not only knowingly violated multiple Firm policies governing the dissemination of electronically stored information, but also his fiduciary duties to the Firm as COO.

96.     Mr. O'Brien's acquisition of Proskauer's trade secrets was accomplished by a persistent pattern of deceiving a subordinate into granting him access to download data to removable media and then downloading and copying trade secrets from Proskauer's network to his own personal USB drives in violation of Firm policies and his fiduciary duties to the Firm.

97.     Mr. O'Brien also misappropriated Proskauer's trade secrets by using or disclosing them without Proskauer's consent.  At the times Mr. O'Brien copied Proskauer's trade secrets to his personal USB drives or otherwise used or disclosed them, he knew or had reason to know that

knowledge of those trade secrets was derived from his or others' use of improper means to acquire those trade secrets; acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets or limit the use of the trade secrets; or derived from or through a person who owed a duty to Proskauer to maintain the secrecy of the trade secrets or limit the use of the trade secrets.

98.     Mr. O'Brien's actions have caused and will continue to cause damage to Proskauer and, unless restrained, will further damage Proskauer, the nature and extent of which may not be able to be proven with certainty, irreparably injuring Proskauer, leaving it without an adequate remedy at law.

99.     Proskauer is entitled to damages for actual losses caused by Mr. O'Brien's misappropriation of its trade secrets, and damages for any unjust enrichment caused by Mr. O'Brien's misappropriation that is not addressed in computing its actual losses.  In the alternative, Proskauer is entitled to a reasonable royalty for Mr. O'Brien's misappropriation of its trade secrets.

100.     Mr. O'Brien's misappropriation of Proskauer's trade secrets was willful and malicious, entitling Proskauer to attorney's fees and exemplary damages.

101.     Temporary, preliminary and permanent injunctive relief is necessary to prevent irreparable harm and further disclosure or use of Proskauer's trade secrets.

## COUNT II

### MISAPPROPRIATION OF TRADE SECRETS UNDER NEW YORK COMMON LAW

102.     Proskauer repeats, re-alleges, and incorporates by reference paragraphs 1 through 101 above as if set forth fully herein.

103.     As set forth above, Proskauer owns various trade secrets critical to the success of its business, including, without limitation, the information described in paragraphs [37-45, 52-59, and 68-72] above, which constitute "trade secrets" under New York law.

104.    Proskauer's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.  Proskauer's trade secrets give it a competitive advantage over other law firms who do not have access to that trade secret information.  Proskauer's trade secrets are valuable and crucial to its business functions and competitive position as a law firm.  The trade secrets Mr. O'Brien has misappropriated are of enormous potential value to a competing law firm or law firm consultant.  For example, they would allow Mr. O'Brien to replicate many of Proskauer's methods and practices for running the business of a large law firm.  As another example, they would give a competing law firm an unfair advantage in trying to lure Proskauer attorneys away from the Firm or target Firm clients. Disclosure or use of Proskauer's trade secret information to other law firms would risk destroying that competitive edge.  Proskauer has taken countless steps and made efforts that are reasonable under the circumstances to maintain the secrecy of its trade secrets by, among other things, designing and implementing the extensive information security measures described in paragraphs 77-89 above, and requiring adherence to and acknowledgement of policies (including its CCUDP Policy and Compliance Policy) as conditions of continued employment at the firm.

105.    By copying Proskauer's trade secrets to his personal USB drives and engaging in other misconduct, Mr. O'Brien has used Proskauer's trade secrets in breach of an agreement, confidence, or duty, or as a result of discovery by improper means, including theft, misrepresentation, and breaches and inducement of breaches of duties to maintain the secrecy of Proskauer's trade secret information.

106.    Mr. O'Brien's actions have caused and will continue to cause damage to Proskauer and, unless restrained, will further damage Proskauer, the nature and extent of which may not be

able to be proven with certainty, irreparably injuring Proskauer, leaving it without an adequate remedy at law.  Proskauer is therefore entitled to temporary, preliminary and permanent injunctive relief to prevent such irreparable harm.

107.    Proskauer is entitled to damages as a result of Mr. O'Brien's misappropriation to the extent its actual losses are calculable.

## COUNT III

## **BREACH OF FIDUCIARY DUTY**

108.    Proskauer repeats, re-alleges, and incorporates by reference paragraphs 1 through 107 above as if set forth fully herein.

109.    As a Proskauer officer and employee, Mr. O'Brien owed Proskauer an undivided duty of loyalty and was obligated to act with the utmost good faith and candor and in the best interests of Proskauer.

110.    Proskauer was entitled to place its trust and confidence in Mr. O'Brien and to expect Mr. O'Brien to act with the utmost good faith and candor toward it in carrying out his duties as COO.

111.    Proskauer relied on Mr. O'Brien's duties of loyalty, integrity, and faithful performance of his duties and responsibilities.

