**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

PROSKAUER ROSE LLP,

                    Plaintiff,

    - against -

JONATHAN O'BRIEN,

                    Defendant.

---

Case No. _____

**PROSKAUER ROSE LLP'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR ORDER TO SHOW CAUSE FOR AN EX PARTE TEMPORARY RESTRAINING ORDER**

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF RELEVANT FACTS ................................................................................. 6

ARGUMENT ................................................................................................................................. 13

    A.    *Ex Parte* Injunctive Relief Is Needed to Ensure the Recovery of Proskauer's Trade Secrets and to Prevent Mr. O'Brien from Disseminating Them or Destroying Evidence. ............................................................................................... 13

        1.    Proskauer Is Likely To Succeed on the Merits ...................................... 15

        2.    Proskauer Will Suffer Irreparable Harm Without an Injunction .............. 20

        3.    The Balance of Hardships Weighs Heavily in Proskauer's Favor ........... 21

        4.    Injunctive Relief Serves the Public Interest ............................................ 23

    B.    Under the Circumstances, Service by Personal Email Is Appropriate ................. 23

    C.    The Court Should Not Require Proskauer to Post a Bond .................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*AFA Dispensing Grp. B.V. v. Anheuser-Busch, Inc.*,
    740 F. Supp. 2d 465 (S.D.N.Y. 2010) ........................................................14

*AUA Private Equity Partners, LLC v. Soto*,
    2018 WL 1684339 (S.D.N.Y. Apr. 5, 2018) ..............................................18

*Ayco Co., L.P. v. Feldman*,
    2010 WL 4286154 (N.D.N.Y. Oct. 22, 2010) ...........................................21

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
    784 F.3d 887 (2d Cir. 2015).......................................................................15

*Broker Genius, Inc. v. Zalta*,
    280 F. Supp. 3d 495 (S.D.N.Y. 2017).......................................................15

*Chadha v. Chadha*,
    2020 WL 1031385 (E.D.N.Y. Mar. 2, 2020) ............................................20

*Citizens Securities, Inc. v. Bender*,
    2019 WL 3494397 (N.D.N.Y. Aug. 1, 2019) ............................................22

*Clarkson Co., Ltd. v. Shaheen*,
    544 F.2d 624 (2d Cir. 1976).......................................................................25

*Credit Suisse Securities (USA) LLC v. Ebling*,
    2006 WL 3457693 (S.D.N.Y. Nov. 27, 2006) ..........................................21

*ExpertConnect, L.L.C. v. Fowler*,
    2019 WL 3004161 (S.D.N.Y. July 10, 2019) ......................................17, 20

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
    559 F.3d 110 (2d Cir. 2009).......................................................................19

*Golden Krust Patties, Inc. v. Bullock*,
    957 F. Supp. 2d 186 (E.D.N.Y 2013) ........................................................25

*Iacovacci v. Brevet Holdings, LLC*,
    437 F. Supp. 3d 367 (S.D.N.Y. 2020).......................................................19

*In re International Telemedia Assocs., Inc.*,
    245 B.R. 713 (Bankr. N.D. Ga. 2000) .......................................................24

*Informa Bus. Intelligence, Inc. v. Reich*,
    2022 N.Y. Misc. LEXIS 5645 (Sup. Ct. N.Y. Cty. Sept. 6, 2022) ............................................19

*Intertek Testing Servs., N.A., Inc. v. Pennisi*,
    443 F. Supp. 3d 303 (E.D.N.Y. 2020) .................................................................20, 23

*KCG Holdings, Inc. v. Khandekar*,
    2020 WL 1189302 (S.D.N.Y. Mar. 12, 2020) .......................................15, 18, 20, 21

*Lumenate Techs., LP v. Integrated Data Storage, LLC*,
    2013 WL 5974731 (N.D. Ill. Nov, 11, 2013) ............................................................19

*Mattel, Inc. v. Animefun Store*,
    2020 WL 2097624 (S.D.N.Y. May 1, 2020) ............................................................23

*Mazak Optonics Corp. v. Marlette*,
    2017 WL 3394727 (N.D. Ill. Aug. 8, 2017) ........................................................22, 23

*Mickey's Linen v. Fischer*,
    2017 WL 3970593 (N.D. Ill. Sept. 8, 2017) .............................................................22

*Mission Cap. Advisors LLC v. Romaka*,
    2016 WL 11517104 (S.D.N.Y. July 29, 2016) .........................................................21

*Philip Morris USA Inc. v. Veles Ltd.*,
    2007 U.S. Dist. LEXIS 19780 (S.D.N.Y. Mar. 13, 2007) ...................................23, 24

*Rio Prop., Inc. v. Rio Intern. Interlink*,
    284 F.3d 1007 (9th Cir. 2002) ...........................................................................23, 24

*Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*,
    No., 2021 WL 1553926 (S.D.N.Y. Apr. 20, 2021).....................................................20

*UAB, Inc. v. Ethos Auto Body LLC*,
    2021 N.Y. Misc. LEXIS 4960 (Sup. Ct. Westchester Cty. Mar. 9, 2021)..................19

*Zurich American Life Insurance Co. v. Nagel*,
    538 F. Supp. 3d 396 (S.D.N.Y. 2021)........................................................................19

**STATUTES**

18 U.S.C. § 1836(b)(1) ............................................................................................15

18 U.S.C. § 1839(3) ................................................................................................16

18 U.S.C. § 1839(5) ................................................................................................15

18 U.S.C. § 1839(5)(a)............................................................................................16

18 U.S.C. § 1839(6)(A)................................................................................................15, 18

**OTHER AUTHORITIES**

Fed. R. Civ. P. 4(f)(3) ................................................................................................23, 24

Fed. R. Civ. P. 65 .........................................................................................................1, 14

Fed. R. Civ. P. 65(b) .........................................................................................................14

Fed. R. Civ. P. 65(c) .........................................................................................................25

Plaintiff Proskauer Rose LLP ("Plaintiff" or "Proskauer") hereby submits this memorandum of law in support of its motion for a temporary restraining order ("TRO") under Rule 65 of the Federal Rules of Civil Procedure.  Because of the severe harm it would likely suffer if Defendant Jonathan O'Brien ("Mr. O'Brien") is given notice of this case or application, Proskauer seeks this relief *ex parte*.

