UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PROSKAUER ROSE LLP,
                   Plaintiff,

- against -

JONATHAN O'BRIEN,
                   Defendant.

Case No. _____

### DECLARATION OF DARYN A. GROSSMAN IN SUPPORT OF PLAINTIFF'S MOTION FOR EX PARTE TEMPORARY RESTRAINING ORDER

I, Daryn A. Grossman hereby declare as follows,

1. I am the Managing Partner of plaintiff Proskauer Rose LLP ("Proskauer" or the "Firm"). I have personal knowledge of the facts set forth herein and, if called to do so, could competently testify thereto.

2. Proskauer is an international law firm. I have been a partner at Proskauer since February 12, 2003. I also currently serve as the Head of the Life Sciences Group. From 2015 until my appointment as Managing Partner in 2020, I was the co-chair of Proskauer's global Corporate Department. I have also previously served on several Firm committees, including the Firm's Hiring Committee, Business Development Committee and Lateral Acquisition Committee. By virtue of my years of experience in Firm management, I have a deep familiarity with and understanding of the Firm's operations, finances and strategic planning processes.

3. Proskauer's ultimate leader is the Firm's Chair. The Chair is an elected position voted on by the Firm's partners at fixed intervals. Proskauer's highest governing body is the Executive Committee (the "EC"), which is comprised of seven partners: the Chair, and six other

1

members who are also elected by the Firm's partners. The Chair appoints (subject to EC approval) and works closely with the Firm's Managing Partner. The Chair and Managing Partner meet regularly with the EC. Meetings of the EC are held regularly, and attendance, particularly during discussion of the Firm's most confidential matters, is limited to EC members, the Chair, the Managing Partner, the Firm's General Counsel and, since 2017, defendant Jonathan O'Brien ("Mr. O'Brien") in his capacity as the Chief Operating Officer (the "COO").

4. The Chair, Managing Partner, and EC are responsible for many critical governance, policy, and strategic matters, including the allocation of Firm profits among the partners, recommendations for the election of lateral partners, promotion of Firm associates to partner, and the Firm's strategic planning. Unsurprisingly, highly confidential, sensitive, and proprietary materials relating to such matters are prepared for review by the Chair, Managing Partner and EC in connection with these decisions. Mr. O'Brien, in his capacity as COO, also had access to these materials, intended for use only by the Firm's senior management, and to which access was restricted, in many cases, to just Mr. O'Brien, the Chair and the Managing Partner. As I detail below, shortly before providing notice of his resignation, Mr. O'Brien stole vast amounts of these highly confidential and proprietary materials from Proskauer.

**Mr. O'Brien's Employment with Proskauer**

5. Mr. O'Brien began working at Proskauer in 2015. From 2015 to 2017, he was the Firm's Chief Financial Officer ("CFO"), responsible for managing the financial affairs of the Firm. In 2017, Mr. O'Brien was appointed the Firm's COO. In that role, Mr. O'Brien was responsible for all of the Firm's business support activities, including finance and financial strategy, accounting, taxes, benefit plans, professional resources, business development, real estate, operations, information services, and the internal audit function. Mr. O'Brien reported directly to

the Firm's Chair and served on many of the Firm's most important committees, including the Business Development Committee, of which he was the Chair, Personnel Practices Committee, Retirement Plan Committee, and Crisis Management Committee, of which he was the Chair.

6. In addition to the EC meetings, Mr. O'Brien also had a standing daily morning management meeting with the Firm Chair and Managing Partner, during which the day's business was discussed, as well as short and long range financial, staffing, and strategic planning. Mr. O'Brien's tenure as COO spanned the tenure of two Proskauer Chairmen, and during this time, Mr. O'Brien was privy to or participated in nearly every meaningful strategic decision of the Firm. In fact, Mr. O'Brien was responsible for producing or overseeing the production of the financial analyses, projections, and backup data that the Chair, Managing Partner and EC review in order to make these decisions. As one of the three key senior members of management, Mr. O'Brien had virtually unfettered access to all Firm systems, records, and resources pertaining to the Firm's finances, operations, and strategic planning.

7. Mr. O'Brien had a team of approximately 650 direct and indirect reports, including, among others, the Firm's Chief Financial Officer, Chief Real Estate and Facilities Officer, Director of Human Resources, Chief Marketing Officer, Chief Information Officer, and Director of Internal Audit.

