UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PROSKAUER ROSE LLP, | |
| *Plaintiff*, | |
| v. | Civil Action No. 1:22-cv-10918 |
| JONATHAN O'BRIEN | |
| *Defendant*. | |

**JONATHAN O'BRIEN'S MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION FOR ORDER TO SHOW CAUSE
FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................1

COUNTER STATEMENT OF FACTS ..............................................................................3

   1.   Mr. O'Brien Prepares To Leave His Role As Proskauer COO Because Of Its
Failing Leadership. ................................................................................................3

   2.   Mr. O'Brien Collects Materials To Do His Job On Vacation. ...........................5

   3.   Mr. O'Brien Resigns As COO. ...........................................................................8

   4.   Proskauer Terminates Mr. O'Brien During His Vacation. ..................................9

   5.   Mr. O'Brien Learns Of This Lawsuit From A Reporter Asking For Comment...............10

   6.   Mr. O'Brien Has Done Nothing Wrong. ...........................................................10

ARGUMENT.....................................................................................................................11

   A.   The Court Should Not Grant The Relief Requested Because Proskauer
Cannot Satisfy the Test for Preliminary Injunctive Relief. .............................11

   1.   Proskauer Is Not Likely To Succeed On The Merits of the Claims that Serve
as the Basis for its Motion. ...............................................................................12

       a.   Count 1: Alleged Violation Of The Defend Trade Secrets Act.........................12

          i.   No actual or threatened misappropriation. ..................................................13

       b.   Count 2:  Alleged Misappropriation of Trade Secrets Under New York
Common Law ....................................................................................................15

       c.   Count 3:  Alleged Breach of Fiduciary Duty....................................................16

   2.   Proskauer Has Not Suffered And Will Not Suffer Irreparable Harm..........................18

   3.   The Balance Of Hardships Is Firmly On Mr. O'Brien's Side. ....................................23

   4.   Injunctive Relief Will Not Serve The Public Interest..................................................24

CONCLUSION ..................................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                           **Page(s)**

*ABKCO Music Inc. v. Harrisongs Music, Ltd.*,
    722 F.2d 988 (2d Cir. 1983) .................................................................................... 16

*Accenture LLP v. Trautman*,
    2021 WL 6619331 (S.D.N.Y. June 8, 2021) ................................................... Passim

*Borey v. National Union Fire Ins. Co.*,
    934 F.2d 30 (2d Cir. 1991) ..................................................................................... 19

*Broker Genius, Inc. v. Zalta*,
    280 F. Supp. 3d 495 (S.D.N.Y. 2017) ..................................................................... 11

*Continental Indus. Group, Inc. v. Altunkilic*,
    788 Fed. Appx. 37 (2d Cir. 2019) ........................................................................... 16

*Design Strategies, Inc. v. Davis*,
    2004 WL 139427 (S.D.N.Y. June 22, 2004) ........................................................... 16

*EarthWeb, Inc. v. Schlack*,
    71 F. Supp. 2d 299 (S.D.N.Y. 1999) ........................................................... 20, 21, 25

*Elko, Inc. v. Peters*,
    2022 WL 256975 (D. Nev. Jan. 27, 2022) .............................................................. 23

*Elsevier Inc. v. Doctor Evidence, LLC*,
    2018 WL 557906 (S.D.N.Y. Jan. 23, 2018) ............................................................ 13

*Faiveley Transport Malmo AB v. Wabtec Corp.*,
    559 F.3d 110 (2d Cir. 2009) ................................................................................... 18

*Forest City Daly Hous., Inc. v. Town of N. Hempstead*,
    175 F.3d 144 (2d Cir. 1999) ............................................................................. 19, 20

*Free Country Ltd. v. Drennen*,
    235 F. Supp. 3d 559 (S.D.N.Y. 2016) ............................................... 12, 15, 20, 21

*Garvey v. Face of Beauty LLC*,
    2022 WL 5246665 (S.D.N.Y. Oct. 6, 2022) ........................................................... 13

*Hanson Trust PLC v. ML SCM Acquisition, Inc.*,
    781 F.2d 264 (2d Cir. 1986) ................................................................................... 11

*In re Document Technologies Litig.*,
    275 F. Supp. 3d 454 (S.D.N.Y. 2017) .............................................................. Passim

*In re Maxsun Produce Corp.*,
    2020 WL 1987761 (Bankr. E.D.N.Y. Apr. 24, 2020) ............................................. 17

*Janus et Cie v. Kahnke*,
    2013 WL 5405543 (S.D.N.Y. Aug. 29, 2013) ....................................................... 21

*Johnson v. Nextel Communications, Inc.*,
   660 F.3d 131 (2d Cir. 2011) ............................................................................... 16

*Medicrea USA, Inc. v. K2M Spine, Inc.*,
   2018 WL 3407702 (S.D.N.Y. Feb. 7, 2018) ....................................................... 11

*Natera, Inc. v. Bio-Reference Lab., Inc.*,
   2016 WL 7192106 (S.D.N.Y. Dec. 10, 2016) ..................................................... 19

*North Atl. Instruments, Inc. v. Haber*,
   188 F.3d 38 (2d Cir. 1999) ................................................................................. 16

*Principia Partners LLC v. Swap Fin. Group, LLC*,
   2019 WL 4688711 (S.D.N.Y. Sept. 26, 2019) ............................................... 12, 13

*Salinger v. Colting*,
   607 F.3d 68 (2d Cir. 2010) ................................................................................. 11

*TRB Acquisitions LLC v. Yedid*,
   2021 WL 293122 (S.D.N.Y. Jan. 28, 2021) ......................................................... 13

*Zurich Am. Life Ins. Co. v. Nagel*,
   538 F. Supp. 3d 396 (S.D.N.Y. 2021) ..................................................... 13, 14, 15

## Statutes

18 U.S.C. § 1836 ................................................................................................... 12, 26
18 U.S.C. § 1839 ............................................................................................... 12, 13, 16

## Rules

Fed. R. Civ. P. 65(c) ............................................................................................... 1, 25

Defendant Jonathan O'Brien hereby submits this memorandum of law in opposition to Plaintiff Proskauer Rose LLP's (hereinafter "Plaintiff" or "Proskauer") motion for a preliminary injunction, which Proskauer needlessly and with no more than rampant speculation and vitriolic hyperbole based on exaggerated and incorrect facts, originally sought as an *ex parte* temporary restraining order.

## **PRELIMINARY STATEMENT**

"No good deed goes unpunished" — an aphorism aptly illustrated by Proskauer's conduct in this litigation.  Levying false accusations of criminal and unethical activity, Proskauer filed this *ex parte* action without even calling its Chief Operating Officer ("COO") of seven years – in Proskauer's own words, the "senior-most officer in this law firm" (Dec. 28, 2022 Hr'g Tr. at 5:18) – to give him an opportunity to address and correct Proskauer's speculation, or even to notify him of the lawsuit.  Indeed, Mr. O'Brien only learned of the existence of this lawsuit from a reporter who emailed him asking for comment, mere hours after the complaint and instant motion were filed.

