UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PROSKAUER ROSE LLP,

Plaintiff,

v.

JONATHAN O'BRIEN,

Defendant.

Case No. 22 Civ. 10918 (AT)

**DECLARATION OF JONATHAN O'BRIEN**

Jonathan O'Brien makes the following declaration pursuant to 28 U.S.C. § 1746:

1.     I am over the age of eighteen.

2.     The facts set forth in this declaration are based on my personal knowledge.

3.     I am the named defendant in this litigation.

4.     As discussed below, I am currently unemployed as the direct result of the baseless and vindictive allegations made by my former employer, Proskauer Rose LLP ("Proskauer" or the "Firm"), in this litigation.

5.     I will discuss Proskauer's various specious allegations about my alleged conduct in greater detail below but, as an initial matter, all allegations concerning any alleged "theft," "crime," or any other nefarious actions by me are absolutely and unequivocally false – something Proskauer should (and would) have known if it had not rushed into Court in order to generate media coverage while completely disregarding the truth and at extreme cost to my professional and personal reputation.  To be very clear, if anything "debased" occurred here (to use Proskauer's terminology), it is Proskauer's doing, not mine.

## THE PARTIES

6.      I am an individual with residences in New York City and Verplanck, New York. At the time of my resignation and subsequent December 27, 2022 termination from Proskauer upon the filing of this action, I was Proskauer's Chief Operating Officer.

7.      As has been alleged, Proskauer is an international law firm with a primary office in New York City, which is the office to which I reported during my seven years working for the Firm.

8.      In rare instances of accuracy amidst a slew of contrived, self-serving misrepresentations to the Court and the public, Proskauer correctly describes (1) the overall structure and management of the Firm; (2) my employment history with the Firm as its Chief Financial Officer from 2015 until 2017, and then as its Chief Operating Officer ("COO") from 2017 until my termination on December 27, 2022; and (3) the scope of my duties and responsibilities while COO.  Accordingly, I will not rehash those topics here other than as necessary to address Proskauer's allegations of misconduct.

9.      Additionally, for necessary context regarding Proskauer's likely ulterior motives in bringing this action against me, it has very publicly and consistently lost talent in 2022 to other prominent law firms, such as Kirkland & Ellis, Ropes & Grey, and White & Case.  I believe that Proskauer is pursuing me out of misdirected malice for leaving (primarily because they surmised that I was resigning to go to work for Paul Hastings, which has as its Chair a former Proskauer partner against whom Proskauer holds a deep animosity) and as a deterrent to others who may be seeking to leave the Firm.

## MY CAREER AND PROFESSIONAL AND PERSONAL REPUTATION

10.      I have spent more than 25 years in various finance and operations roles.

11.     Immediately prior to my work for Proskauer, I briefly worked as the Acting Chief Financial Officer ("CFO") for LumiFi, and, prior to that, I spent four years as Global Finance Director for The Boston Consulting Group.  Before joining The Boston Consulting Group, I worked for 11 years for Fidelity, first as Group Finance Director in the United Kingdom and then as its CFO/COO Asia Pacific.

12.     I endeavor to give back to my community as much as possible and have been engaged in numerous charitable and religious organizations for decades.

13.     Consistent with the trust given to me by the numerous respected organizations throughout my career, I have always taken pride in my professionalism and integrity.  As my own harshest critic, I strive to maintain the highest standards of duty, care, professionalism, and performance in my professional life.  I believe that I would not have reached the levels that I have – COO and CFO roles at major multinational corporations – had my standards for myself been any less exacting.

14.     I have never, in my decades of professional work and other endeavors, engaged in or been accused of anything remotely similar to what Proskauer alleges.

### MY "VACATIONS" WHILE AT PROSKAUER

15.     Over my seven years at Proskauer, I took approximately six or seven vacations – to Mexico, the Caribbean, and an international cruise.  To the best of my recollection, I performed (as was always expected of me) significant amounts of work for Proskauer during each of those vacations.