112.    Mr. O'Brien knowingly and willingly breached those fiduciary duties by misappropriating Proskauer's trade secrets for his own personal gain through improper means, including through the use of deception and by violating Firm policies.  In recruiting Proskauer's personnel to join his corrupt scheme, Mr. O'Brien breached his fiduciary duties to the Firm and caused his subordinates to breach their fiduciary duties as well.

113.    As a direct and proximate result of Mr. O'Brien's disloyalty and breach of his fiduciary duties, Proskauer has been and is being harmed.  Mr. O'Brien is still in possession of Proskauer's most valuable confidential business information and trade secrets and is able to access and use this information for his own personal gain and for the benefit of Proskauer's competitors. On information and belief, Mr. O'Brien has shared, or is planning to share, this confidential information with others who may use, or are using, the information to Proskauer's detriment.

114.    Mr. O'Brien's actions have caused and will continue to cause damage to Proskauer and, unless restrained, will further damage Proskauer, the nature and extent of which may not be able to be proven with certainty, irreparably injuring Proskauer, leaving it without an adequate remedy at law.

115.    Temporary, preliminary and permanent injunctive relief is necessary to prevent irreparable harm and further disclosure or use of Proskauer's most valuable confidential business information and trade secrets.

## COUNT IV

## **FAITHLESS SERVANT**

116.    Proskauer repeats, re-alleges, and incorporates by reference paragraphs 1 through 115 above as if set forth fully herein.

117.    As a Proskauer officer and employee, Mr. O'Brien owed Proskauer an undivided duty of loyalty and was obligated to act with the utmost good faith and in the best interests of Proskauer.

118.    Proskauer was entitled to place its trust and confidence in Mr. O'Brien and to expect Mr. O'Brien to act with the utmost good faith toward it in carrying out his duties as COO.

119.    Proskauer relied on Mr. O'Brien's duty of loyalty, integrity, and faithful performance of his duties and responsibilities.

120.    Since at least as early as November 14, 2022, Mr. O'Brien has been knowingly and willingly breaching that duty and persistently performing his duties faithlessly by orchestrating and carrying out a scheme to misappropriate Proskauer's most valuable confidential business information and trade secrets for his own personal gain in violation of Firm policies.

121.    As a direct and proximate result of Mr. O'Brien's disloyalty, faithlessness, and breach of his duties, Proskauer has been and is being harmed.  Mr. O'Brien is still in possession of Proskauer's most valuable confidential business information and trade secrets and is able to access and use this information for his own personal gain and for the benefit of Proskauer's competitors.  On information and belief, Mr. O'Brien has shared, or plans to share, this confidential information with others who may use, or are using, the information to Proskauer's detriment.

122.    Proskauer is entitled to disgorgement of Mr. O'Brien's salary, compensation, and company-paid benefits paid or earned during the period of Mr. O'Brien's faithless service.

## Count V

## CONVERSION

123.    Proskauer repeats, re-alleges, and incorporates by reference paragraphs 1 through 122 above as if set forth fully herein.

124.    Proskauer had legal ownership and a superior right of possession to each of the files in the Saved.PST file, Kingston USB thumb drive, and 2022 tax documents.zip file.

125.    Mr. O'Brien exercised unauthorized dominion over those files that rightfully belonged to Proskauer.

126.    Mr. O'Brien's unlawful possession of Proskauer's most valuable confidential business information and trade secrets was to the exclusion of Proskauer's rights and inconsistent with Proskauer's private possession.

127.    As a direct and proximate result of Mr. O'Brien's unauthorized actions, Proskauer has been and is being harmed.  Mr. O'Brien is still in possession of Proskauer's most valuable confidential business information and trade secrets and is able to access and use this information for his own personal gain and for the benefit of Proskauer's competitors.  On information and belief, Mr. O'Brien has shared, or plans to share, this confidential information with others who may use, or are using, the information to Proskauer's detriment.

128.    Proskauer is entitled to damages as a result of Mr. O'Brien's misappropriation to the extent its actual losses are calculable.

## PRAYER FOR RELIEF

Proskauer reserves the right to pursue any and all available remedies against Mr. O'Brien, including damages, punitive damages, exemplary damages, statutory damages, attorneys' fees, and any equitable remedies including an order of seizure, a temporary restraining order, a preliminary injunction, a permanent injunction, and other available remedies necessary to prevent propagation or dissemination of Proskauer's trade secrets.