## PRELIMINARY STATEMENT

This is an action for theft of Proskauer's trade secrets and other confidential and proprietary information.  Proskauer is an international law firm, comprised of approximately 800 attorneys (including 289 partners) and 650 non-lawyer employees.  Mr. O'Brien was, until recently, Proskauer's Chief Operating Officer.  In or about November of this year, Mr. O'Brien hatched a plot to steal the Firm's valuable confidential information.  In late December, he resigned from the Firm after having completed the theft.

Mr. O'Brien was a crafty plotter.  In November of this year, he created a shopping list of secret and sensitive information that he intended to steal, including, among other things: (i) proprietary operational reports, models, and analyses; (ii) software and programming tools the Firm had developed to create proprietary reports and data matrices; (iii) other proprietary know-how; (iv) each partner's practice information, including clients, financial performance, compensation, evaluations, and other highly confidential and competitively sensitive data; (v) the financial performance, profitability, and other key metrics of each department, practice group, and office; (vi) confidential strategies for lateral partner acquisitions; (vii) client metrics; (viii) critical, forward-looking strategic planning, including planning for 2023 and recession planning; and (ix) vast amounts of other valuable confidential information.

Mr. O'Brien knew this information would be highly useful to Proskauer's competitors, as it would enable them to effectively target and recruit Proskauer's partners, practice groups, and clients. The information would also enable Mr. O'Brien to hit the ground running on behalf of another firm, whether as an employee or a consultant. He would not have to expend time, effort, and resources creating effective analytical, modeling, and other systems and methods if he simply lifted them wholesale from Proskauer.

To bring his plot to fruition, Mr. O'Brien exploited his authority as Chief Operating Officer to override the Firm's controls. Proskauer's computer and information systems are programmed to prevent copying files and data onto removable storage media, like USB drives ("thumb drives," in common parlance). That key security measure is intended to prevent the theft of information concerning the Firm and its clients. Mr. O'Brien overrode that security measure, telling an information technology employee that Mr. O'Brien needed to copy files to a removable USB drive to provide information to an outside Firm consultant. Based on that explanation, Mr. O'Brien was granted an exception to this security measure. Mr. O'Brien had never before requested an exception to this security measure during the seven years it has been in place.

Mr. O'Brien's proffered reason for the exception was a lie. The outside consultant had in fact received all requested information via email. The consultant never requested, and never received, a thumb drive from Mr. O'Brien or anyone else at the Firm.

Having secured the ability to easily copy data on false pretenses, Mr. O'Brien proceeded to steal the Firm's proprietary and confidential information, copying large amounts to a USB drive on December 5, 2022. He did so again on Friday, December 16, 2022, after his annual bonus was deposited into his bank account earlier that same day.

In that December 16 theft, Mr. O'Brien directed the creation of a compressed ".zip" file, falsely labeled "2022 tax documents." Mr. O'Brien then orchestrated the copying of more than a thousand files into that .zip file, including some of the Firm's most confidential and sensitive information. All (or nearly all) of the copied material had nothing to do with taxes. After copying that .zip file to a second USB drive, he deleted every file on his personal network drive to try and cover up his theft.

Mr. O'Brien's plot also included an effort to delete massive amounts of his email. For several years, Mr. O'Brien had been subject to a litigation hold, meaning that his emails could not be deleted as they might be evidence in potential litigation. In December 2022, Mr. O'Brien overrode the Firm's controls to remove his litigation hold. Circumventing the Firm's General Counsel, who is responsible for instituting and removing litigation holds, Mr. O'Brien directed one of the Firm's e-Discovery consultants to lift his litigation hold. She complied. When a hold is lifted, all emails older than one year are instantaneously deleted.

Mr. O'Brien also manually deleted thousands of other emails. The result: Mr. O'Brien not only wrongfully spirited the Firm's proprietary information out of the Firm, he also deleted a large amount of other data by secretly lifting his litigation hold without proper authorization and then by manually purging more than 2,000 of his remaining emails.

On Tuesday, December 20, Mr. O'Brien gave notice that he would leave the Firm's employ, effective January 6, 2023, and he would be on vacation in Mauritius from December 22 through January 4. Mr. O'Brien's vacation schedule left essentially one day for transition. Asked whether he would permit a greater amount of time to aid in the transition, Mr. O'Brien responded that he was an employee at will and could leave whenever he wished, adding "I owe the Firm nothing." When questioned, Mr. O'Brien refused to tell the Firm where he would be working following his departure.

3

But he did confide in one of his direct reports, the Chief Professional Resources Officer, that when the Firm's management found out where Mr. O'Brien had landed, they would be very angry. It is a fair inference that Mr. O'Brien will join a competing law firm, or work as a consultant to law firms that compete with Proskauer. The huge, vital trove of proprietary information that Mr. O'Brien misappropriated would be highly useful to Proskauer's competitors, which would make Mr. O'Brien more valuable – whether as an employee or a consultant. Dissemination of that highly sensitive information would also be very damaging to Proskauer.

Proskauer first uncovered evidence of Mr. O'Brien's theft on the evening of December 20, 2022 and has worked expeditiously to determine the extent of the data theft and how Mr. O'Brien perpetrated his scheme.

\* \* \* \* \*

Mr. O'Brien enjoyed a position of unique power and authority—the power to (i) access the most confidential and personal information of the Firm; (ii) participate in and influence the most sensitive financial, compensation, strategic and other competitive planning of the Firm; (iii) establish (and override) critical systems; and (iv) otherwise sit at the center of trust in a firm with tens of thousands of clients, thousands of employees and hundreds of partners. He did so not just in any business entity, but in a law firm – where there is the most solemn obligation to preserve confidences and to safeguard the secrecy of all protected information.

There is no benign explanation for Mr. O'Brien's conduct, and no legitimate purpose for which he could use the materials he stole. That is why the Firm's policies (which Mr. O'Brien was in charge of administering) strictly prohibit his conduct. That is why the Firm's systems are set up to prevent it. And that is why he needed to override those systems by abusing his authority and taking advantage of his subordinates' trust.