8. On December 7, 2022, Mr. O'Brien learned that he would be receiving a sizable bonus. At that time, Proskauer was unaware Mr. O'Brien intended to leave the Firm. As COO, Mr. O'Brien was responsible for directing the payment of employee bonuses, and therefore knew that, as for all other employees, the bonus would not be deposited to his bank account until December 16.

9. On the morning of December 20, Proskauer learned for the first time that Mr. O'Brien was leaving the Firm. Mr. O'Brien called me to tell me he was resigning. I informed the Firm's Chair, Steven M. Ellis, who then called Mr. O'Brien. I understand Mr. O'Brien told Mr. Ellis that he would be leaving the Firm effective January 6, 2023. In the afternoon of December 20, I telephoned Mr. O'Brien to discuss his last day with the Firm and expressed disbelief as to how we could possibly transition his responsibilities and knowledge accumulated over the last seven years during such a short time frame. He reaffirmed that his last day would be January 6. I told him that just over two weeks was not enough time to transition, especially during the holidays, but that we could possibly do it provided that he was able to be in the office daily, and was not going away over the holidays. Mr. O'Brien responded that, actually, he would be leaving the country the next evening (December 21) to take paid vacation in Mauritius until the evening of January 4, 2023, and completing his employment at Proskauer on the second day after his return. I told Mr. O'Brien that was unacceptable, and that as Proskauer's COO and a key member of the management team of a business with revenues exceeding $1 billion, his responsibility was to ensure a successful transition. Mr. O'Brien begrudgingly told me that he "might" be able to extend his employment with Proskauer for another week, and leave on January 13. He then stated that he "was an employee at will" and further stated: "I owe you nothing." When I asked him where he was going, Mr. O'Brien refused to say where he plans to work next.

10. Based on Mr. O'Brien's theft of the Firm's confidential information as described below, the EC has voted to terminate Mr. O'Brien's employment upon the filing of this action.

11. Upon learning that Mr. O'Brien was leaving the Firm, as it does for other departing employees, Proskauer's Information Security and Technology team ran a "30-day" report to check for suspicious computer usage by Mr. O'Brien within the past 30 days. That report revealed that

Mr. O'Brien had copied 115 files to a USB drive. Since receiving that report, I have spent time reviewing copies of some of those files that the Information Security and Technology team was able to recover from Mr. O'Brien's office computer. That review is still ongoing.

**Mr. O'Brien Prepares to Steal Proprietary and Confidential Firm Materials**

12. Like all Firm personnel, Mr. O'Brien is required to comply with—and expressly acknowledge—the Firm's policies. This includes acknowledging and complying with the Firm's "Computer and Communications Use and Data Protection Policy," which governs employees' use of the Firm's technology resources and connectivity to Firm systems, and details the Firm's safeguards to protect firm, client, lawyer, and employee data. The Firm's General Counsel's office also maintains a Compliance Policy, which Mr. O'Brien was also required to comply with and expressly acknowledge. The Compliance Policy sets forth additional rules with respect to the confidentiality of client affairs and compliance with applicable laws and regulations. The Compliance Policy states that all client information, "whatever its source," should not be disclosed to any person other than persons in the Firm engaged in the representation of those clients. It also reminds personnel that the duty to preserve "continues after a lawyer or employee is no longer associated with the Firm." Generally speaking, these policies protect the Firm's confidential information, restricting access to such materials only for a legitimate business need and prohibiting the transfer of such information outside of the Firm's secured technology resources and office premises or to any third-party.

13. I understand that sometime on or before November 14, 2022, more than a month before Mr. O'Brien resigned from the Firm, he created and saved a file named "List.txt" on his Firm computer. The list in the file is copied below:

- - All FP&A reports
  - Firm financials
  - Department financials
  - Practice financials
  - Office financials
  - Full black book disclosure
- Policies
- Finance Portal Docs
- Business of Law
- Cash Flow
- Expense Report – full GL
- PPP Forecast
- Billing Rates
- Black Book Binder (already printed)
- CCM reports
- Lateral Partner P&L
- Lateral Partner Template
- Client Ops – SPD, Countdown, Collections projs, B&C shortfall by day
- Pricing AFA guide

14. This list describes materials that are among the Firm's most confidential, proprietary and valuable financial, performance and strategic materials. For example, "FP&A" means "Financial Planning & Analysis." The FP&A Group is responsible for regularly creating 127 distinct types of reports, access to which is strictly limited to different groupings of senior Firm personnel. These reports constitute the broadest swath of the Firm's confidential strategic materials. The materials in these reports include, among other things, lawyer productivity reports, projections, budgets, profit analyses, and performance data, all of which provide detailed insight not only into the Firm's financial performance, but also into how the Firm thinks about and evaluates its performance, strategy and future.