Had Proskauer deigned to pick up the phone, they would have received the "benign explanation" they baselessly claim does not exist.  (Dkt. No. 6, Mem. at 4.)  Before leaving on his long-planned vacation, Mr. O'Brien was specifically told by Proskauer's Managing Partner, Daryn Grossman, that (as he had already anticipated would be necessary) he should expect to be "working every day of his vacation" after he submitted his resignation on December 20, 2022.

Before Mr. O'Brien headed to the island of Mauritius, located in the Indian Ocean off the coast of Madagascar, he was concerned that he would not be able to respond to the usual flurry of requests from Proskauer's senior management because of past difficulties he had accessing files through the firm's VPN while on vacations even less remote.  Mr. O'Brien therefore asked

Proskauer's IT and business professionals to assist him in compiling the documents he knew he would need on a USB drive, so that he could bring it with him to be able to perform his work. (And Mr. O'Brien's concern about the remoteness proved warranted as the internet connection could not even consistently support a video call.)

The day before Proskauer terminated Mr. O'Brien, he had a conference call with several Proskauer partners (during which they did not even bother to raise or inquire about any of the allegations that Proskauer would assert less than 24 hours later in its lawsuit), whose requests to Mr. O'Brien would have required his use of the documents at issue. This should come as no surprise – as COO, Mr. O'Brien needed "sensitive personal, professional, confidential, and proprietary information of the Firm" (Dkt. No. 6, Mem. at 5) to do his job, because he was "responsible for all of the Firm's business support activities, including finance and financial strategy, accounting, taxes, benefit plans, professional resources, business development, real estate, operations, and information services," and included his involvement in "nearly every meaningful strategic decision" that Proskauer undertook. *Id.* at 6.

Mr. O'Brien has not "stolen" any information, as Proskauer eagerly but improperly claimed to this Court. Rather, Mr. O'Brien did precisely what any COO traveling abroad at year end would have done; he took steps to ensure that he had the information he would need to do his job, and nothing more. He has not used it or disclosed any of the information – or any other allegedly confidential information of Proskauer – other than specifically for purposes of doing his job. And, Mr. O'Brien always planned to return everything on his last day with Proskauer, which was supposed to be January 6, 2023.

The simple fact is that, consistent with his tenure at Proskauer and indeed his entire career, Mr. O'Brien was attempting to be a good firm citizen. Having submitted his resignation, he was

nonetheless willing and prepared to work through his family vacation (as he had had to do for every so-called vacation that he had taken while at Proskauer) in order to ensure a smooth transition with his departure. Unfortunately, Mr. O'Brien's best efforts were futile. Not satisfied with prematurely terminating Mr. O'Brien's employment during his notice period in a classic case of "you're not breaking up with me – I'm breaking up with you," Proskauer went several steps further, secretly filing the instant action and entering its salacious allegations against Mr. O'Brien into the public record.

Mr. O'Brien's world has been shattered by the accusations levied against him and the media circus that Proskauer has intentionally ignited. Now unemployed with no job offers or prospects, Mr. O'Brien simply wants to clear his name and set the record straight.

As set forth fully below, the allegations against Mr. O'Brien are meritless. And now that the truth has come out, Proskauer cannot show that it will prevail on the merits of its case. The Court should deny Proskauer's Motion in full.

## COUNTER STATEMENT OF FACTS

1. *Mr. O'Brien Prepares To Leave His Role As Proskauer COO Because Of Its Failing Leadership.*

After his seven-year tenure at Proskauer, Mr. O'Brien was approached by Paul Hastings around April 2022. O'Brien Decl. ¶ 64. Following sporadic talks, Mr. O'Brien received an offer in the fall of 2022 from Paul Hastings to join as its COO. *Id.* ¶¶ 66-68. Mr. O'Brien considered the offer, and he determined that it was the right decision. *Id.* ¶ 67. Out of loyalty to Proskauer, and due to Mr. O'Brien's high standards of professionalism, Mr. O'Brien informed Paul Hastings that the earliest he could leave Proskauer was in the beginning of 2023, as to not leave Proskauer in a difficult situation for their year-end close. *Id.* ¶ 68.

Instructively, Mr. O'Brien was not the only high-level business departure at Proskauer in 2022. In addition to Mr. O'Brien, the former director of Financial Planning and Analysis, Mr. Jeremy Russo, resigned in December 2022 (Russo Decl. ¶ 8), and the former Chief Financial Officer, Leigh Anne Whyte, also left in December 2022. In addition, there have been significant attorney departures from Proskauer during 2022. *See, e.g.*, "Kirkland Raids Proskauer for 6-Lawyer Registered Funds Group, Dan Roe, The American Lawyer, *available at* https://www.law.com/americanlawyer/2022/05/16/kirkland-raids-proskauer-for-6-lawyer-registered-funds-group/ (last accessed Jan. 4, 2023)); "White & Case adds private credit leader in Boston from Proskauer," Sara Merken, Reuters, *available at* https://www.reuters.com/legal/legalindustry/white-case-adds-private-credit-leader-boston-proskauer-2022-03-01/ (last accessed Jan. 4, 2023); "Ropes & Gray Adds Ex-Proskauer Capital Markets Partner," Emily Lever, Law360, available at https://www.law360.com/articles/1485058/ropes-gray-adds-ex-proskauer-capital-markets-partner (last accessed Jan. 4, 2023). Mr. O'Brien was evidently one of many individuals at Proskauer who did not feel comfortable with the direction the firm was heading, and who did not trust firm leadership to be able to right the course. Unfortunately, it was Mr. O'Brien, the most high-profile of all the departures from Proskauer in 2022, who Proskauer chose to punish for having left.

As Mr. O'Brien prepared to submit his resignation, he began cleaning out his emails, as was his standard practice when leaving past employers. O'Brien Decl. ¶¶ 40-55. Contrary to the accusations of nefarious behavior levied against him, Mr. O'Brien began this process for his massive, sprawling email account, to remove anything personal or private in the emails that he did not want to leave there. *Id.* ¶ 42. Because of an outdated litigation hold, massive amounts of

emails remained in his inbox, rather than being automatically deleted under Proskauer's automatic deletion policy, which deletes anything older than one year.  *Id.* ¶¶ 40, 50-51.

Contrary to Proskauer's assertion, there are, in fact, two ways that Proskauer manages litigation holds.  *Id.* ¶¶ 43-45.  The first is through Proskauer's General Counsel.  *Id.* ¶ 44.  For these holds, the General Counsel instructs the IT department to place an individual under a litigation hold, usually for the purpose of an investigation, where all emails are retained until the General Counsel releases the hold.  *Id.*  The second is through Proskauer's eDiscovery team.  In these instances, the litigation hold is put in place in response to a litigation involving the firm, and the hold is managed by the eDiscovery team.  *Id.* ¶ 45.  Once the litigation is terminated, and the client-matter number closes, the litigation hold is supposed to lift automatically.  *Id.*

In Mr. O'Brien's case, his litigation hold was in place in relation to a matter where Proskauer had previously been sued.  *Id.* ¶ 46.  The case resolved years prior, and the client-matter number was closed.  Those two events should have led to the automatic release of the litigation hold for Mr. O'Brien, but it was still in place.  *Id.*  When Mr. O'Brien checked with the eDiscovery team to inquire whether the hold was still necessary, they confirmed it was not, and they released the hold.  *Id.* ¶¶ 48-52.