16.     To be clear, I am not complaining that I had to work while on vacation.  Given my position as CFO and then COO, it was expected that I be responsive to the Firm regardless of whether I was away.  However, the expectation that I work while on vacation – which is entirely

omitted from Proskauer's narrative – provides critical context for why I needed to gather information in December in advance of my trip to Mauritius, discussed below.

17.     To work and access Proskauer information while away from a Proskauer office, I would need to access Proskauer's network through a VPN connection. It was my experience while on past vacations in the Caribbean that VPN access was very slow and often failed entirely. This led to hours of frustration for me and delays when I needed to promptly address various work-related issues while I was away.

### MY VACATION TO MAURITIUS AND PLANNING FOR MY RESIGNATION

18.     As has been discussed already in this litigation, I was recently on vacation with my wife in Mauritius, an island in the Indian Ocean off the coast of Madagascar.

19.     That vacation was originally planned before the COVID-19 pandemic, but we had to postpone it once the pandemic hit.

20.     This past fall, we rescheduled our vacation to Mauritius, departing on December 21, 2022 and returning January 5, 2023.

21.     I do not recall whether I specifically informed Proskauer's Managing Partner, Daryn Grossman, of my vacation (nor was that required as I did not report to her), but her insinuation in her Declaration that it came as a surprise to the Firm is false. I notified Proskauer's Chairman, Steven Ellis, to whom I reported directly, of my intended vacation on November 9, 2022. The Firm, therefore, was aware of my vacation for nearly two months before it happened.

22.     Given that I had worked on every prior vacation while at Proskauer, I fully expected (and was later ordered by Ms. Grossman) to work while on vacation in Mauritius. I reasonably assumed that, given the connectivity issues I had experienced in less-remote areas, I

might face similar, and potentially worse, issues while in Mauritius.  My concern was vindicated – the internet connection in Mauritius could not even support a successful video call (it was so choppy I had to stay on audio only), much less accessing a VPN and downloading reams of material.  I needed to be able to efficiently and effectively access documents that would be of use to my work without having to rely on or use a potentially problematic VPN connection.

23.     It was for that reason that I, along with the assistance of certain other individuals at Proskauer, gathered materials to bring with me to Mauritius.  Additionally, as discussed below, I intended to resign before my vacation.  I expected a significant number of questions and transition issues while I was away, which was all the more reason to have access to everything possibly relevant in my possession without having to rely on a VPN connection.  I wanted to ensure that my transition could progress seamlessly regardless of my vacation.

### PROSKAUER'S DELUSIONS CONCERNING MY CONDUCT

24.     I have attempted to address the myriad allegations against me.  Proskauer's machinations are so voluminous, however, that it may be impossible to address every unfounded accusation.  To the extent any allegation of theft or other misconduct may not be specifically addressed, **I absolutely and unequivocally deny it** and will do so again when I submit a formal answer to Proskauer's Complaint.

25.     As discussed below, I did not abuse my position of authority within the Firm with respect to anyone in IT, e-discovery, or otherwise.  I made open and candid requests through normal channels, many of which Proskauer can see for itself as they were done over email.  I did not pressure anyone to do anything inconsistent with Firm policy, notwithstanding what Proskauer would have the Court and the public believe.

### List.Txt/Printed "Black Book Binder"

26.     I understand that Proskauer contends that I created a list of materials in November 2022 and implies that it was essentially a list of things I intended to steal.  This allegation is indicative of Proskauer's rush to accuse and convict me in the court of public opinion without performing the necessary diligence to determine whether their incendiary allegations are true – they are not.  I did **not** create this list.

27.     Rather, this list was created by Proskauer's former Chief Financial Officer as part of a project whereby she had Proskauer's Finance Administrator (an administrative coordinator for the Finance Group) make hard-copy binders of the listed documents. These binders were, I believe, intended to bring together year-end data and other frequently used finance information for easy access and use by me and others at the Firm.  The "Black Book Binder" had already been created as part of the Firm's year-end profit-allocation process on November 14, 2022, which is why the list shows it as already having been printed.