**WHEREFORE**, Proskauer respectfully requests that the Court:

I.  Grant an *ex parte* temporary restraining order (i) temporarily restraining Mr. O'Brien, and anyone acting in concert or participation with Mr. O'Brien, from further misappropriation, dissemination, copying, and use of any of Proskauer's proprietary, confidential and/or trade secret information (including copies thereof) that he copied, printed or otherwise obtained from Proskauer's computer systems, including all copies

of Proskauer's electronic files and all paper copies in his possession (including the two USB drives to which Mr. O'Brien and/or subordinates copied Proskauer information on December 5, 2022 and December 16, 2022, and any electronic or paper copies of files on those drives); (ii) temporarily restraining Mr. O'Brien, and anyone acting in concert or participation with Mr. O'Brien, from continuing to possess and requiring the return to Proskauer, by no later than _____, 202_ ____ at ___ am/pm, any and all of Proskauer's proprietary, confidential and/or trade secret information (including copies thereof) that Mr. O'Brien and/or subordinates at his direction copied, printed or otherwise obtained from Proskauer's computer systems, including all copies of Proskauer's electronic files and all paper copies in his possession (including the two USB drives to which Mr. O'Brien and/or subordinates at his direction copied Proskauer information on December 5, 2022 and December 16, 2022, and any electronic or paper copies of files on those drives); (iii) temporarily restraining Mr. O'Brien, and anyone acting in concert or participation with Mr. O'Brien, from destroying, deleting, transferring, copying, or downloading of any of Proskauer's proprietary, confidential and/or trade secret information in his or their custody or control; (iv) requiring Mr. O'Brien, and anyone acting in concert or participation with Mr. O'Brien, to permit the permanent removal, deletion, and destruction of all copies of Proskauer's electronic files or information transmitted to Mr. O'Brien's computers or personal email accounts or otherwise in his possession, subject to the supervision of Proskauer, so as to preserve evidence of all such files or information; (v) temporarily restraining Mr. O'Brien, and anyone acting in concert or participation with Mr. O'Brien, from working or consulting for any person or business (a) to whom

he has disclosed or discussed any of the materials he copied from Proskauer's computer systems, or (b) with whom, on or after December 5, 2022 through the date of this order, he discussed any employment or consulting arrangement.

II.  Grant a preliminary injunction (i) ordering Mr. O'Brien, and anyone acting in concert or participation with Mr. O'Brien, to refrain from engaging in further acts of misappropriation of any of Proskauer's proprietary, confidential and/or trade secret information obtained from Proskauer's computer systems; (ii) ordering Mr. O'Brien, and anyone acting in concert or participation with Mr. O'Brien, to refrain from using, copying, reviewing or disclosing any of Proskauer's proprietary, confidential and/or trade secret information obtained from Proskauer's computer systems; (iii) ordering Mr. O'Brien, and anyone acting in concert or participation with Mr. O'Brien, to account for any and all of Proskauer's proprietary, confidential and/or trade secret information currently in his custody or control, or in the alternative, produce for immediate inspection and imaging all computers and/or other electronic devices belonging to, under the control of, accessible to, or operated by him, including his home computer(s) and/or other electronic devices capable of transmitting and/or storing information; (iv) ordering that Mr. O'Brien, and anyone acting in concert or participation with Mr. O'Brien, is temporarily restrained from working or consulting for any person or business (a) to whom he has disclosed or discussed any of the materials he copied from Proskauer's computer systems, or (b) with whom, on or after December 5, 2022 through the date of this order, he discussed any employment or consulting arrangement.

III. Enter a judgment that Mr. O'Brien has:

    a.  Violated the DTSA;

    b.  Misappropriated Proskauer's trade secrets;

    c.  Breached his fiduciary duties, including his duty of loyalty to Proskauer;

    d.  Persistently performed his duties faithlessly; and

    e.  Exercised unauthorized dominion over property that rightfully belonged to Proskauer.

IV. Enter a judgment that Mr. O'Brien's violations and breaches were willful and malicious;

V. Find that Mr. O'Brien can have no benefit as a result of his misappropriation and wrongful acts; and

VI. Award Proskauer:

    f.  Compensatory and other damages in amounts to be determined at trial;

    g.  Exemplary damages;

    h.  Disgorgement damages;

    i.  Attorneys' fees;

    j.  Costs of this litigation; and

    k.  Such other legal and equitable relief as this Court deems proper.

Dated:  New York, New York
        December 27, 2022

                         PROSKAUER ROSE LLP

                         /s/ Michael T. Mervis
                         Robert Cleary
                         Michael T. Mervis

Jacob R. Butwin
Eleven Times Square
New York, New York 10036-8299
212.969.3000
rjcleary@proskauer.com
mmervis@proskauer.com
jbutwin@proskauer.com

Timothy W. Mungovan (*pro hac vice*
forthcoming)
One International Place
Boston, Massachusetts 02110-2600
617.526.9600
tmungovan@proskauer.com

Kyle A. Casazza (*pro hac vice* forthcoming)
2029 Century Park East, Suite 2400
Los Angeles, California 90067-3010
310.557.2900
kcasazza@proskauer.com

*Attorneys for Plaintiff Proskauer Rose LLP.*