The information stolen by Mr. O'Brien reflects some of the most sensitive personal, professional, confidential, and proprietary information of the Firm.  While industry surveys report the gross revenues, expenses, profits and profits per partner of competitive law firms, they do not reflect any of the past or future strategies of the firms, their individual partner compensation, or any of the client information underlying those gross revenues because no law firm would allow such information to be disclosed.

With rare exceptions, Proskauer partners do not have access to all the information Mr. O'Brien stole, including the proprietary systems and methods by which it was calculated, preserved, and administered, some of which was developed over years and at great expense and all at the center of the Firm's ability to operate and preserve its ecosystem of culture, internal trust, and external obligation of confidence to its clients.

The legal industry is in an era of intense competition for partner talent and clients.  The methods by which partners are compensated and the processes for doing so are highly confidential and would be of great value to a competitor.  They also are deeply personal and the threat to disclose such information could be used to pressure, intimidate, and extort partners and the Firm.

Proskauer's financial systems record detailed financial information about individual clients. That information is at the essence of the Firm's duty to preserve and protect client confidences. There is almost no limit to how such data could be abused.  Indeed, Mr. O'Brien's conduct was so brazen and malicious that it rises to a criminal law violation.

Proskauer is nearing its 150th anniversary as law firm.  The Firm is unaware of any employee (much less an officer) ever acting in such a corrupt, debased, and illegal manner.  Mr. O'Brien's wrongful scheme must be stopped and remedied with great dispatch to forestall the harm he has caused and intends to continue to cause.

## STATEMENT OF RELEVANT FACTS

The Complaint and Declarations submitted with this brief (particularly those of Ms. Grossman and Mr. Hsu) discuss in depth the full extent of Mr. O'Brien's wrongdoing.  Below Proskauer summarizes the more salient aspects.

Proskauer, a law firm, is led by the Firm's Chair, who works closely with the Firm's Managing Partner and its Executive Committee ("Executive Committee" or "EC").  The Executive Committee is responsible for a number of critical matters, including allocations of Firm profits among the partners, promotions and partner elections, and strategic planning.  Meetings of the Executive Committee are held regularly, and are typically limited to the members of the Executive Committee, the Chair, the Managing Partner, the General Counsel, and since 2017, Mr. O'Brien, in his capacity as Proskauer's COO.  (Grossman Decl. ¶ 3.)

As COO, Mr. O'Brien was responsible for all of the Firm's business support activities, including finance and financial strategy, accounting, taxes, benefit plans, professional resources, business development, real estate, operations, and information services.  He reported directly to the Firm's Chair and served on many of its most important committees.  (Grossman Decl. ¶ 5.)  Mr. O'Brien was involved in nearly every meaningful strategic decision, and enjoyed unfettered access to Proskauer's systems, records and resources—subject to Firm policies.  (Grossman Decl. ¶ 6.) Like all Proskauer personnel, Mr. O'Brien was required to comply with and expressly acknowledge various Firm policies including those that protect access to and use of the Firm's confidential and proprietary financial, performance, and strategic information.  (Grossman Decl. ¶ 12; Hsu Decl. ¶¶ 14-16.)

Nevertheless, by November 14, 2022, Mr. O'Brien had prepared a list of materials he planned to steal from Proskauer:

- o      All FP&A reports
- o      Firm financials
- o      Department financials
- o      Practice financials
- o      Office financials
- o      Full black book disclosure
- Policies
- Finance Portal Docs
- Business of Law
- Cash Flow
- Expense Report – full GL
- PPP Forecast
- Billing Rates
- Black Book Binder (already printed)
- CCM reports
- Lateral Partner P&L
- Lateral Partner Template
- Client Ops – SPD, Countdown, Collections projs, B&C shortfall by day
- Pricing AFA guide

As another example, the "Black Book Binder" is a detailed set of highly-confidential and proprietary records relating to Proskauer partner compensation and allocation of the Firm's profits. The binder details, among other things, a three-year report of a variety of financial, productivity, and

other performance metrics on a partner-by-partner basis.  Most partners do not have access to many aspects of this reporting, which is shared in its entirety only with the EC.  The "Black Book" information is among the most protected, confidential information the Firm keeps.  (Grossman Decl. ¶ 16.)

After identifying a list of materials he wanted to steal from Proskauer, on November 29, 2022, Mr. O'Brien orchestrated the copying more than 30 gigabytes of emails, attachments, and other data from his Proskauer mailbox to a new "PST" file, "Saved.PST."  (Hsu Decl. ¶ 24.)  Mr. O'Brien, working with Proskauer employees who were his subordinates (including one information technology specialist), was compiling and pre-positioning this data to facilitate his theft in the coming weeks.  (Hsu Decl. ¶¶ 22-32.)

To protect against theft of Proskauer's proprietary information, Proskauer implements technical controls on Firm computers that prevent users from copying files from their computers to removable media, such as USB drives.  (Hsu Decl. ¶ 18.)  Mr. O'Brien knew about these restrictions, which presented an obstacle to his plan to steal Proskauer's data.  On December 5, 2022, Mr. O'Brien called the Firm's Director of Technology Support to request a specific exception to the prohibition on copying to a USB drive.  (Polakoff Decl. ¶ 4.)

Mr. O'Brien lied about the reason he needed this permission, and claimed that he needed to transfer the materials to a consultant.  (Polakoff Decl. ¶ 5.)  While he and the Firm were working with consultants at this time, Proskauer's consultants never asked Mr. O'Brien to send them Firm information on a thumb drive or any portable storage device, nor have they ever received a thumb drive or any portable storage device from Mr. O'Brien.  (Grossman Decl. ¶ 21.)  Every piece of data Mr. O'Brien or anyone else at Proskauer sent to the consultants, in the actual course of the consultants' work for Proskauer, was sent through email.  (Grossman Decl. ¶ 21.)

Because the request came from the Firm's COO, and because Mr. O'Brien's reports in the Technology Support Team had no reason to question O'Brien's proffered reason for needing the exception, it was promptly approved.  (Polakoff Decl. ¶ 8.)  He promptly copied his recently created PST file to the USB drive.  (Hsu Decl. ¶ 25.)