15. The FP&A group also produces the "firm," "department," "practice," and "office" financials on Mr. O'Brien's list, which provide confidential financial information about those different business units and offices.

16. The "Black Book Binder" is a detailed set of highly confidential and proprietary records relating to Proskauer partner compensation and the allocation of the Firm's profits. For

6

each partner, the binder details, among other things, historical compensation, originations, client relationships, hours, collections, and realization. Partners do not have access to many aspects of this report, which is shared in its entirety only with the Firm's EC. The Firm's "Black Book" information is among the most protected, confidential information the Firm keeps.

17. Other materials on Mr. O'Brien's list include highly sensitive and proprietary information about the Firm's strategic planning and initiatives. For example, the "Pricing AFA Guide" is a detailed document outlining the Firm's strategy with respect to alternative fee arrangements. The "Lateral Partner P&L" and "Lateral Partner Template" include information about the Firm's assessment and hiring of lateral partners, including metrics the Firm considers in evaluating prospective lateral partners.

18. The listed materials also include sensitive, confidential information related to the Firm's client relationships, profitability and profit margins, cash on hand, and financial forecasts.

19. These materials in Mr. O'Brien's list are securely kept electronically on Proskauer's systems, but by dint of Mr. O'Brien's role as COO, he had access to all of them. Notwithstanding the policies restricting the use and transfer of such confidential and proprietary materials, Mr. O'Brien's list says that, as of November 14, 2022, when the list was last modified, he had "already printed" a hard copy of the highly confidential "Black Book Binder."

**The First Batch of Materials Stolen by Mr. O'Brien**

20. I understand that on December 5, 2022, before Mr. O'Brien had given any indication he intended to leave the Firm, he called Kevin Polakoff, the Firm's Director of Technology Support (and one of Mr. O'Brien's reports), and asked Mr. Polakoff to grant him access to download data to his removable USB device. Like all Firm employees, Mr. O'Brien had

7

to provide a reason for the requested exception to the Firm's technical controls precluding use of removable USB media with firm-issued computers.

21. I understand Mr. O'Brien told Mr. Polakoff that he needed to use a thumb drive to provide data to consultants. The Chair and I had engaged business consultants pursuant to an engagement agreement which, among other things, preserves the confidentiality of the targeted set of materials exchanged with the consultants. These consultants sent a document request list to the Chair and me, which we then forwarded to Mr. O'Brien and instructed Mr. O'Brien to respond, on our behalf, with the documents requested by the consultant. I have spoken with a representative of the consulting firm since Mr. O'Brien resigned. Based on that conversation, it is my understanding the consultants never asked Mr. O'Brien to send them Firm information on a thumb drive or any portable storage device, nor have they ever received a thumb drive or any portable storage device from Mr. O'Brien. Every piece of data Mr. O'Brien or anyone else at Proskauer sent to the consultants, in the actual course of the consultants' work for Proskauer, was sent through email.

22. I have been informed by Ken Hsu, Proskauer's Information Security and Technology Officer, that on December 5, after being granted access to use a removable USB device, Mr. O'Brien copied more than 100 files to that drive. The files included his list of materials to steal and included the kinds of Proskauer materials from that list I described above.

23. I have reviewed a copy of a folder from Mr. O'Brien's computer labeled "MP," which contains these files. I do not know what, if anything, "MP" stands for. Although MP is often short for Managing Partner, which is my current title, I did not ask Mr. O'Brien to compile such documents for me or others (nor did I ask him to compile any documents to put on removable

media whatsoever). In the copy of the "MP" folder I reviewed, the files were organized into the thirty-one folders listed below, which would have taken hours to create.