### 2.  Mr. O'Brien Collects Materials To Do His Job On Vacation.

Around the same time, in late November/early December 2022, Mr. O'Brien began preparing for his long-awaited vacation to Mauritius with his wife.  *Id.* ¶¶ 23, 28-38.  Mr. O'Brien had notified Proskauer's Chairman, Steven Ellis, on November 9, 2022, of the trip, which had originally been scheduled (and then postponed) when the pandemic began.[1]  *Id.* ¶¶ 19-21.  In his

---

[1] Proskauer asserts that Mr. O'Brien surprised the Firm with a last-minute request for a remote two-week vacation, when nothing could be further from the truth.  *See* Dkt. No. 6, Mem. at 3, 12 (asserting Mr. O'Brien resigned and informed the Managing Partner of his vacation at the same

seven years at Proskauer, Mr. O'Brien had worked through every vacation, and he expected this one to be the same. *Id.* ¶ 22. Additionally, in prior vacations closer to home (such as the Caribbean), Mr. O'Brien found himself unable to do his job well as a result of problems with Proskauer's VPN service – a service that should allow him to log into Proskauer's network and access files, but which he found to be unreliable in past travels. *Id.* As such, Mr. O'Brien decided it would be prudent to take the documents that he knew he would need with him in a more reliably accessible way when traveling to Mauritius, a remote island in the Indian Ocean, off the coast of Madagascar. *Id.* ¶¶ 22-23.

On this issue, Proskauer characterizes Mr. O'Brien's intent as nothing short of criminal – that he "planned to steal" information from Proskauer. *See, e.g.*, Dkt. No. 6, Mem. at 6. In reality, Mr. O'Brien planned to do his job and remain responsive to Proskauer's many demands while on vacation in a remote location.[2] O'Brien Decl. ¶¶ 22-23. Mr. O'Brien therefore asked Mr. Jeremy Russo, at the time Proskauer's Director of Financial Planning and Analysis ("FP&A"), for a complete copy of his year-end folder in early December 2022, which contained everything that Mr. O'Brien might need to access for his Proskauer work while in Mauritius.[3] *Id.* ¶ 28. Mr. Russo updated the file with new information (as it is constantly evolving and being updated), including

_____

time). Proskauer had known of Mr. O'Brien's vacation, scheduled for the end of December, since the beginning of November, *i.e.*, for nearly two months. O'Brien Decl. ¶ 21.

[2] As explained fully below in Section 4, Mr. O'Brien's concern was nearly immediately validated after having taken the files in question with him, in that on a conference call with several Proskauer partners on December 27, 2022 (which was so choppy that it could not support a video call), the requests to Mr. O'Brien required him to make use of documents in the file. O'Brien Decl. ¶¶ 22, 38. Mr. O'Brien was terminated hours after that call, and as a result, he never made use of the files to complete the requests. *Id.* ¶ 38.

[3] As yet another example of Proskauer's attrition at its highest levels, Mr. Russo announced his own resignation on December 16, 2022. Russo Decl. ¶ 8.

on December 16, 2022, which was relevant to the work that Mr. O'Brien might have to do while in Mauritius.  *Id.* ¶ 33; Russo Decl. ¶ 7.  Mr. O'Brien transferred it to the USB for his use in his role as COO while on vacation.  O'Brien Decl. ¶ 35.  And, therefore, no surprise, he brought the USB drive with him.  *Id.*  Had he not needed it for work, he would have had every reason to leave it at home and not bring it on his vacation.

Contrary to Proskauer's reckless and baseless accusations of a cover-up, it was Mr. Russo – not Mr. O'Brien – who re-named the year-end folder "2022 tax documents" at some point after its creation.  *Id.* ¶ 36; Russo Decl. ¶ 11.  As Mr. Russo explains, he was in the midst of some personal tax work, and he mistakenly named the file that way while distracted by his own resignation and his consideration of his personal finances.  *Id.*  As Mr. Russo set forth in his sworn declaration, the folder "was absolutely not named that way as an effort to conceal anything."  *Id.*

Similarly, contrary to Proskauer's baseless assumptions that Mr. O'Brien asked for "proprietary code and reusable scripts" to be included in the year-end folder, nothing could be further from the truth.  O'Brien Decl. ¶ 39; Russo Decl. ¶¶ 9-10.  Again, as Mr. Russo makes clear, those materials were not placed in the year-end folder by Mr. O'Brien.  *Id.*  They were included as the result of a misunderstanding.  *Id.* ¶ 9.  Mr. O'Brien had asked another FP&A team member to include all codes in the year-end folder.  *Id.*  That FP&A team member mistakenly interpreted Mr. O'Brien's request to be one for computer code, when, in reality, Mr. O'Brien was requesting passcodes for any protected documents within the year-end folder so he would be able to open them while on vacation.  *Id.*  As Mr. Russo explains, the idea that Mr. O'Brien would try to steal computer code and scripts from Proskauer is nonsensical, because they are useless outside of the Firm due to the Firm's bespoke data infrastructure.  *Id.* ¶ 10.  On a different system (such as the Paul Hastings system), they would be meaningless.  *Id.*

Notably, Proskauer did not submit sworn declarations from either Mr. Russo or anyone else on the FP&A team in support of its Motion.  Presumably, Mr. Hsu, the Firm's Information Security and Technology Officer, would be able to see that the FP&A team prepared the files in question, not Mr. O'Brien, but this information is not contained in his declaration.  *See* Dkt. No. 9, Hsu Decl.  Why Proskauer did not ask Mr. Hsu to review that information, and why Proskauer did not bother to speak with either Mr. Russo or anyone else who was on the FP&A team during the time at issue, are open questions that only underscore the Firm's reckless sprint to the courthouse in this case.

### 3.  *Mr. O'Brien Resigns As COO.*

After making the decision to leave Proskauer for Paul Hastings, Mr. O'Brien called Ms. Grossman (Proskauer's Managing Partner) on December 20, 2022 and submitted his resignation in what was a very short call.  O'Brien Decl. ¶ 70.  Ms. Grossman informed Mr. Ellis (who was on vacation at the time), and Mr. Ellis asked Mr. O'Brien to call him, which Mr. O'Brien did.  *Id.* Mr. O'Brien informed Mr. Ellis that he planned for his last day to be January 6, 2023, after his return from his planned vacation (that the Firm had known about since early November).  *Id.* ¶ 71. Mr. Ellis asked if he had been offered more money in an apparent attempt to make a counteroffer, and Mr. O'Brien confirmed it was significantly more.  *Id.*  Mr. O'Brien, understandably, did not confirm when Mr. Ellis pointedly asked whether he was going to Paul Hastings.  *Id.*

Not satisfied with keeping things professional, when Ms. Grossman and Mr. O'Brien spoke later the same day, Ms. Grossman became furious about the timing of Mr. O'Brien's vacation, and implied that she wanted him to remain at Proskauer for a significantly longer period of time.  *Id.* ¶ 72.  Mr. O'Brien responded that he was an employee at will, but that he was still happy to work on a transition over a reasonable period of time, perhaps some extra weeks.  *Id.* ¶ 73.  Mr. O'Brien

also offered to remain available for questions after he started in his new role.  *Id.*  Ms. Grossman ultimately angrily instructed Mr. O'Brien that he should expect to work every day while on his vacation.  *Id.* ¶ 74.