### Thumb Drives

28.     In or around late November or early December 2022, I asked then-Director of Financial Planning and Analysis ("FP&A"), Jeremy Russo, for a copy of his year-end materials, which I knew would comprise everything I might need to access while working in Mauritius.  I explained to him why I wanted the information (to take on vacation for the reasons I have stated above).  Rather than pick and choose files to take on vacation, which I did not do, or have Mr. Russo waste time sorting through each and every document, I simply asked Mr. Russo for his entire year-end folder and anything else he thought I might need while on vacation.  He had actually already put together a file of the year-end information and added the information from

the binder project and other additional materials he thought might be useful to me and directed me to a shared Proskauer finance drive where I could access and download it.

29.     Around the same time, I had been asked to send certain files to an external consultant retained by the Firm to help it formulate an overall forward-looking strategy, which the Firm did not have.  I was struggling to email large files and had received a number of bounce backs, which Proskauer should be able to see in my Firm email.  As a result, I contemplated moving everything onto a USB drive but did not know whether Proskauer materials moved to a thumb drive would be accessible to an external party.  That was why, on December 5, I spoke with the Director of Technology Support, Kevin Polakoff, to ask him whether an external party would be able to access Proskauer information via a USB.  He responded that they would.

30.     Ultimately, I did not need to resort to a USB.  Because I was gathering the information over a period of several days and did not want to delay sending the materials to the consultant, I managed to break the files down sufficiently to successfully send them to the consultant through multiple emails.

31.     During that same conversation on December 5 with Mr. Polakoff, I also asked whether he could he open the USB port on my Firm PC so I could save a file.  He said he would open a ticket to accomplish that for me.  I saved the file to a USB drive once the port was opened. Absent an exception like the one I requested, Proskauer does not permit Proskauer information to be downloaded to a USB – the port is blocked for the transfer of information in that direction.  In contrast, the port always permits access to anything already on a USB drive.

32.     Simply put, and contrary to Proskauer's allegations, I did **not** lie about a consultant.  I believe Mr. Polakoff has conflated my two distinct lines of inquiry in a way that, unfortunately, Proskauer has exploited to lend support to its conspiracy theory.

33.     On December 16, 2022, Mr. Russo updated the file with new information (as it is constantly evolving and being updated) that might be relevant to any work I might have to do while in Mauritius.

34.     I presumed, as should have been the case if Proskauer's own policy had been correctly followed, that the USB port was closed after a short period of time (I believe it should have been closed in approximately 24 hours).

35.     Accordingly, after Mr. Russo updated the file for me on December 16, I again asked for the USB port to be opened. As it turns out, it was still open even though approximately 10 days had passed since the port had been opened. I saved the updated file to the USB and then brought it with me when I left for Mauritius on December 21.

36.     I understand that Proskauer believes I was trying to hide something related to this file because it was called "2022 tax documents." I have no idea why Mr. Russo gave the file that particular name, but I had no role whatsoever in its naming.

37.     Once I brought the USB drive home, I plugged in the USB and unzipped the file to ensure everything was there. To the best of my recollection, that was the last time I touched that file because, ultimately, I was terminated while on vacation before I needed to access or use the documents in the file.

38.     Specifically, I had a phone call scheduled for late in the evening (Mauritius time) on December 27. The call was with several Proskauer partners, including the Tax Matters Partner, his successor, the partner who had been tasked with picking up some of my duties after I left, and a member of the Executive Committee. We discussed Firm tax matters generally. At no point did anyone on the call ask me about the files I had taken with me, or any of the other allegations Proskauer made against me in the days that followed. The call wrapped up at around

10:00 PM Mauritius time. To complete the necessary follow-up from the call, specifically in relation to the cashflow and tax position of UK partners, I intended to use some documents from the USB drive the following morning when I woke up. However, before doing so, I received notice of my termination.

<u>CODE AND SCRIPTS</u>

39.     I have no idea why the file prepared by Mr. Russo contained code and scripts. My best guess is that he (or someone else on the FP&A team) erroneously included those files in the year-end file. I understand that Mr. Russo also provided notice of his own resignation to Proskauer that same day, so if it was him who placed those files in the year-end file, I assume he had many things on his mind and simply made a mistake.