A few hours later, with the help of one or more subordinates, Mr. O'Brien directed the copying of a trove of additional materials.  (Hsu Decl. ¶¶ 27-29.)  These carefully curated materials would have taken hours of time to collect and organize, and contain the Firm's "crown jewels." (Grossman Decl. ¶¶ 23-24.)  They include the Firm's confidential, valuable, and proprietary financial analyses.  (Grossman Decl. ¶ 24.)  These materials also contain many of the systems and frameworks needed to successfully run a large law firm, and a number of proprietary methodologies the Firm developed to maintain its position in a highly competitive market for legal services.  (Grossman Decl. ¶¶ 25-28.)  For example, the "CCM" folder includes the Firm's own recently developed proprietary methodology for evaluating profitability, including by office, department, and practice group.  The documents in that folder include templates, partner training and presentation materials, presentations to the EC relating the Firm's methodology, profitability benchmarks, and documents detailing certain of the Firm's actual profit margins for 2022.  It includes material reflecting each of Proskauer's clients that generated over $50,000 in revenue (and associated margins) which is, in effect, the Firm's client list and constitutes competitively sensitive information.  The "Comp Models" folder includes the Firm's own compensation models that account for, among other things, the effects of bonuses and other variables on the Firm's financials.  "Budget," "Cash Flow," and "Recession Deck" contain detailed information about the Firm's assumptions, expenses, financial projections, and plans for changes in economic conditions, including strategic and contingency planning for a potential economic recession in 2023.  (Grossman Decl. ¶ 25.)

A reflection of the value of this confidential information, and the steps the Firm takes to protect it, appears in one of the many documents in the "Policies" folder that Mr. O'Brien stole. (Grossman Decl. ¶ 29.)  Proskauer's "Internal Financial Data Disclosure Policy," which is itself "proprietary information of Proskauer Rose LLP," begins by noting the following:

> Finance teams are routinely requested to deliver internal financial information to partners, other lawyers, and administrators of the Firm. Due to the highly sensitive nature of this information, strict protocols regarding access rights are necessary.  This is to not only protect the privacy of the Firm, to safeguard its financial data, but to protect the privacy and confidentiality of individuals and various associations within the Firm (e.g. individual partners, departments, practices, etc.).

(Grossman Decl. ¶ 29.)

Having misappropriated thousands of valuable Firm files, Mr. O'Brien orchestrated an effort to cover his tracks.  His Outlook mailbox was subject to a litigation hold, which prevented Mr. O'Brien from successfully deleting any emails or other information from his Proskauer mailbox. (Hsu Decl. ¶¶ 20-21, 26.)  On December 5, 2022, less than an hour after he copied the PST file to a thumb drive, Mr. O'Brien e-mailed a senior eDiscovery consultant who ultimately reports to him, and asked her to release him from the litigation hold, bypassing the General Counsel's office (which is responsible for implementing and dissolving litigation holds).  (Grossman Decl. ¶ 26.)

The next morning, Mr. O'Brien's litigation hold was lifted.  (Hsu Decl. ¶ 26.)  Everything over a year old in Mr. O'Brien's Outlook mailbox—approximately 66 gigabytes of emails and attachments—was instantly deleted from that mailbox.  (Hsu Decl. ¶ 26.)  After the litigation hold was lifted, Mr. O'Brien also manually deleted more than 2,000 emails from his Outlook mailbox. (Hsu Decl. ¶ 26.)

**More Theft and More Lies**

Operating under the false sense of security that both his misappropriation to date and future actions would now go undetected, Mr. O'Brien ramped up his theft before leaving Proskauer.  On December 7, 2022, he learned he would be receiving a year-end bonus.  (Grossman Decl. ¶ 8.)  But, as COO, he knew that, as for all other employees, cash would not be in his bank account until December 16.  (Grossman Decl. ¶ 8.)  So he waited until then to make his next move.

On December 16, shortly after his year-end bonus hit his account, Mr. O'Brien and one of his subordinates created a compressed ".zip" containing 1,138 files, totaling 1.45 gigabytes of Proskauer's proprietary data.  (Hsu Decl. ¶ 29.)  The .zip file appears to have contained all of the materials in the thirty-one folders Mr. O'Brien copied on December 5, plus eight additional top-level folders: Business of law, Charitable, Compass, Expenses, Forecast, Surveys, Timetables.Notes, and Year End.

Presumably to evade suspicion, Mr. O'Brien (working in concert with another subordinate) falsely named this file "2022 tax documents.zip."  This file had nothing to do with Proskauer's, or anyone else's, 2022 taxes.   Instead, it was a voluminous compilation of Proskauer's highly confidential operational and business strategy materials and trade secrets.  (Grossman Decl. ¶¶ 32-34.)  It appears Mr. O'Brien directed the creation of this second file primarily to steal the 833 documents in the "Compass" folder, which reveal how Proskauer performs its financial planning and analysis, including hundreds of files containing proprietary code and reusable scripts that the Firm itself had created to make its financial reporting more effective, efficient and useful, and would permit Mr. O'Brien to use Proskauer's proprietary methodology for the benefit of a competitor. (Grossman Decl. ¶ 35.)  Other notable documents in these additional folders include "how to" information that the Firm's finance team uses to successfully close out the Firm's fiscal year and various templates for tracking a host of partner-specific metrics.  In addition, at least one of the

folders, titled "Dashboards," contained several new files that, like the files in the "Compass" folder, are reusable with modifications.  The Firm developed these files using considerable skill, time and effort, and copying them would save considerable time compared to creating new ones from scratch.  (Grossman Decl. ¶¶ 35-37; Hsu Decl. ¶ 30.)

Later on December 16, Mr. O'Brien again contacted the Firm's Director of Technology Support to request permission to copy files to a USB drive, and again lied about needing to provide the materials to a consultant.  (Polakoff Decl. ¶ 10.)  Mr. O'Brien promptly copied the materials to a second USB drive.  (Hsu Decl. ¶ 29.)  Minutes later, Mr. O'Brien manually deleted the entirety of his H drive—a network drive that is personal to each user—including all 1,138 of the files he had copied to the USB drive, and 1,773 other files.  (Hsu Decl. ¶ 32.)  He then immediately emptied his "recycling bin," where all of those deleted files otherwise would have been stored.  (Grossman Decl. ¶ 29.)