24. I have gone through and reviewed these files, nearly all of which appear by our records to have been copied to Mr. O'Brien's thumb drive. The files represent the Firm's "crown jewels." Not only do they contain the Firm's confidential, valuable, and proprietary financial and strategic analyses, they also contain many of the systems and frameworks needed to successfully run a large law firm. Nearly every single file within each folder contains the Firm's confidential, valuable, and proprietary information. I will highlight only some of those in this Declaration.

25. The materials include a number of proprietary methodologies the Firm developed through significant effort and expense to maintain its position in a highly competitive market for legal services. For example, the "CCM" folder (which stands for "Client Contribution Metrics",

which is how we internally refer to our client profitability analyses) includes the Firm's own recently developed methodology to evaluate profitability for purposes of Firm planning, development and investment. The documents in that folder include templates, partner training and presentation materials, presentations to the EC relating to our methodology, profitability benchmarks, and documents detailing certain of our actual profit margins for 2022. It includes material reflecting each of Proskauer's clients that generated over $50,000 in revenue (and associated margins) which is in effect the Firm's client list and constitutes competitively sensitive information. The "Comp Models" folder includes the Firm's own compensation models that account for, among other things, the effects of bonuses, special bonuses, and other variables on the Firm's financials. "Budget," "Cash Flow," and "Recession Deck" contain detailed information about the Firm's budgets (including for the current fiscal year, which began on November 1, 2022), fees, rate increases, and expenses. For example, the "Budget Consolidation" file is essentially a line item budget of the Firm's revenue and expenses, detailing what we expect our revenue to be for the current fiscal year, and detailing every category of expense (and the cost of each). A "FY23 Budget Overview" file describes the Firm's key assumptions, expenses, and financial projections for the current fiscal year. The "Budget" folder also includes budget projections on a month by month basis for the current fiscal year. The Recession Deck contains detailed contingency plans for changes in economic conditions. The level of detail in nearly all of these files has not been presented to the partnership in general.

26. Many of these folders contain "How To" templates that would only be useful to someone looking to replicate the Firm's proprietary operational reports, models, and analyses elsewhere. For example, the "Promotions" folder contains a sample "promotion package" that the Firm put together for a specific lawyer, regarded as a very strong performer, for the EC to evaluate

his potential promotion. The "Reports" folder contains, among many other reports, an "Activity Summary" report about another strong-performing partner's 2022 performance, including numerous performance metrics. These reports are examples of the Firm's proprietary methodologies used to make strategic business decisions concerning attorney performance, promotion, and client relationships. Mr. O'Brien could use them to replicate the Firm's methodologies at a future employer.

27. This first batch of stolen files also contains the Firm's proprietary strategic and financial analyses. For example, the "AmLaw and PPP" folder includes confidential and highly sensitive analyses of the Firm's performance in certain widely publicized, industry-wide rankings. The documents include the Firm's own analyses of its performance versus that of a select sample of competitors, as well as detailed strategies for improving its performance relative to those firms, some of which would have been presented only to the EC (and some which have not been shared other than with the Chair and Managing Partner).

28. The "Dept Financials," "Final Numbers," "Firm Financials," "Office Financials," "Partner Decks", and "Practice Financials" folders contain detailed confidential financial information about the Firm's fiscal year 2022 performance, including productivity, collections, and expenses for those different business units and offices and detail business projections for the upcoming year. Of note, among the documents stolen by Mr. O'Brien is a presentation detailing the content and functionality of a secure website called the "Partner Portal," which the Firm uses to safeguard certain confidential information distributed to the partnership.

29. A reflection of the value of this confidential information, and the steps the Firm takes to protect it, appears in one of the many documents in the "Policies" folder that Mr. O'Brien

stole. It is Proskauer's "Internal Financial Data Disclosure Policy," which is itself "proprietary information of Proskauer Rose LLP." It begins by noting the following:

> Finance teams are routinely requested to deliver internal financial information to partners, other lawyers, and administrators of the Firm. Due to the highly sensitive nature of this information, strict protocols regarding access rights are necessary. This is to not only protect the privacy of the Firm, to safeguard its financial data, but to protect the privacy and confidentiality of individuals and various associations within the Firm (e.g. individual partners, departments, practices, etc.).

30. The Internal Financial Data Disclosure Policy further highlights how limited is the access to much of the information stolen by Mr. O'Brien. This policy includes a matrix that describes which groupings of Proskauer employees have access to certain categories of internal financial information. Only the Firm Chair, Managing Partner and COO/CFO have "unlimited access" to all of Proskauer's internal financial data. As described herein, the material Mr. O'Brien stole includes many different files containing each of these types of sensitive, protected materials to which access is generally restricted.