        4.   *Proskauer Terminates Mr. O'Brien During His Vacation.*

Mr. O'Brien's bringing of the materials he might need with him on vacation was soon validated.  On December 27, 2022, Mr. O'Brien had a late phone call (ending at about 10:00 Mauritius time) with several Proskauer partners to discuss some of the Firm's tax matters, after which Mr. O'Brien would have needed to access some of the Proskauer materials he had with him on the USB drive.  *Id.* ¶ 38.  On that call, no one asked Mr. O'Brien about the files he had taken with him, or about any of the other allegations that Proskauer would soon level against him.  *Id.* Accordingly, Mr. O'Brien, unaware that Proskauer was going to fire him and file the lawsuit shortly after that call, planned to use the materials to complete the necessary follow-up from the call the next day when he woke up.  *Id.*  At about 3:30 AM Mauritius time, however, Mr. O'Brien received notice of his termination through an email (which he later read when he woke up) from Mr. Ellis, acknowledging that Mr. O'Brien had previously given notice, and simply summarily terminating him.  After seven years at the Firm, that was the only communication Mr. O'Brien had from the Firm regarding his termination.  Notably, Mr. Ellis did not disclose the impending lawsuit in the email, or through any other communication before it was filed.  *Id*. ¶ 80.  After seven years of dedicated work as the Firm's "senior-most officer in this law firm" (Dec. 28, 2022 Hr'g Tr. at 5:18), no one from Proskauer contacted Mr. O'Brien before filing suit to discuss or even raise the Firm's purported concerns.  *Id.* ¶ 83.

*5. Mr. O'Brien Learns Of This Lawsuit From A Reporter Asking For Comment.*

As noted above, on the night of December 27, 2022, Mr. O'Brien had a substantive work call with Proskauer partners, and had no inkling that he was about to be fired, let alone that he was about to have his life upended. But, even as Mr. O'Brien was diligently working, his former employer was finalizing the papers that would launch the instant litigation. On December 27, 2022, Proskauer filed the Complaint and *ex parte* Motion. Dkt. Nos. 1, 5, 6; O'Brien Decl. ¶ 79. Mr. O'Brien did not learn that he was in Proskauer's, and the media's, crosshairs until he received an email on December 28, 2022 at 10:43 AM Eastern Standard Time, from a reporter from American Lawyer seeking comment on Proskauer's claims. O'Brien Decl. ¶¶ 82-83. Mr. O'Brien was not served with the papers for this lawsuit until December 28, 2022 at 6:23 PM Eastern Standard Time, which was after 3:00 AM in Mauritius. *Id.* ¶ 84.

*6. Mr. O'Brien Has Done Nothing Wrong.*

It is clear that Mr. O'Brien is the victim of a coordinated smear campaign by Proskauer; conduct that is frankly beneath the Firm's alleged reputation and character. Mr. O'Brien has done nothing wrong: he has already complied with the Court's *ex parte* order, he has provided Proskauer the written assurances that he has not and will never share its confidential information, and will continue to protect the Firm's confidential information. By contrast, the Firm has rushed into court without even the briefest of pauses to ask Mr. O'Brien about its purported concerns, or to speak with Mr. Russo or anyone else on the FP&A team, who could have put the majority of those purported concerns firmly to rest. Instead, Mr. O'Brien is being punished for having had the audacity to seek greener pastures and leave Proskauer, an employer that would clearly rather coerce and intimidate people to stay rather than making it a place where top talent wants to work.

## ARGUMENT

A. The Court Should Not Grant The Relief Requested Because Proskauer Cannot Satisfy the Test for Preliminary Injunctive Relief.

A preliminary injunction is "one of the most drastic tools in the arsenal of judicial remedies." *Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 273 (2d Cir. 1986) (internal citation omitted). *See also Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 509 (S.D.N.Y. 2017) (quoting same language and cautioning that a preliminary injunction should only be "used with great care"); *Medicrea USA, Inc. v. K2M Spine, Inc.*, No. 17-CV-8677 (AT), 2018 WL 3407702, at *4 (S.D.N.Y. Feb. 7, 2018) (Torres, J.) (quoting same language in evaluating a TRO). To justify such extraordinary and drastic relief, the moving party bears the burden of demonstrating the following four elements: (1) a likelihood of success on the merits;[4] (2) a likelihood that the moving party will suffer irreparable harm in the absence of injunctive relief; (3) that the balance of hardships tips in the moving party's favor; and, (4) that the public interest is not disserved by relief. *In re Document Technologies Litig.*, 275 F. Supp. 3d 454, 461 (S.D.N.Y. 2017) (quoting *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010)). *See also Medicrea, USA, Inc.*, 2018 WL 3407702, at *4 (listing same factors required to support either a TRO or a preliminary injunction). Proskauer has not satisfied, and cannot satisfy, the rigorous requirements to obtain this type of extraordinary relief.

---

[4] Alternatively, in the Second Circuit, a plaintiff who cannot show a likelihood of success on the merits of their claims may show that there are "sufficiently serious questions going to the merits [of the claims] to make them a fair ground for litigation," ***and*** that the "balance of hardships tip[s] decidedly toward the party requesting the preliminary injunctive relief." *Broker Genius, Inc.*, 280 F. Supp. 3d at 523-24 (internal citation omitted) (emphasis added). Proskauer fails to satisfy this alternative criterion, either.

1. Proskauer Is Not Likely To Succeed On The Merits of the Claims that Serve as the Basis for its Motion.

In support of the instant motion, Proskauer relies on its misappropriation of trade secrets (Counts 1 and 2) and breach of fiduciary duty (Count 3) claims against Mr. O'Brien.  Proskauer is unlikely to succeed on the merits of any of these claims for multiple reasons. Most significantly, Proskauer has not identified (and cannot identify) any improper acquisition, use, or disclosure of any of its information – whether that information qualifies as a trade secret or not[5] – by Mr. O'Brien.  Proskauer's derivative claim for breach of fiduciary duty fails for the same reason.  Given these fatal flaws in Proskauer's arguments, Proskauer is unlikely to succeed on the merits of its claims, dooming Proskauer's request for preliminary injunctive relief.  The Court need go no further in its analysis.

a. *Count 1: Alleged Violation Of The Defend Trade Secrets Act*

To prevail on a claim for violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA"), a plaintiff must show misappropriation by: (1) the acquisition of a trade secret by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) the unconsented disclosure of use of a trade secret of another by a person who (a) used improper means to acquire knowledge of the trade secret; or (b) at the time of disclosure knew, or had reason to know, that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy or limit the use of the trade secret, or derived from or through a person who owed such a duty.  *See* 18 U.S.C. § 1839(5)(A)-(B); *Free Country Ltd. v. Drennen*, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016); *Principia Partners LLC v. Swap Fin. Group, LLC*, 18-CV-7998 (AT), 2019 WL 4688711, at *2 (S.D.N.Y. Sept. 26, 2019)

---

[5] For present purposes only, Mr. O'Brien assumes that all of the information Proskauer identifies is in fact confidential and is protectable as a trade secret.