<u>EMAILS AND LITIGATION HOLD</u>

40.     The tale that Proskauer has woven about my emails is also pure fantasy.

41.     As discussed below, I was fairly certain that I would be leaving Proskauer once I had helped the Firm complete its year-end process,

42.     Before leaving, I wanted to do some housekeeping on what had become a very unwieldy email box, in part, resulting from a litigation hold on my email that I believed should have been lifted long ago. It was a standard practice for me to clean up my email before leaving prior jobs, and I did the same here, as I wanted to see if there was anything personal or private in the emails that I did not want to leave there. My concern for my privacy (and the privacy of others) has continued and, given the history, I expect that Proskauer intends to further malign me because I will not provide unfettered access to personal information that resides on my Proskauer-issued phone – which I have returned to Proskauer. Before providing the passcode to that phone, however, I have repeatedly reiterated I am not, in any way, trying to prevent

Proskauer from reviewing and accessing its own information and requested confirmation that my personal information, and the information of others, will not be reviewed absent an agreed-upon protocol. As I understand, Proskauer has not yet agreed, but I remain optimistic that we will be able to reach an agreement that addresses everyone's concerns in a reasonable way.

43.    As an initial matter, Proskauer's description of the litigation-hold process generally, and the manner in which a litigation hold may be lifted, is inaccurate because it is incomplete. The Firm handles litigation holds in two ways: (1) via the General Counsel's Office or its designee ("GCO") or (2) through e-discovery.

44.    In the first scenario, the GCO will instruct IT to place an individual on a litigation hold, typically for purposes of an internal Firm investigation, and that hold may only be lifted by the GCO.

45.    In the second scenario, the hold is implemented through the Firm's e-discovery function. This happens when the Firm has been named in litigation, and e-discovery implements a hold on the email of all custodians who might have potentially relevant information. In that scenario, Proskauer's policy is that the hold expires automatically once the Client-Matter number associated with the hold is closed.

46.    My email account had been subject to a hold because of a former suit against the Firm. The suit had resolved, and the Client-Matter had been closed (at the latest) in 2019, at which time the hold should have been automatically removed. For some reason, the hold was not lifted as it should have been.

47.    As I mentioned, I wanted to clean up my email before leaving the Firm.

48.     I did not know why my email was subject to a litigation hold and asked Cathleen

Peterson, one of the Firm's Senior eDiscovery Consultants, if she knew.  She confirmed that the

relevant matter (the subject of the litigation hold) had been long closed.

49.     I then asked Proskauer's Chief Professional Resources Officer, Christopher

Gardephe, how to remove the hold, and he told me that if Ms. Peterson confirmed (which she

already had) that the matter was closed, the hold could be lifted.

50.     Consistent with my discussion with Mr. Gardephe, I then emailed Ms. Peterson

and asked her to remove the hold.  When she did, all emails in my account that were more than a

year old were **automatically** deleted per Firm policy (this was one reason why I made sure to

archive my most important emails in an organized file structure).

51.     To be clear, had the litigation hold not been erroneously left in place, those emails

would have already been deleted per the Firm's entirely separate document retention policy long

ago.

52.     I strictly followed Firm protocol.  Because the hold was an e-discovery hold, there

was no need to involve the GCO to lift the hold.

53.     Prior to the removal of the hold, I also saved a PST file of my most important

emails that I was archiving to a USB.  That way, I could clean up my email box, move data off

the Exchange server, and keep it on the USB, so if needed, the email could be accessed as needed

by the Firm in the future, I had done this before in 2019, and that PST file (like the one I saved in

early December) was returned to Proskauer as was always my intention.

### RECYCLE BIN

54.     Proskauer has alleged I attempted to permanently delete (1) the materials put on

the USB drive from my computer and (2) my personal drive.  Apparently, according to

Proskauer, I did so by moving materials into my recycling bin and then emptying the recycling bin.