On the morning of December 20, Mr. O'Brien told the Firm's Chair and Managing Partner that he would be leaving the Firm effective January 6, 2023.  (Grossman Decl. ¶ 9.)  He told the Firm's Managing Partner that he would be leaving the country the very next evening (December 21, 2022) to take paid vacation in Mauritius until the evening of January 4, 2023, completing his employment at Proskauer immediately upon his return.  (Grossman Decl. ¶ 9.)  Despite having been asked by the Firm's Managing Partner, Mr. O'Brien refused to tell Proskauer where he plans on working next.  (Grossman Decl.¶ 9.)  But the next day, on December 21, Mr. O'Brien told one of his reports that the Firm would be "mad" about where he would be working next, and that O'Brien did not know whether he would ever return to the office.  (Gardephe Decl. ¶ 5.)

Proskauer understands Mr. O'Brien is currently in Mauritius and accessing his email. (Grossman Decl. ¶ 9; Hsu Decl. ¶ 33.)

# ARGUMENT

**A.**   ***Ex Parte* Injunctive Relief Is Needed to Ensure the Recovery of Proskauer's Trade Secrets and to Prevent Mr. O'Brien from Disseminating Them or Destroying Evidence.**

As evidenced by his conduct to date, it would take little effort for Mr. O'Brien to make more copies of the stolen data or to take steps to cover his tracks.  Thus, in order to prevent Mr. O'Brien from further propagating or disseminating Proskauer's proprietary, confidential and/or trade secret information in his custody or control, *ex parte* injunctive relief should issue restraining Mr. O'Brien, and anyone in concert or participation with Mr. O'Brien, (1) from further misappropriation, dissemination, copying, and use of any of Proskauer's proprietary, confidential and/or trade secret information (including copies thereof) that he copied, printed or otherwise obtained from Proskauer's computer systems, including all copies of Proskauer's electronic files and all paper copies in his possession (including the two USB drives to which Mr. O'Brien and/or subordinates copied Proskauer information on December 5, 2022 and December 16, 2022, and any electronic or paper copies of files on those drives); (2) from continuing to possess any and all of Proskauer's proprietary, confidential and/or trade secret information (including copies thereof) that Mr. O'Brien and/or subordinates at his direction copied, printed or otherwise obtained from Proskauer's computer systems, including all copies of Proskauer's electronic files and all paper copies in his possession (including the two USB drives to which Mr. O'Brien and/or subordinates at his direction copied Proskauer information on December 5, 2022 and December 16, 2022, and any electronic or paper copies of files on those drives), and requiring the information to be returned by a date and time to be set by the court; (3) from destroying, deleting, transferring, copying, or downloading of any of Proskauer's proprietary, confidential and/or trade secret information in his or their custody or control; (4) permitting the permanent removal, deletion, and destruction of all copies of Proskauer's electronic files or information transmitted to Mr. O'Brien's computers or personal email accounts

or otherwise in his possession, subject to the supervision of Proskauer, so as to preserve evidence of all such files or information; and (5) from working or consulting for any person or business (a) to whom he has disclosed or discussed any of the materials he copied from Proskauer's computer systems, or (b) with whom, on or after December 5, 2022 through the date of this order, he discussed any employment or consulting arrangement.

Federal Rule of Civil Procedure 65 permits a court to issue a temporary restraining order ("TRO") without written or oral notice to the adverse party.  Fed. R. Civ. P. 65(b).  *Ex parte* relief is appropriate here in order to avoid further dissemination and propagation of Proskauer's trade secrets and to prevent Mr. O'Brien from destroying evidence of his wrongdoing.  Mr. O'Brien's own conduct to date demonstrates why *ex parte* relief is necessary: The day after telling the Firm he was leaving, Mr. O'Brien left for Mauritius, an island nation more than 9,000 miles from Proskauer's New York headquarters that is a not a party to the Hague Service Convention.  (Grossman Decl. ¶ 9.)  Although Mr. O'Brien told Proskauer that he plans on returning to the United States on January 4, 2023, this lawsuit could change his behavior.  (Grossman Decl. ¶ 9.)  If Mr. O'Brien is given notice that Proskauer has discovered his misconduct, he will have the opportunity and incentive to copy or disseminate the trade secrets and destroy any evidence of what he has already done with them.  With current technology, he could further copy, transfer, and disseminate the trade secrets within a matter of minutes, without risk of violating any court orders.

"[T]he standard for an entry of a temporary restraining order is the same as for a preliminary injunction."  *AFA Dispensing Grp. B.V. v. Anheuser-Busch, Inc.*, 740 F. Supp. 2d 465, 471 (S.D.N.Y. 2010).  In order to obtain injunctive relief, the movant must show (1) a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable

14

injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction.  *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (citation omitted).  Proskauer meets each of these requisite elements.

### 1.    Proskauer Is Likely To Succeed on the Merits

To establish a likelihood of success on the merits, a plaintiff "need not show that success is an absolute certainty.  He need only make a showing that the probability of his prevailing is better than fifty percent."  *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 510 (S.D.N.Y. 2017) (quoting *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)).  Because there should be no dispute that Mr. O'Brien stole trade secret and other confidential and highly proprietary information, repeatedly lying to do so, and violated his fiduciary duties and multiple firm policies, Proskauer easily satisfies the "likelihood of success" standard.

*Count I: Violation of the Defend Trade Secrets Act ("DTSA").*  The DTSA creates a private cause of action in favor of the owner of a trade secret that is misappropriated "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).  Under the DTSA, "misappropriation" includes "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent" in specified circumstances.  18 U.S.C. § 1839(5).  The phrase "improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means[.]"  18 U.S.C. § 1839(6)(A); *KCG Holdings, Inc. v. Khandekar*, 2020 WL 1189302, at *10 (S.D.N.Y. Mar. 12, 2020).