31. The confidential, sensitive and proprietary materials were downloaded by Mr. O'Brien in direct contravention of this and the Firm's other policies. Mr. O'Brien was aware of these policies and he expressly acknowledged them.

**Mr. O'Brien Steals Ten Times More Material In His Second Theft**

32. I have been informed by Ken Hsu, Proskauer's Information Security and Technology Officer, that, on the morning of December 16, a compressed ".zip" file containing 1,138 files of Proskauer's proprietary data, labeled "2022 tax documents.zip" was created. This file was created shortly after Mr. O'Brien's year-end bonus was deposited into his bank account.

33. The zip file appears to have contained all of the files and folders Mr. O'Brien copied on December 5, plus eight additional top-level folders that were not in the "MP" folder I reviewed:

Business of Law, Charitable, Compass, Expenses, Forecast, Surveys, Timetables.Notes, and Year-End (shaded in grey, below):



34. I have also reviewed the files in these additional folders. Although this file was named "2022 tax documents.zip," the voluminous compilation of proprietary and confidential operational and business strategy materials has nothing to do with Proskauer's, or anyone's, 2022 taxes. Indeed, an electronic search of the entire "2022 tax documents.zip" reveals only two files containing the word "tax". Both files are financial results of Proskauer's Tax practice department.

35. While there is considerable overlap between this file and the December 5 zip file, it appears Mr. O'Brien used this second file primarily to steal the 833 documents in the "Compass" folder. The files in this folder reveal how Proskauer performs all of its financial planning and

analysis. Not only does the folder contain confidential and proprietary reports, many of which are described above, it also contains hundreds of files containing proprietary code and reusable scripts that the Firm itself had created to make its financial reporting more effective, efficient and useful, and which presumably would permit Mr. O'Brien to use Proskauer's proprietary methodology for the benefit of a competitor.

36. Other notable documents in these additional folders include "How To" information that the Firm's finance team uses to close out the Firm's fiscal year and various templates for tracking a host of partner-specific metrics. Amongst its peer firms, Proskauer has one of the most efficient billing and collection cycles, inuring to the Firm's profitability, and the materials taken by Mr. O'Brien provide a roadmap for how to replicate it elsewhere. The additional folders created and downloaded by Mr. O'Brien also included various files reflecting Proskauer's expenses, including the Firm's capital expenditures, capital account balances, and capital expense planning for fiscal year 2023.

37. The existing folders also contained documents that were not in the first set that Mr. O'Brien stole on December 5. For example, "Dashboards" included information relating to newly-created, proprietary software tools (which we refer to as "Dashboards") developed in 2022 and, in some cases, not yet fully completed or made available to Firm partners. These Dashboards were developed over many months by Firm personnel in our Finance group, using significant know-how and resources. They are tools unique to our business and are valuable management tools. The Dashboard file Mr. O'Brien stole contains folders entitled "Backup Codes", "Data Model", "Executive Dashboard User Guide", "Lawyer Performance Dashboard", "Lawyer Performance Dashboard Outstanding Items" and "Power BI Executive Dashboard", which appears to be a Microsoft file for the code used to create one or more of the Dashboards. He stole software code,

data models, user guides, the Microsoft creation tool, and a list of outstanding items for the Dashboard under development. There is no reasonable conclusion other than Mr. O'Brien intends to use this proprietary tool for the benefit of his new employer.

38. Before copying these materials to a removable thumb drive on December 16, I understand Mr. O'Brian contacted Mr. Polakoff to request another exception to the Firm's block on removable media, again falsely stating he needed to provide material to consultants. The materials in this zip file were not created for a Proskauer consultant and, as mentioned above, the consultant never requested or received a thumb drive from anyone at Proskauer.

39. I understand that on December 16, just after Mr. O'Brien copied the more than 1,000 files in the zip file to a removable thumb drive, he deleted them along with the entirety of the files on his personal network drive, and then immediately emptied his "recycling bin," in an apparent attempt to "permanently" delete them.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing statements are true and correct to the best of my knowledge.

Dated: New York, New York
       December 27, 2022

*/s/ Daryn A. Grossman*

_____
Daryn A. Grossman