(Torres, J.).  The term "improper means," includes theft, bribery, misrepresentation, breach or inducement of a breach to maintain secrecy, or espionage through electronic or other means.  18 U.S.C. § 1839(6)(A).

i.    No actual or threatened misappropriation.

Assuming for present purposes only that all of the information Proskauer identifies is, in fact, confidential and is protectable as a trade secret,[6] Proskauer has not shown, and cannot show, that Mr. O'Brien has misappropriated any purported trade secrets.  At the time that Mr. O'Brien requested and received the year-end folder at issue, he was authorized to acquire and use the information it contained as part of his job as Proskauer's COO.  *See* O'Brien Decl. ¶¶ 22, 27-28, 57, 60.  Any suggestion that he did so for any purpose other than to do his work for Proskauer is pure speculation and wrong.  As Mr. O'Brien has explained under oath, Proskauer's speculation of nefarious intent is baseless, and he expressly refutes each and every assertion.  *See*  O'Brien

---

[6] Proskauer will face significant obstacles in ultimately proving that its described information rises to the level of protectable trade secrets.  Much of the information described by Proskauer is not even confidential; for example, Proskauer's billing rates, annual profits per partner, and other financial information is routinely shared by the firm with The American Lawyer and other media outlets.  O'Brien Decl. ¶ 62.  In addition, unless the alleged trade secret confers the owner with a competitive advantage and cannot be readily duplicated from generally available information, things like marketing strategies or knowledge of the intricacies of a business do not generally rise to the level of a trade secret.  *See, e.g., Garvey v. Face of Beauty LLC,* 21-CV-10729 (ALC), 2022 WL 5246665, at *9 (S.D.N.Y. Oct. 6, 2022) (granting motion to dismiss claim for violation of DTSA); *Accenture LLP v. Trautman*, No. 21-CV-2409, 2021 WL 6619331, at *9 (S.D.N.Y. June 8, 2021) (denying motion for preliminary injunction).  Furthermore, while a plaintiff is not obligated to reveal its secrets in the complaint simply to prove that they exist, this does not allow a party to simply provide nebulous descriptions or general categories of information and data.  *Zurich Am. Life Ins. Co. v. Nagel*, 538 F. Supp. 3d 396, 404 (S.D.N.Y. 2021) (citing *TRB Acquisitions LLC v. Yedid*, No. 20-CV-0552 (JMF), 2021 WL 293122, at *2 (S.D.N.Y. Jan. 28, 2021)).  *See also Elsevier Inc. v. Doctor Evidence, LLC*, No. 17-CV-5540 (KBF), 2018 WL 557906, at *6 (S.D.N.Y. Jan. 23, 2018) (allegations of the existence of merely general categories of confidential, without providing any details to define the trade secrets at issue, is insufficient).  Mr. O'Brien expressly reserves and does not waive his right to challenge Proskauer's misappropriation claims on these grounds in future pleadings.

Decl. ¶ 24.  Indeed, even the purported centerpiece of Proskauer's claim – the alleged attempted cover up of his tracks – has been directly proven to be false by the affidavit of the only other person (besides Mr. O'Brien) with knowledge: Jeremy Russo.  Russo Decl. ¶ 11.

As explained, Mr. O'Brien was expected to regularly access and use the type of information in the year-end folder to carry out his job duties, and he planned to do so on his December 2022 vacation in Mauritius (consistent with what Proskauer had required of him during previous vacations).  *See* O'Brien Decl. ¶¶ 22, 27-28, 57, 60.  Indeed, Proskauer's Managing Partner, who became irate when Mr. O'Brien tendered his resignation to her, warned him that he would be expected to continue to work every day of his vacation.  *See* O'Brien Decl. ¶ 74.  And, Mr. O'Brien ultimately did have to work while he was in Mauritius, with the full knowledge, consent, and expectation of Proskauer's senior management.  *See* O'Brien Decl. ¶¶ 38, 74.  Moreover, Mr. O'Brien's concerns about performing work remotely and his prescience to bring a USB drive in order to access and use work-related documents were spot on when he arrived in Mauritius and was unable to even participate in a video call as a result of poor connectivity issues.  *See* O'Brien Decl. ¶ 22.

When the facts are viewed in context without the vitriol and hyperbole, Mr. O'Brien's conduct with respect to Proskauer's alleged trade secrets not only cannot credibly be characterized as acquisition by improper means or nonconsensual use, but was entirely appropriate within the scope of his job for Proskauer.  *See, e.g., Zurich Am. Life Ins. Co*, 538 F. Supp. 3d at 405 ("[Defendant] was authorized to acquire this information as part of his job, so he did not acquire it by improper means.").

Further, there are no credible allegations that Mr. O'Brien ever disclosed any of Proskauer's purported trade secrets without consent, and, to the contrary, Mr. O'Brien adamantly denies ever doing so.[7]  *See* O'Brien Decl., ¶¶ 69, 86.

Because Proskauer cannot show that it is likely to succeed on its misappropriation claims, its motion should be denied.  *See, e.g.*, *In re Document Technologies Litig.*, 275 F. Supp. 3d at 463-64 (preliminary injunctive relief denied where plaintiff failed to demonstrate a likelihood of success on the merits for its misappropriation claims because it had not shown that individual defendants had intentionally retained its confidential information to gain an improper advantage in their new employment); *Free Country Ltd.*, 235 F. Supp. 3d at 569-70 (in the absence of evidence of misuse, plaintiff had failed to show likelihood of success on the merits of its misappropriation claim).

> b. *Count 2:  Alleged Misappropriation of Trade Secrets Under New York Common Law*

New York courts generally apply the same analysis to both DTSA claims and claims for misappropriation of trade secrets in violation of state common law.  *See, e.g., In re Document Technologies Litig.*, 275 F. Supp. 3d at 461-62 ("The requirements for showing a misappropriation of a trade secret are similar under [New York] and federal law."); *Free Country Ltd.*, 235 F. Supp. 3d at 565 (same).  Specifically, to prevail on a common law claim of misappropriation, a plaintiff

---

[7] Moreover, as *Zurich* instructed in rejecting the plaintiff's DTSA claim, "merely threatening <u>to keep</u> trade secrets, without threatening to use or disclose them, does not give rise to a DTSA claim."  538 F. Supp. 2d at 405 (emphasis in original).  Mr. O'Brien's retention of Proskauer's purported trade secret in the aftermath of his immediate termination – while he was still on vacation in Mauritius and not even in a position to return the information – does not even rise to the level of the defendant's conduct in *Zurich* (which fell short of misappropriation) as he has never threatened or even suggested an intent to retain Proskauer's information beyond his last day of employment with the firm.  O'Brien Decl. ¶ 83.  By way of contrast, the defendant in *Zurich* tried to use the fact that he still had the plaintiff's property as leverage and offered to return that property in exchange for consideration.  *See* 538 F. Supp. 2d at 405.

must allege that (1) it possessed a trade secret, and (2) that the defendant used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means. *Continental Indus. Group, Inc. v. Altunkilic*, 788 Fed. Appx. 37, 40 (2d Cir. 2019) (citing *North Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43-44 (2d Cir. 1999)).   There is a notable difference, however, in that New York's common law regarding misappropriation requires Proskauer to demonstrate ***use***, not just improper acquisition, of a trade secret by Mr. O'Brien. *Compare Continental Indus. Group, Inc.*, 788 Fed. Appx. at 40 *with* 18 U.S.C. § 1839(5)(A)-(B). Based on the myriad shortcomings identified above with respect to Proskauer's DTSA claim, Proskauer does not have a likelihood of success on establishing its narrower New York common law misappropriation claim, either. *See supra*, at p. 16-18.