55.     I have no recollection of doing this.  But, I was trying to clean up files, so it is possible I did that as part of that process.  If I did delete anything, it was certainly not an effort to cover my tracks – there was nothing to hide.  I have already explained how and why materials were put on the USB drive.  As to my personal drive, I know that Proskauer keeps a backup of that drive – deleting anything would be meaningless.

### I HAD NO NEED TO (AND DID NOT) "STEAL" PROSKAUER'S ALLEGEDLY "CONFIDENTIAL" INFORMATION

56.     Under Proskauer's theory, I would have had no reason to take the USB drive to Mauritius; however, I brought it with me for precisely the legitimate reasons I have stated.

57.     As discussed above, I intended to work while on vacation and, based on past experience, was (rightly) worried about connectivity.  The ability to access a wide array of information was going to be particularly important given that I planned to resign before leaving on vacation and anticipated that I would almost certainly need to field an array of transition-related questions.

58.     What is more, in my role as COO, I was intimately familiar with all Firm protocols and policies, including IT and information-security issues.  I knew, for example, that the Firm would conduct a 30-day review of my activity once I resigned as it does for all departing employees.  The idea that I would engage in misconduct *knowing* that the Firm would be reviewing my actions is as illogical as it is ludicrous.

59.     To be very clear, I *never* took any Proskauer information with the intention of using it for any purpose other than my work for Proskauer.  Had I wanted to do so, I certainly would not have done so through requests to IT and e-discovery.  I already had the "Black Book

Binder" and other documentation in hard copy – if I wanted to conceal my actions, why would I request it electronically?

## NATURE OF THE INFORMATION

60. I do not dispute that there was a wide array of information on the USB drive. It was necessarily broad and high-level given that I was the Firm's COO, and I would be both working and transitioning my role while in Mauritius.

61. I did not select any information in particular to be transferred to the USB drive – I asked Mr. Russo to be overinclusive to ensure I would have everything I could possibly need. I did not, for example, request any templates, or training materials. Mr. Russo simply provided me with a large swath of materials that he considered potentially useful to me.

62. In any event, much of the information is not confidential, for example, Proskauer's billing rates, annual profits per partner, and other financial information that the Firm routinely shares with AmLaw and other outlets.

63. Proskauer's allegations that I took information related to "strategy" are ironic given that Proskauer has no real strategy. The Firm has steadily dropped in the global law firm rankings and is quite obviously desperate to avoid the appearance of being in a tailspin. I have to imagine that was a large motivator for this litigation – it is an opportunity to paint a self-serving portrait of the Firm in a very public manner at my expense.

## MY DECISION TO LEAVE PROSKAUER

64. In April 2022, Paul Hastings LLP ("Paul Hastings") reached out to me about a potential opportunity to join them as its COO.

65. Given Paul Hastings' superior status (compared to Proskauer) in the rankings of global law firms, I was very intrigued by the possibility of advancing my career in the legal

industry.  However, I did not seriously consider making a move at that point.  I knew that I would not leave Proskauer any time before helping to get the Firm through year-end (the busiest and most important part of the year for my role as COO).

66.     Following that initial outreach, I had a few conversations with Paul Hastings that slowly progressed.

67.     In July 2022, Paul Hastings and I began to engage in more substantive discussions, and I spent a significant amount of time evaluating whether Paul Hastings would be a good fit for me.  Ultimately, around September 2022, I concluded that it would.

68.     I had previously informed Paul Hastings, and reiterated, that I would not leave Proskauer in the lurch for their fiscal year-end.  Accordingly, we decided that I would resign at the end of the year and start with Paul Hastings in early 2023.

69.     Neither I nor Paul Hastings has any need of Proskauer's information.  Paul Hastings is a very well-established, international firm that has historically enjoyed a higher ranking than Proskauer.  Even if the information could have been useful, I would not have taken it, **did not take it**, would not have used it, and **did not use it** for anyone other than Proskauer.  Additionally, at no point did I discuss or share any Proskauer trade secrets or other confidential information with Paul Hastings or promise to bring any such information with me.