### i.    *The copied Proskauer files are trade secrets.*

Under the DTSA, a trade secret includes:

all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if –

(A) The owner thereof has taken reasonable measures to keep such information secret; and

(B) The information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3).

The information in the files Mr. O'Brien stole plainly meets this statutory definition, which is why he stole the materials in the first place.

Mr. O'Brien stole substantially all the Firm's internal financial reporting materials, including reports showing its client lists and its profit margin for each client; strategic planning documents, including its proprietary methodologies for evaluating profitability; computer scripts necessary to generate financial reporting, which are the product of years of work by numerous Proskauer employees. Proskauer takes pains to maintain the secrecy of this financial and strategic information, including limiting access to electronic versions of these documents to only a small number of authorized personnel. (Hsu Decl. ¶¶ 11-13.) Access to these materials would provide Proskauer's competitors with a blueprint for how to successfully compete with Proskauer in the highly competitive market for legal services.

ii.   *Mr. O'Brien misappropriated Proskauer's trade secrets.*

There is no dispute that Mr. O'Brien knowingly acquired Proskauer's trade secrets by improper means, which is one kind of "misappropriation" under the DTSA. 18 U.S.C. § 1839(5)(a). The term "improper means" includes not only "theft" and "misrepresentation," both of which were done by Mr. O'Brien, but also "breach or inducement of a breach or duty to maintain secrecy." *Id.*

Mr. O'Brien had acknowledged and participated in revising and implementing policies that created a duty to maintain secrecy.  (Hsu Decl. ¶ 15.)  Proskauer's "Computer and Communications Use and Data Protection Policy" ("CCUDP Policy"), which governs employee use of the Firm's systems and devices, provides that the Firm's Confidential Information—which is defined to include information related to the "internal business of the firm," such as "firm trade secrets, methodologies, business strategies, business plans, information about clients, and other competitor-sensitive information"—should "not be accessed in the absence of a legitimate business need or firm objective."  (Hsu Decl. ¶ 16.)  It also provides that Confidential Information (i) should not be disclosed to third parties, (ii) "should be kept within the Firm's secured Technology Resources, or its secured office premises, or its authorized offsite storage facilities," and (iii) "should not be transmitted via the Internet or wireless network" or "stored on a mobile device or removable media without encrypting Highly Sensitive Information using firm-approved encryption software and protocols."  (Hsu Decl. ¶ 16.)  Proskauer's Compliance Policy similarly provides that all client information, "whatever its source," should not be disclosed to any person other than persons engaged in the representation of Firm clients, and reminds personnel that the duty to preserve confidentiality "continues after a lawyer or employee is no longer associated with the Firm."  (Grossman Decl. ¶ 12).

As the Firm's COO, Mr. O'Brien was also under a fiduciary duty to not misuse the Firm's confidential information.  *See* Count III: Breach of Fiduciary Duty, *infra*; *ExpertConnect, L.L.C. v. Fowler*, 2019 WL 3004161, at *7 (S.D.N.Y. July 10, 2019) ("[T]he duty of loyalty arises from an ongoing employer-employee relationship.").

Mr. O'Brien not only violated those policies and his fiduciary duties, but he also lied to subordinate employees in order to do so.  Mr. O'Brien twice told a subordinate that his "business

reason" to copy Proskauer files to a USB drive was to send them to a Firm consultant.  (Polakoff Decl. ¶¶ 5, 10.)  That was a lie: the consultant never requested nor received files on removable media. (Grossman Decl. ¶ 21.)  Mr. O'Brien also employed misrepresentations to cover up his misconduct by lying to an eDiscovery consultant to remove his litigation hold, after which thousands of his emails were both automatically and manually deleted.  (Hsu Decl. ¶ 26.)  In recruiting Proskauer's personnel to join his corrupt scheme, Mr. O'Brien breached his fiduciary duties to the Firm and caused his subordinates to breach their fiduciary duties as well.  (*Id.* ¶ 29.)

Were that not enough, on December 16, 2022, the day his bonus hit his bank account, Mr. O'Brien deleted the entirety of his network drive, presumably to try and erase any record of his copying files from that drive to his USB drives.  (Hsu Decl. ¶ 32.)  Unfortunately for Mr. O'Brien, those efforts did not work.

By duplicitously copying Firm files to removable media for his personal use, Mr. O'Brien "breach[ed] . . . a duty to maintain secrecy[.]" 18 U.S.C. § 1839(6)(A); *KCG Holdings*, *Inc.*, 2020 WL 1189302, at *10 (defendant used improper means to acquire and use trade secrets when, in violation of his employer policy, he copied, reviewed, and organized files into his personal directory); *AUA Private Equity Partners, LLC v. Soto*, 2018 WL 1684339, at *7 (S.D.N.Y. Apr. 5, 2018) (misappropriation by acquisition plausibly alleged with claims that defendant "uploaded [plaintiff's] trade secrets from her work laptop to her personal cloud-based storage without [plaintiff's] permission and in direct violation of the confidentiality agreements that she signed").

Further, Mr. O'Brien downloaded many of the confidential files mere weeks before resigning, and the remainder of the confidential files within days of giving notice.  Courts consider this suspicious downloading of company information in determining whether the defendant misappropriated trade secrets.  *E.g., Lumenate Techs., LP v. Integrated Data Storage, LLC*, 2013

WL 5974731, at *5 (N.D. Ill. Nov, 11, 2013) (citations omitted) (determining that defendant had misappropriated his employer's trade secrets based in part on evidence that the defendant downloaded data two days before resigning and then deleted the information).

*Count II: Misappropriation of Trade Secrets under New York Common Law.* Proskauer's claim for misappropriation of trade secrets under New York law also is strong.  Because "[t]he elements for a misappropriation claim under New York law are fundamentally the same" as a DTSA claim, "courts have found that a '[c]omplaint sufficiently plead[ing] a DTSA claim ... also states a claim for misappropriation of trade secrets under New York law.'"  *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (quoting *ExpertConnect, LLC*, 2019 WL 3004161, at *7).

To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate that: (1) it possessed a trade secret, and (2) the defendant used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means.  *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009) (applying New York law).  As explained above, both prongs are clearly met.