> *c.  Count 3:  Alleged Breach of Fiduciary Duty.*

To establish a claim for breach of fiduciary duty under New York law, a plaintiff must show: (1) the existence of a fiduciary duty; (2) a knowing breach of that duty; and, (3) damages resulting from the breach. *See Johnson v. Nextel Communications, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011).   Under New York law, an employee owes a duty of good faith and loyalty to his employer in the performance of his duties. *Design Strategies, Inc. v. Davis*, No. 02-CV-5329 (VM), 2004 WL 1394327, at *4 (S.D.N.Y. June 22, 2004).   An aspect of this is that an employee has a duty "not to use confidential knowledge acquired in his employment in competition with his principal." *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 994 (2d Cir. 1983) (internal citation omitted).   However, the use of information based on general business knowledge or gleaned from general business experience is permissible, and the former agent may compete with his former principal in reliance on such publicly available information. *Id.*

16

Proskauer simply has not demonstrated (and cannot demonstrate) a likelihood of success as to its breach of fiduciary duty claim because there is no credible or, much less actual, evidence of a breach – Mr. O'Brien has acted in good faith and loyalty towards the firm at all times.[8]  *See* O'Brien Decl. at 88.  For example, there was no nefarious intent in Mr. O'Brien's activities with respect to the deletion of emails in his Proskauer account; he was simply trying to streamline and organize years' worth of emails and remove any personal or private information.  *See* O'Brien Decl. ¶¶ 42-53.  (At any rate, all emails from the past year, before he even began his preliminary communications with Paul Hastings, were unaffected by the removal of the litigation hold and presumably remain in his Proskauer account.)

Mr. O'Brien brought Proskauer's information with him on vacation so that he would be able to effectively and efficiently do the work that he had planned to do (and was later ordered to perform by the Managing Partner) for the firm.  *See* O'Brien Decl. ¶ 74.  To accomplish that, he transferred that information to a USB drive because, in the past, he had experienced technical difficulties when trying to access the firm's VPN service from remote locations closer to home than Mauritius, and he did not want to risk having connectivity issues yet again.  *See id.* at ¶ 15-17, 22-23, 28, 33, 56, 74.  Mr. O'Brien never pressured anyone to do anything inconsistent with Firm policy, nor did anything inconsistent with Proskauer policy actually happen, notwithstanding what Proskauer would have the Court and the public believe.  *See id.* at ¶¶ 25, 51-52.  He did everything openly and in accordance with Firm policies and protocols rather than trying to evade

---

[8] To the extent that Proskauer argues that Mr. O'Brien's breach was that he did not disclose his plans to leave before receiving a bonus, the claim fails as Mr. O'Brien was under no duty to disclose his plans before he was ready, and, regardless, that claim would be a quintessentially money damages claim.  *See, e.g. In re Maxsun Produce Corp.*, No. 13-42875-NHL, 2020 WL 1987761, at *8 (Bankr. E.D.N.Y. Apr. 24, 2020) ("Absent a provision in the corporate documents to the contrary, a director or officer may generally resign at will, and need not provide written notice.")

internal restrictions.[9]  *See id.*  Proskauer has not otherwise demonstrated (and cannot demonstrate)

that Mr. O'Brien has placed his own interests before the firm's interests.  *See id.* at ¶ 88.

Furthermore, as explained repeatedly, Mr. O'Brien has not used or disclosed any of Proskauer's

information to compete with the firm.  *See* O'Brien Decl. ¶¶ 69, 86.  Proskauer's histrionics and

attempts to put a sinister spin on Mr. O'Brien's conduct simply do not square with the actual facts.

Ironically, none of the conduct of which Proskauer now complains was undertaken in order to

benefit third parties or Mr. O'Brien personally, but rather, was undertaken by Mr. O'Brien to

ensure that his departure from the firm would be as professional and seamless as possible.  *See*

O'Brien Decl. ¶¶ 23, 65, 73, 78, 88.

Not only does Proskauer fail to show that Mr. O'Brien ever breached his fiduciary duties

to the firm, but it also fails to show that it has suffered any harm as a result of the non-existent

breach.  For all of these reasons, Proskauer is unlikely to succeed on the merits of its breach of

fiduciary duties claim.

### 2.   Proskauer Has Not Suffered And Will Not Suffer Irreparable Harm.

"A showing of irreparable harm is the single most important prerequisite for the issuance

of a preliminary injunction."  *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118

(2d Cir. 2009) (internal quotation and citation omitted).  Irreparable harm cannot be "remote or

speculative" or based on conjecture – it must be based in the facts of the actual case.  *See, e.g.,*

*Faiveley Transport Malmo AB*, 559 F.3d at 118 (to satisfy the irreparable harm requirement,

---

[9] Indeed, as Mr. O'Brien points out, he was intimately familiar with the Firm's IT and information
security policies, including its policies directed at departing employees.  *See* O'Brien Decl. ¶ 58.
He knew, for example, that the Firm would be conducting review of his activities in the 30 days
leading up to his resignation.  *See id.*  It is as illogical as it is ludicrous for him to engage in the
type of misconduct of which Proskauer accuses him knowing that the Firm would discover it.  *See*
*id.*

plaintiffs must demonstrate that they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm) (internal quotation and citation omitted); *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999) (irreparable harm requires an "injury that is neither remote nor speculative"). The "mere possibility of irreparable harm is insufficient to justify the drastic remedy of a preliminary injunction." *Accenture LLP*, 2021 WL 6619331, at *7 (quoting *Borey v. National Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1991).

Here, Proskauer's assertions of irreparable harm caused by Mr. O'Brien amount to rank speculation and unsubstantiated fear.[10] Proskauer surmises that Mr. O'Brien will disclose or use its purported trade secrets in his new job, but Mr. O'Brien unreservedly denies that he has disclosed or used – or that he will or even would disclose or use – any information belonging to Proskauer at Paul Hastings or elsewhere. *See* O'Brien Decl. ¶¶ 69, 86, 89. Proskauer's imagined disclosure and use of its information by Mr. O'Brien is exactly the kind of speculative leap that courts deem insufficient to show irreparable harm. *See, e.g.*, *Natera, Inc. v. Bio-Reference Lab., Inc.*, No. 16-CV-9514 (RA), 2016 WL 7192106, at *3 (S.D.N.Y. Dec. 10, 2016) (plaintiff's claim that defendant's actions would cause it to lose trade secrets was "far too speculative to constitute irreparable harm.") In short, Proskauer has not alleged a single fact to demonstrate any actual threat of irreparable harm (or any harm at all for that matter) attributable to Mr. O'Brien, and its

---

[10] Proskauer's speculative assertions of irreparable harm are also somewhat internally inconsistent. On the one hand, Proskauer stated during the December 28 *ex parte* hearing that there was a low risk of Mr. O'Brien finding out about the lawsuit because he was "9,000 miles away in Mauritius on a vacation." (Dec. 28, 2022 Hr'g Tr. at 4.). On the other hand, the thrust of Proskauer's argument is that, despite his presence in this remote destination, he still posed such a threat to its trade secrets that an *ex parte* motion was justified.

unsubstantiated generalities cannot properly be the basis for injunctive relief.[11]

Furthermore, the specious allegations of misconduct contained in declarations supporting Proskauer's motion are not only refuted and reasonably explained by Mr. O'Brien, *see* O'Brien Decl. ¶ 24, but they also fail to establish the likelihood of any irreparable harm.  *See, e.g., Accenture LLP*, 2021 WL 6619331, at *14-17 (court found that defendant had adequately explained the conduct at issue and found that the plaintiff was unlikely to suffer irreparable harm without an injunction).[12]  Indeed, there is *no* harm whatsoever based on Mr. O'Brien's purported conduct.