### **MY RESIGNATION**

70.     On December 20, 2022, I called Ms. Grossman (Managing Partner) and submitted my resignation.  It was a very short call.  I would have normally first informed Mr. Ellis (the Firm's Chair and my direct supervisor), but he was on vacation at the time.  I understand that Ms. Grossman promptly informed him of my resignation, and he then asked me to call him, which I did.

71.     During that call, I informed Mr. Ellis that I planned for my last day to be January

6, 2023, after I returned from my planned vacation in Mauritius.  He asked if I had been offered

more money (seemingly because he wanted to make a counteroffer to get me to stay).  I said it

was significantly more.  He asked if I was going to Paul Hastings, and I said something to the

effect of "I can't say where I'm going."

72.     When I spoke again with Ms. Grossman later that day, I informed her of my

timing.  She was furious that part of my notice period would be occurring during my vacation.

She implied that she wanted me to remain for a significantly longer time.

73.     Ms. Grossman alleges I said I was "an employee at will."  I did say this and told

her that, while I was not obligated to provide any particular amount of notice, I was happy to

work on a transition over a reasonable period of time, perhaps some extra weeks.  I also said I

could help with any questions after I started in my new role and that I would be "only a phone

call away."

74.     Ultimately, she angrily instructed me that I should expect to work every day while

on vacation.

75.     She also alleges that I said, "I owe you nothing."  That is simply not true.  I did

not and to suggest I did is ridiculous.  I worked for months to ensure I got Proskauer through

year-end and fully intended (even before Ms. Grossman's tirade) to continue to work for the

Firm, as needed, during my vacation.

76.     Similarly, I did not "smirk" at Mr. Gardephe.  The conversation with him

probably lasted less than a minute.  As best as I can recall, I told him that the Firm was mad

about my resignation.  I don't believe I said anything about what the Firm's reaction might be

when they found out about my new employer.  Nor would I have said anything like that because

it would have been an immediate signal that I was headed to Paul Hastings, something I did not want to disclose.

77.     Proskauer has displayed significant animosity toward Paul Hastings' Chair.  Paul Hastings' current Chair is a very prominent former Proskauer partner, and the circumstances leading up to and surrounding his 2019 departure are still a very sensitive, uncomfortable topic for Proskauer.  His elevation to the position of Paul Hastings' Chair-Elect in October 2021 rekindled that animosity.  For that reason, I declined to identify my new employer to Mr. Ellis, Ms. Grossman, and Mr. Gardephe when they asked.

78.     I understand that my notice period was perceived as too short and received poorly despite my willingness to extend it for some reasonable amount of time.  Obviously Proskauer views it differently but, to my mind, I had already ensured a successful year-end and provided for a smooth transition and departure.

### THE PRESS CONTACTED ME ABOUT THIS LAWSUIT BEFORE PROSKAUER

79.     I understand that Proskauer initiated this lawsuit against me on December 27, 2022.

80.     I was terminated by email on the evening of December 27, 2022.  The lawsuit was not disclosed.

81.     I first learned of the lawsuit (and Proskauer's purported concerns) from a press inquiry.

82.     Specifically, I received an email from Justin Henry at American Lawyer at 10:48 AM EST on December 28 (it was close to 8:00 PM in Mauritius) notifying me that a lawsuit had been filed against me by Proskauer and asking me about various claims concerning my alleged theft of Proskauer information.

16

83.     I was stunned.  After seven years of dedicated work and innumerable personal sacrifices for Proskauer, the Firm did not even reach out to me at all to discuss their purported concerns before filing this defamatory lawsuit.  Had they done so, I would have gladly provided the explanations set forth above and assured Proskauer that all information would be returned by my last day – as was **always** my intention.  This lawsuit was entirely unnecessary.

84.     I received the various court filings and the *ex parte* Temporary Restraining Order from Proskauer by email at 6:23 PM EST on December 28 (a little after 3:00 AM on December 29 in Mauritius).