*Count III: Breach of Fiduciary Duty.*  To establish a claim for breach of fiduciary duty, a plaintiff must show (1) the existence of a fiduciary relationship, (2) misconduct by the other party, and (3) damages directly caused by that party's misconduct.  *Informa Bus. Intelligence, Inc. v. Reich*, 2022 N.Y. Misc. LEXIS 5645, at *9 (Sup. Ct. N.Y. Cty. Sept. 6, 2022).  Under New York law, "the employer-employee relationship is fiduciary," and Mr. O'Brien therefore owes fiduciary duties to Proskauer.  *UAB, Inc. v. Ethos Auto Body LLC*, 2021 N.Y. Misc. LEXIS 4960, at *33 (Sup. Ct. Westchester Cty. Mar. 9, 2021); *Zurich American Life Insurance Co. v. Nagel*, 538 F. Supp. 3d 396, 403 (S.D.N.Y. 2021) ("Under New York law, employees owe fiduciary duties to their employers,

independent of any contractual duties, and some such duties survive termination."). And Mr. O'Brien has plainly engaged in misconduct—large-scale misappropriation of Proskauer's trade secret and confidential information, which were obtained through deception and violations of Firm policies (Hsu Decl. ¶ 25); (Grossman Decl. ¶¶ 12, 19, 21, 29-31)—that threatens to cause severe financial harm to Proskauer, thereby breaching his fiduciary duties. *ExpertConnect*, 2019 WL 3004161, at *7 ("As Defendants were still at ExpertConnect when they are alleged to have misappropriated confidential information, the Complaint sufficiently pleads a breach of the duty of loyalty claim."). Mr. O'Brien also corrupted other senior employees of Proskauer, and induced them to breach their fiduciary duties to the Firm by participating in the scheme to steal Proskauer's trade secrets and cover up their conduct.

2.    Proskauer Will Suffer Irreparable Harm Without an Injunction

Absent injunctive relief, Proskauer will continue to suffer immediate and irreparable injury. "Irreparable harm is defined as certain and imminent harm for which a monetary award does not adequately compensate." *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 328-29 (E.D.N.Y. 2020) (noting irreparable harm occurs "where the loss is difficult to replace or measure, or where plaintiffs should not be expected to suffer the loss."). Proskauer will suffer irreparable harm absent an injunction because Mr. O'Brien "does not merely seek to use its trade secrets or keep them to himself . . . [instead], he could disseminate the trade secrets he improperly acquired to a wider audience—namely, his" new employer. *KCG Holdings, Inc.*, 2020 WL 1189302, at *17; *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, 2021 WL 1553926, at *13 (S.D.N.Y. Apr. 20, 2021) ("TriZetto has demonstrated irreparable harm . . ., specifically the likelihood that, if not enjoined, Syntel will disseminate or impair the trade secrets by sharing them with unauthorized third parties."); *Chadha v. Chadha*, 2020 WL 1031385, at *15 (E.D.N.Y. Mar. 2,

2020) (finding irreparable harm where a plaintiff has no control over the use and dissemination of the stolen information).

Although Proskauer does not know the identity of Mr. O'Brien's next employer, he told one of this direct reports that he expects Proskauer management will be unhappy about who his next employer will be.  (Gardephe Decl. ¶ 5.)  Once there, Mr. O'Brien will be able to use "the knowledge he gleaned from his improper acquisition . . . to develop" systems and software at his new firm that are "predicated on [Proskauer's] trade secrets."  *KCG Holdings, Inc.*, 2020 WL 1189302 at *17. There is no other plausible, *legitimate*, use for the information that Mr. O'Brien stole.  Accordingly, the threat that Mr. O'Brien would disseminate Proskauer's trade secrets if he were permitted to retain copies of the stolen files, to disseminate the files, or to work or consult with a party with whom he has discussed the files causes irreparable harm because it would impair Proskauer's competitive advantage and "impair [the] value" of its trade secrets.  *KCG Holdings, Inc.*, 2020 WL 1189032, at *17; *Credit Suisse Securities (USA) LLC v. Ebling,*, 2006 WL 3457693, at *1 (S.D.N.Y. Nov. 27, 2006) (TRO was granted compelling defendant and all those acting in concert with him to return immediately all confidential information and trade secrets that defendant unlawfully took from his employer); *Ayco Co., L.P. v. Feldman*, 2010 WL 4286154, at *1 (N.D.N.Y. Oct. 22, 2010) (TRO "requiring the immediate return of any [confidential information and trade secrets] in Defendant's possession").

### 3.   The Balance of Hardships Weighs Heavily in Proskauer's Favor

The harm to Proskauer of denying its request for injunctive relief firmly outweighs the harm to any legitimate interests of Mr. O'Brien and the harm to any third parties who may be affected by the relief.  *See Mission Cap. Advisors LLC v. Romaka*, 2016 WL 11517104, at *2 (S.D.N.Y. July 29, 2016) ("Plaintiff avers that dissemination of the [trade secrets] would cause irreparable harm to

Plaintiff, its business activities, and its market share, which could cause loss of revenue and competitive advantage.  Defendant has no legitimate interest in Plaintiff's Contact Lists.").

Mr. O'Brien has no *legitimate* interests that would be harmed by entry of the requested injunction.  Conversely, Proskauer continues to face significant irreparable harm if Mr. O'Brien is not enjoined from using or disseminating its information.  Furthermore, Mr. O'Brien chose to work for Proskauer and acknowledged the policies limiting his ability to use Proskauer's confidential trade secret information.  *See Mickey's Linen v. Fischer*, 2017 WL 3970593, at *19 (N.D. Ill. Sept. 8, 2017) (holding that balance of harms weighed in favor of former employer and granting preliminary injunction to former employer in trade secrets case); *Mazak Optonics Corp. v. Marlette*, 2017 WL 3394727, at *3 (N.D. Ill. Aug. 8, 2017) (same).