To the extent that Proskauer plans to argue that it will be irreparably harmed because its trade secrets remain in Mr. O'Brien's head, and he will inevitably disclose them, that argument must be rejected.  First, as courts have consistently held, New York law recognizes a specific means for an employer to protect information under such circumstances – a noncompete agreement.  *See Free Country, Ltd.*, 235 F. Supp. 3d at 567 (citing *EarthWeb, Inc. v. Schlack*, 71

---

[11] Proskauer also fails to demonstrate *imminence* of harm, an independent basis to deny its Motion. *See, e.g.*, *Forest City Daly Hous., Inc.*, 175 F.3d at 153 (irreparable harm requires an "injury that is neither remote nor speculative, but actual and imminent."); *In re Document Technologies Litig.*, 275 F. Supp. 3d at 469 (quoting same language).  None of the harm Proskauer speculates about in its complaint or motion even pretends to be imminent, particularly now that Mr. O'Brien's job offer from Paul Hastings has been rescinded as a consequence of Proskauer's false accusations, and he has no other employment prospects.  *See* O'Brien Decl. ¶¶ 92-93.

[12] The *Accenture LLP* Court was also unconvinced that the three-month delay between the time that the defendant had signed an employment agreement with her new employer (November 2020) and her resignation notice (February 2021) demonstrated that the plaintiff was likely to suffer irreparable harm.  *See* 2021 WL 6619331, at *16.  The Court accepted as credible the defendant's offered reason for the delay – that she did not want to switch jobs before the year-end holidays and also stayed in to attend meetings set up with key executives of a client.  *Id.*  The Court further observed that even if part of the defendant's reason for delaying her departure through the year-end holidays had been to ensure that her outstanding stock options would vest, that self-interested objective – when she had put in many years of work at Accenture – would not demonstrate that she would disregard her legal duties to keep Accenture's confidential information secret and refrain from using it at her new employer.  *Id.*

F. Supp. 2d 299, 311 (S.D.N.Y. 1999); *Janus et Cie v. Kahnke*, No. 12-CV-7201 (WHP), 2013 WL 5405543, at * 2 (S.D.N.Y. Aug. 29, 2013)).  But Proskauer never sought, much less obtained, a noncompete from Mr. O'Brien.

Second, "[a]bsent evidence of actual misappropriation by an employee, the [inevitable disclosure] doctrine should be applied in only the rarest of cases." *EarthWeb, Inc.*, 71 F. Supp. 2d at 311.  *See also Janus et Cie*, 2013 WL 5405543, at *3 (declining to recognize "inevitable disclosure of trade secrets as a stand-alone claim in a complaint bereft of any allegations that [employee] misappropriated trade secrets or breached a non-compete agreement," which would "greatly expand the reaches of a restricted doctrine heavily disfavored under New York law.")  As a threshold matter, there is no evidence of actual misappropriation, and there is not a shred of evidence to support that this is the extraordinary type of case in which the inevitable disclosure doctrine should be applied to satisfy the requirement of irreparable harm, particularly given the recission of Mr. O'Brien's job offer from Paul Hastings.  *See Free Country, Ltd.*, 235 F. Supp. 3d at 567; *EarthWeb, Inc.*, 71 F. Supp. 2d at 311; *Janus et Cie*, 2013 WL 5405543, at * 2.

Specific factors to consider in weighing whether to grant injunctive relief based on application of the inevitable disclosure doctrine are whether: (1) the employers in question are direct competitors providing the same or very similar products or services; (2) the employee's new position is nearly identical to his old one, such that he could not reasonably be expected to fulfill his new job responsibilities without utilizing the trade secrets of his former employer; and, (3) the trade secrets at issue are highly valuable to both employers. *EarthWeb, Inc.*, 71 F. Supp. 2d at 310.  "Other case-specific factors such as the nature of the industry and trade secrets should be considered as well." *Id.*  But Mr. O'Brien does not even have a new employer or position, much less a job that would require him to use anything other than his general knowledge and skills.

Consistent with that, as he has made abundantly clear, he would never use or disclose any of Proskauer's purported trade secrets anyway.

Proskauer fails to demonstrate yet another aspect of the irreparable harm standard:  that the requested injunction would avoid its alleged irreparable harm. *See, e.g.*, *In re Document Technologies Litig.*, 275 F. Supp. 3d at 460-61 (court must consider the likelihood that the moving party will suffer irreparable harm if a preliminary injunction is not granted).  ***Proskauer's Proposed Order identifies conduct it wishes the Court to proscribe – but that is already being complied with by Mr. O'Brien***.  As requested in the first part of Proskauer's Proposed Order (Dkt. No. 15), Mr. O'Brien is already voluntarily (1) refraining from engaging in acts of misappropriation of any of Proskauer's proprietary, confidential and/or trade secret information obtained from Proskauer's computer systems; and (2) refraining from using, copying, reviewing or disclosing any of Proskauer's proprietary, confidential and/or trade secret information obtained from Proskauer's computer systems.  O'Brien Decl. ¶¶ 85-86, 89.  To the extent that the Mr. O'Brien ever had hard copies or Proskauer devices containing Proskauer's proprietary, confidential and/or trade secret information in his possession, custody, or control, that information has now been returned to the firm in compliance with the TRO.  *See id.*  In further adherence to the TRO, Mr. O'Brien has agreed to engage in a forensic review to locate and delete any Proskauer information that may have remained on any of his personal devices or in his personal accounts. *See id.* at ¶¶ 86-87.  Finally, Paul Hastings rescinded its job offer upon learning of the allegations in this lawsuit, and Mr. O'Brien is now unemployed for the foreseeable future.[13]  *See* O'Brien

---

[13] Furthermore, Mr. O'Brien unequivocally denies that he ever disclosed any of Proskauer's proprietary, confidential and/or trade secret information to Paul Hastings.  O'Brien Decl., ¶ 69.  Proskauer has no evidence to the contrary – simply because it never happened.

Decl. ¶¶ 92-93.  Thus, Proskauer's concerns about Mr. O'Brien's threatened disclosure or use of its trade secrets to a competitor were not only baseless, but they are also now moot.[14]  For all of these reasons, there is no risk that denying Proskauer's requested injunctive relief would lead to irreparable harm, since an injunction would accomplish no purpose.