### MY COMPLIANCE WITH THE TRO AND ALL OTHER OBLIGATIONS TO PROSKAUER

85.     I have fully complied, and will continue to fully comply, with the Court's December 28 Temporary Restraining Order. (I note that by agreement and Court order, the January 5, 2023 12:00 PM EST deadline was extended to January 6, 2023 at 6:00 PM EST to allow me time to comply once I was back in the country.)

86.     I have provided (and affirm here) written certifications to Proskauer, including that  I have not shared any Proskauer trade secret or other confidential information of Proskauer other than as authorized in the normal course of my Proskauer employment and that, to the extent any Proskauer information may remain on my personal devices (which would have occurred solely in the course of performing my duties for Proskauer), I will work with Proskauer, pursuant to an agreed-upon protocol, to identify, return, and remove from my possession all such information, if any.

87.     Counsel for the parties are negotiating the referenced forensic protocol.

88.     I have not, at any time, violated any duty or obligation to Proskauer.  I worked diligently for the Firm to ensure its success to the best of my ability until the moment I learned of my termination.

### A FURTHER ORDER IS ENTIRELY UNNECESSARY

89.     There is no reason for the Court to enter any injunctive relief against me.  I have already complied with the Court's *ex parte* order.  Further, I also have no intention of retaining, using, disclosing, or sharing any of Proskauer's information – and never had any intention of doing that.

90.     This entire lawsuit (and the obvious media attention that Proskauer knew it would draw) could have all been avoided, and my reputation preserved, had Proskauer simply contacted me, or even raised their concerns when we spoke immediately before they secretly filed their lawsuit.  Indeed, there was certainly no risk of harm to them given that I was on vacation halfway around the world and clearly was not about to rush off and use their information.  Nor is there any risk to them now, given my representations to this Court under oath.

91.     I suspect Proskauer will argue that I will not be harmed if I am simply ordered to do what I am already doing.  I strongly disagree.  It is one thing to have an *ex parte* order entered – which, to be clear, has already caused irreparable harm to my reputation and my career by the media circus caused by the false allegations, which are assumed to be well-founded given they were able to obtain the *ex parte* existing order.  It would be a wholly unnecessary piling on causing me even greater harm if a further order were entered against me, especially now that the truth has been provided to the Court.  As set forth below, the damage I have already sustained as a result of Proskauer's ego is incalculable.

### PROSKAUER'S MISREPRESENTATIONS HAVE CAUSED ME
### BOTH MONETARY AND IRREPARABLE HARM

92.     Upon learning of Proskauer's salacious allegations, Paul Hastings rescinded its offer to me.

93.     I currently have no job and no prospects of employment.  I believe I am untouchable for now as a candidate for any job, and certainly one with a large law firm.

94.     Proskauer insinuates that there was something improper about my receiving a bonus in December 2022.  I worked diligently for all but the last three days of 2022 (because I was precipitously terminated).  The Firm chose to give me a bonus based on my performance.  My loyalty to Proskauer did not shift, nor did my commitment to ensuring the Firm's success to the best of my ability.  Any allegation to the contrary is false and nothing more than an attempt to pile on additional monetary harm.

95.     The mental toll this lawsuit has already taken on me and my wife is incalculable.  I have had severe difficulty sleeping, extreme anxiety and stress, all related to this lawsuit.

96.     I also feel compelled to resign from my charitable engagements to avoid imposing any public embarrassment on those institutions.

97.     I have worked for decades to establish myself as a person of integrity and Proskauer has eviscerated that reputation practically overnight.  Proskauer's incendiary allegations and their widespread media coverage have, I believe, destroyed my personal and professional reputation.

98.     I am very concerned about being able to work again in any industry.  Even though the allegations are false, I worry that Proskauer's vindictive version of events has rendered me a *persona non grata.*

99.    I am not at retirement age, and did not intend to retire for many years.  I am very concerned that I will have no other options for comparable future employment.

100.    I declare under penalty of perjury that the foregoing is true and correct.


Dated:  January 11, 2023
        Verplanck, New York

                                                    _____
                                                    Jonathan O'Brien

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 11, 2023, the foregoing document was served electronically via ECF upon all counsel of record.

/s/ *Russell Beck*
Russell Beck