The relief Proskauer seeks imposes minimal burdens on Mr. O'Brien, simply requiring him to turn over copies of materials that he has no legitimate right to possess, to refrain from further disseminating the misappropriated information, and to not destroy evidence of his misconduct.  *See Citizens Securities, Inc. v. Bender*, 2019 WL 3494397, at *5 (N.D.N.Y. Aug. 1, 2019) ("Plaintiff will continue to suffer substantial harm absent an injunction through Defendant's use of proprietary information to . . . Defendant, however, will only suffer minimal harm if an injunction is granted."). Further, Proskauer's request to bar his working or consulting with any person or business to whom he has disclosed or discussed Proskauer's trade secrets or with whom, on or after December 5, 2022 through the date of the Court's order, he discussed any employment or consulting arrangement will pose no real hardship because he is in Mauritius through January 4 and planned his last day of employment to be January 6.  (Grossman Decl. ¶ 9.)  Any arguable burden (and there is none) pales in comparison to the severe risk of competitive harm Proskauer faces if its trade secrets and confidential information are widely shared.

4.      Injunctive Relief Serves the Public Interest

The public interest supports the entry of injunctive relief in favor of Proskauer.  "Injunctive relief would serve the public interest by . . . protecting plaintiff's legitimate interests in maintaining . . . the secrecy of its trade secrets and confidential information."  *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 347 (E.D.N.Y. 2020); *see also Mazak Optonics Corp.*, 2017 WL 3394727, at *3 (The "public interest is supported by upholding the sanctity of confidential information such as trade secrets and preventing others from the unauthorized use of such confidential information for their own benefit.").

**B.      Under the Circumstances, Service by Personal Email Is Appropriate.**

Mr. O'Brien told Proskauer that he left the country the day after his resignation, shortly before Proskauer discovered his theft of Proskauer proprietary materials.  (Grossman Decl. ¶ 9.) He is currently in Mauritius and will not be returning to the United States until the evening of January 4, 2023.  (Grossman Decl. ¶ 9.)  Federal Rule of Civil Procedure 4(f)(3) authorizes service by email at the Court's discretion when a defendant is located outside the United States.  Service by email of Mr. O'Brien is equitable and appropriate under the present circumstances.

Alternative means of service pursuant to Fed. R. Civ. P. 4(f)(3) is permissible as long as it "(1) is not prohibited by international agreement; and (2) comports with constitutional notions of due process."  *Mattel, Inc. v. Animefun Store*, 2020 WL 2097624, at *5 (S.D.N.Y. May 1, 2020) (citation and internal quotation marks omitted).  Due process requires the alternative method of service authorized by the Court to be "reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *See Philip Morris USA Inc. v. Veles Ltd.*, 2007 U.S. Dist. LEXIS 19780, at *5-8 (S.D.N.Y. Mar. 13, 2007) (internal quotations omitted).  Alternative service under Rule 4(f)(3) need not be the "last resort nor extraordinary relief."  *Rio Prop., Inc. v. Rio Intern. Interlink*, 284 F.3d

1007, 1015 (9th Cir. 2002).  Instead, it is one means among several which enables service of process on a defendant located outside of the United States.  *Id.*

There are no international agreements between the United States and Mauritius that preclude service by email.  *See Mauritius Judicial Assistance Information (state.gov)*.  And, service by email is reasonably calculated to provide prompt, actual notice to Mr. O'Brien of Proskauer's claims.  *See Rio Props.*, 284 F.3d at 1017 (finding email service pursuant to Rule 4(f)(3) permissible and meeting due process standard where defendant indicated preference for email communication and where email was determined to be method most likely to reach defendant).  While ostensibly in Mauritius, Mr. O'Brien has used his Proskauer email—jobrien@proskauer.com—over the past several days.  (Hsu Decl. ¶ 33.)  Proskauer can serve Mr. O'Brien at his personal email address, to which Mr. O'Brien forwarded various emails from his Proskauer email address as recently as December 21, 2022.  (Hsu Decl. ¶ 33.)

"By design, Rule 4(f)(3) was adopted in order to provide a modern flexibility and discretion to the federal courts in today's digital age in dealing with questions of alternative methods of service of process in foreign countries." *Philip Morris*, 2007 U.S. Dist. LEXIS 19780, at *8. "Such flexibility necessarily includes the utilization of modern communication technologies to effect service when warranted by the facts." *In re International Telemedia Assocs., Inc.*, 245 B.R. 713, 720 (Bankr. N.D. Ga. 2000).  Where Mr. O'Brien abruptly left on an international vacation after stealing thousands of files and hundreds of gigabytes of Proskauer's data, and where service by email is the most effective way of reaching him while he is in Mauritius, alternative service by email comports with due process and is warranted.

### C.     The Court Should Not Require Proskauer to Post a Bond.

Ordinarily, a temporary restraining order may issue "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found

24

to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  However, because the "amount of any bond to be given upon the issuance of a preliminary injunction rests within the sound discretion of the trial court, the district court may dispense with the filing of a bond."  *Clarkson Co., Ltd. v. Shaheen*, 544 F.2d 624, 633 (2d Cir. 1976) (citations omitted).  That is particularly the case where, as here, "[t]here is little likelihood of harm to the parties enjoined."  *Id*; *Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 202 (E.D.N.Y 2013).  Mr. O'Brien has no legitimate interest in or use for the confidential information he stole, and he therefore will not be harmed by the injunctive relief Proskauer requests.

Dated:  New York, New York

       December 27, 2022

                                               PROSKAUER ROSE LLP

                                               */s/* Michael T. Mervis

                                               Robert Cleary
                                             Michael T. Mervis
                                             Jacob R. Butwin
                                           Eleven Times Square
                                           New York, New York 10036-8299
                                           212.969.3000
                                           rcleary@proskauer.com
                                           mmervis@proskauer.com
                                           jbutwin@proskauer.com

                                           Timothy W. Mungovan (*pro hac vice*
                                           forthcoming)
                                           One International Place
                                           Boston, Massachusetts 02110-2600
                                         617.526.9600
                                           tmungovan@proskauer.com

                                           Kyle A. Casazza (*pro hac vice* forthcoming)
                                           2029 Century Park East, Suite 2400
                                         Los Angeles, California 90067-3010
                                           310.557.2900
                                           kcasazza@proskauer.com

                                           *Attorneys for Plaintiff Proskauer Rose LLP.*