In short, there is simply no actual – or even credible threat of – irreparable harm.  Mr. O'Brien used Proskauer's purported trade secrets and confidential information solely for his work for the firm as its COO and nothing else, and there is zero evidence to the contrary.  O'Brien Decl. ¶¶ 69, 86, 89.  Mr. O'Brien has returned everything that Proskauer requested, has volunteered to have any Proskauer materials on his personal devices or in his personal accounts forensically removed, and has not disseminated or used – and will not disseminate or use – such information. O'Brien Decl. ¶ ¶¶ 85-87, 89.  *See, e.g., In re Document Technologies Litig.*, 275 F. Supp. 3d at 464 n.7 (noting that plaintiff failed to show the element of irreparable harm where individual defendants were no longer in possession of disputed thumb drives, and they had expressed a willingness to delete an invoice spreadsheet in their possession upon request).  Moreover, Mr. O'Brien is not going to any new employer, let alone a competitor of Proskauer.  *See* O'Brien Decl. ¶¶ 92-93.

     3.   The Balance Of Hardships Is Firmly On Mr. O'Brien's Side.

Any potential harm caused to Proskauer by a denial of its motion must be balanced against any reciprocal harm caused to Mr. O'Brien by the imposition of an injunction.  As explained above,

---

[14] *See, e.g., Elko, Inc. v. Peters*, No. 3:22-CV-00015-MMD-CLB, 2022 WL 256975, at *4 n.7, *7 (D. Nev. Jan. 27, 2022) (the preliminary relief requested for the return of plaintiff's trade secrets had been rendered moot by defendants' agreement to arrange for the return and/or destruction of such information and request for the preservation of all case-related evidence was likewise deemed to be moot because defendants had an inherent obligation to preserve evidence in connection with the litigation).

Proskauer has already received all of the relief that it seeks from the initial TRO.  Mr. O'Brien has returned all of the information requested by Proskauer, he is cooperating with working out a forensic protocol to dictate the search and deletion of any Proskauer information that may remain on his personal devices or accounts, his job offer has been rescinded, and he currently has no employment prospects (let alone to a competitor).  No actual or threatened irreparable harm to Proskauer exists.

However, enforcing Proskauer's Proposed Order would be disproportionately harmful to Mr. O'Brien.  Proskauer has succeeded in defiling Mr. O'Brien's previously sterling professional and personal reputation in just a few short days, already resulting in the recission of his job offer from Paul Hastings and his planned resignation from his charitable engagements to avoid imposing any public embarrassment on those institutions.  O'Brien Decl. ¶¶ 92, 96-97.  If the Proposed Order is imposed, it will get Proskauer nothing more than Mr. O'Brien has done and represented he will do, while in contrast, make it considerably more difficult for Mr. O'Brien to find a job and legitimately engage in his chosen employment.  *See id.* at ¶ 89-91, 97-98.

4.   Injunctive Relief Will Not Serve The Public Interest.

Proskauer has improperly used the judicial system as a sledgehammer to destroy Mr. O'Brien's career and reputation.  Mr. O'Brien was simply trying to do the right thing (as he did throughout his seven-year tenure at Proskauer) by trying to wrap up his affairs and ease his departure from the firm, going so far as to make himself available for work during a long-planned international vacation over the holidays and offering to extend his original last day to assist with the transition.  O'Brien Decl. ¶ 22-23.  Rather than first raising any concerns with Mr. O'Brien about the underlying issues raised in the complaint and trying to resolve things amicably, Proskauer rushed to court on an *ex parte* basis in an obvious attempt to portray Mr. O'Brien as a

24

villain when, in reality, he is just one of many victims of the firm's Machiavellian management. (Indeed, Mr. O'Brien is now considering the multiple counterclaims that he may have against both Proskauer and the individuals at Proskauer in their personal capacity who are driving this vindictive litigation against him.[15])

Proskauer does not even purport to have required a noncompete of Mr. O'Brien.  Yet, by ginning up a false claim of misappropriation of trade secrets and hand wringing about imaginary risks of harm, Proskauer seeks to (baselessly) obtain from this Court what it never asked for or obtained from Mr. O'Brien: A *de facto* noncompete.  *See, e.g.*, *EarthWeb, Inc.*, 71 F. Supp. 2d at 310 ("While the inevitable disclosure doctrine may serve the salutary purpose of protecting a company's investment in its trade secrets, its application is fraught with hazards….This can be a powerful weapon in the hands of an employer; the risk of litigation alone may have a chilling effect on the employee.  Such constraints should be the product of open negotiation.").  If Proskauer prevails, it will chill other Proskauer employees' freedom of mobility by deterring them from resigning for fear of incurring the Firm's unrestrained wrath.  *See, e.g.*, *Accenture LLP*, 2021 WL 6619331, at * 9 ("The law of trade secrets and restrictive covenants….is not intended to stifle competition by protecting a firm against the loss of an employee whose value resides not in the secrets she will divulge to her new employer but in the experience and skill she will bring.")   In short, the public interest is heavily in favor of allowing Mr. O'Brien – an employee who never had

---

[15] Pursuant to Fed. R. Civ. P. 65(c), a court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Accordingly, if the Court were to grant any further injunctive relief – which it should not – Mr. O'Brien requests that the Court order Proskauer to post a multimillion dollar bond as a proper estimate of his costs and damages if or when he is found to have been wrongfully enjoined or restrained.

a noncompete with Proskauer and did not actually misappropriate any Proskauer information – to peacefully leave the firm as he intended from the beginning and promoting employee mobility for better job opportunities.  To rule otherwise will only provide encouragement for Proskauer and other unscrupulous employers to wage similar disinformation wars against their departing employees in the future and unnecessarily clog the judicial system with frivolous lawsuits.[16]

## **CONCLUSION**

For all of the reasons set forth above, Proskauer's request for injunctive relief fails as to both the facts and the law, and this Court should deny Plaintiff's Motion for Order to Show Cause for an *Ex Parte* Temporary Restraining Order in its entirety.

---

[16] Based on the circumstances, Mr. O'Brien submits that this is an instance in which an award of reasonable attorney's fees for would be warranted and appropriate.  *See, e.g.*, 18 U.S.C. § 1836(b)(3)(D)(providing that a court may, "if a claim of the misappropriation is made in bad faith, which may be established by circumstantial evidence,…award reasonable attorney's fees to the prevailing party.").

Dated: January 11, 2023

Respectfully submitted,

JONATHAN O'BRIEN,

By his attorneys,

/s/ *Russell Beck*
Russell Beck
*rbeck@beckreed.com*
Sarah C. C. Tishler
*tishler@beckreed.com*
BECK REED RIDEN LLP
155 Federal Street, Suite 1302
Boston, Massachusetts 02110
Telephone: (617) 500-8660
Facsimile: (617) 500-8665

Russell M. Yankwitt
Michael H. Reed
YANKWITT LLP
140 Grand Street, Suite 705
White Plains, New York 10601
Tel: (914) 686-1500
Fax: (914) 801-5930
russell@yankwitt.com
michael@yankwitt.com

## CERTIFICATE OF SERVICE

I hereby certify that, on January 11, 2023, the foregoing document was served electronically via ECF upon all counsel of record.

/s/ *Russell Beck*
Russell Beck