**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PROSKAUER ROSE LLP,                              :
                                                 :
                    Plaintiff,                    :
                                                 :          1:22-cv-10918-AT-SLC
          v.                                      :
                                                 :
JONATHAN O'BRIEN,                                :
                                                 :
                    Defendant.                    :
                                                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**PROSKAUER ROSE LLP'S REPLY BRIEF IN FURTHER**
<u>**SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION**</u>


DEBEVOISE & PLIMPTON LLP          PROSKAUER ROSE LLP
Mark P. Goodman                   Robert J. Cleary
Jyotin Hamid                      Michael T. Mervis
Adam C. Saunders                  Jacob R. Butwin
Jaime M. Fried                    Eleven Times Square
66 Hudson Boulevard               New York, New York 10036
New York, New York 10001          (212) 969-3000
(212) 909-6000
                                  Timothy W. Mungovan
                                  One International Place
                                  Boston, Massachusetts 02110
                                  (617) 526-9600

                                  Kyle A. Casazza
                                  2029 Century Park East, Suite 2400
                                  Los Angeles, California 90067
                                  (310) 557-2900


*Attorneys for Plaintiff Proskauer Rose LLP*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENT ........................................................................................................................... 3

I.  O'Brien's Narrative Defies Belief and Common Sense ...................................................... 3

    A.  O'Brien Admits Downloading Mass Quantities Of Confidential Firm Information, In Contravention of Firm Policy, But Offers An Utterly Implausible Explanation For This Conduct ............................................................. 3

    B.  O'Brien Admits That He Unilaterally Decided That A Litigation Hold No Longer Applied To Him, Without Discussion With The General Counsel, And Then Deleted Thousands Of Emails Just Before Quitting ............................. 8

II.  Proskauer Satisfies The Standard For Preliminary Injunctive Relief ................................ 9

    A.  O'Brien's Actions Satisfy Both The Federal And New York Standards For Misappropriation ................................................................................................. 9

    B.  The Risk Of Imminent And Irreparable Harm Persists ........................................ 11

    C.  Proskauer's Irreparable Harm Outweighs O'Brien's Perceived Harm To His Career ........................................................................................................ 13

III.  Proskauer Is Also Entitled To A Preliminary Injunction Under The "Serious Questions" Standard ....................................................................................................... 14

CONCLUSION ........................................................................................................................ 15

i

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

*AUA Private Equity Partners, LLC v. Soto*
  2018 WL 1684339 (S.D.N.Y. Apr. 5, 2018)..........................................................................9

*Golden Krust Patties, Inc. v. Bullock*
  957 F. Supp. 2d 186 (E.D.N.Y. 2013) ...............................................................................13

*Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*
  922 F. Supp. 2d 435 (S.D.N.Y. 2013)................................................................................14

*KCG Holdings, Inc. v. Khandekar*
  2020 WL 1189302 (S.D.N.Y. Mar. 12, 2020) ..............................................................10, 11

*Lumenate Techs., LP v. Integrated Data Storage, LLC*
  2013 WL 5974731 (N.D. Ill. Nov. 11, 2013) ....................................................................10

*Payment All. Int'l, Inc. v. Ferreira*
  530 F. Supp. *2d* 477 (S.D.N.Y. 2007).................................................................................12

*Spanski Enterprises, Inc. v. Telewizja Polska S.A.*
  832 F. App'x 723 (2d Cir. 2020) .......................................................................................14

*Town & Country Linen Corp. v. Ingenious Designs LLC*
  556 F. Supp. 3d 222 (S.D.N.Y. 2021)..................................................................................9

*Tradescape.com v. Shivaram*
  77 F. Supp. 2d 408 (S.D.N.Y. 1999)..................................................................................14

*Upjohn Co. v. Am. Home Prods. Corp.*
  598 F. Supp. 550 (S.D.N.Y. 1984) ....................................................................................12

*Ventura de Paulino v. N.Y.C. Dep't of Educ.*
  959 F.3d 519 (2d Cir. 2020)...............................................................................................14

**<u>Other Authorities</u>**

Restatement 3d of Unfair Competition, § 49 cmt. c (1995).........................................................11

## PRELIMINARY STATEMENT

Jonathan O'Brien's opposition to the preliminary injunction application of Proskauer Rose LLP ("Proskauer" or the "Firm") defies belief and common sense.  When the collective weight of facts which he admits or fails to dispute is held up against the "innocent" explanation he offers for his conduct, there is only one rational conclusion: that explanation is ludicrous. O'Brien admits or fails to dispute that:

- On December 5, 2022, he downloaded 34 gigabytes (roughly equivalent to 10 million emails) of Proskauer's confidential information to external storage devices and failed to disclose to the Firm's Chairman, Managing Partner, General Counsel or any Executive Committee member that he was compromising the security of that information by taking it outside the Firm.

- On December 16, 2022, only hours after receiving a seven-figure annual bonus and only two business days before announcing his resignation from Proskauer, he downloaded another trove of Proskauer's information—over 1,000 documents—suspiciously mislabeled "2022 tax documents."  There were no tax documents in this collection.

- To accomplish these downloads, he knowingly circumvented Proskauer's policy prohibiting downloading of data to external storage devices, again without the knowledge of or permission from the Firm's General Counsel or other leadership.

- After bringing one of the USB drives home on or after December 16, he plugged the device into a computer outside the Proskauer network, thereby further compromising the security of Proskauer's data.

- Before leaving the Firm, ostensibly to do some "housekeeping," he unilaterally and erroneously decided that a litigation hold on his emails no longer applied, without any discussion with the Firm's General Counsel (the one person authorized to make such a decision), and then manually deleted thousands of emails.

- He engaged in all this activity at a time when he had already decided to leave Proskauer to join a direct competitor but had not disclosed that fact to the Firm.

- On December 20, 2022, he abruptly resigned from the Firm, giving the Firm only one workday's notice, and refused to disclose where he would be working next.

- His two chief lieutenants, Leigh Ann Whyte and Jeremy Russo, also abruptly resigned just days before O'Brien announced his resignation, and Russo participated in the downloading.

- The vast troves of the Firm's data he stole included, among other highly confidential information: (i) financial performance, client lists and profitability metrics, compensation, and evaluations of every one of Proskauer's over 200 partners; (ii) the financial performance, profitability and other key metrics for all of the Firm's departments and practice groups; (iii) confidential strategies for lateral partner acquisitions; and (iv) forward-looking strategic planning documents.

- The day after resigning, he left on a vacation halfway around the world, supposedly taking all the data with him, again (if true) in contravention of Firm policy and without disclosing to the General Counsel or anyone else in Firm leadership that he was doing so, with the plan to join a direct competitor upon his return.

Despite these admissions, O'Brien asks this Court to believe that he took the data "innocently" in case he might need to refer to it while on vacation and asks the Court to not maintain the status quo by entering a preliminary injunction, pending discovery and a trial.

O'Brien's incredible tale begs many questions that are almost too obvious to state. Did he really need to download more than 34 gigabytes of data (including detailed financial performance metrics for every partner in the Firm) in case he might need to work on vacation? Is it remotely believable that this activity was for the Firm's benefit given that he planned to join a competitor upon returning from the vacation and refused to disclose to the Firm that that was his plan? Is it credible that he needed to take all of this highly confidential and sensitive information with him after the Firm's fiscal year closed on October 31 when virtually all of the Firm's year-end work had been completed nearly two months before he left on vacation? Is it even remotely believable that O'Brien was simply "trying to clean up files" when, just minutes after he downloaded 1,138 files to a USB, he deleted the entire contents of his "H drive" (including copies of all 1,138 files he had just downloaded) and then immediately emptied the contents of his recycling bin where all of those deleted files would otherwise have been stored? Is it really just a coincidence that the more than 1,000 files included in his second mass download just happened to be mislabeled for reasons he cannot explain? Is it really just a

2

coincidence that, according to O'Brien, the IT person who he tricked into assisting him in

circumventing Firm policy just happened to misunderstand (in two separate conversations) the

reason O'Brien gave for his request to circumvent the policy?  Is it believable that a professional

of O'Brien's sophistication and experience would think it is acceptable to unilaterally decide a

litigation hold no longer applies to him and to delete thousands of emails without any discussion

with the General Counsel?  Is a supposed desire "to do some housekeeping" when he knew he

would soon be leaving for a competitor a believable rationale for that mass deletion?

        In sum, O'Brien's own opposition papers are so riddled with fatal admissions, incredible

coincidences, and facially absurd excuses that they advance Proskauer's own case.  They

underscore that Proskauer remains likely to prevail on the merits of its claims, that there is an

ongoing danger of irreparable harm absent relief, and that the balance of harms is

overwhelmingly in the Firm's favor: the harm to Proskauer if its commercially sensitive material

is used or disclosed would be severe, while O'Brien would suffer no harm from an order

preventing him from using or disclosing that information (which he has no right to do anyway).

## <u>ARGUMENT</u>

## I.    **O'Brien's Narrative Defies Belief And Common Sense**

### A.    <u>O'Brien Admits Downloading Mass Quantities Of Confidential Firm Information, In Contravention of Firm Policy, But Offers An Utterly Implausible Explanation For This Conduct</u>

O'Brien admits that he transferred a PST file of emails to a USB.  O'Brien Decl. [ECF

No. 32] ¶ 53.  This is the first of two separate December 5, 2022 downloads, and the PST file

contained more than 34 gigabytes of emails, attachments, and other data from his Proskauer

mailbox—enough space to account for 10 million "basic" emails or over 60,000 emails with

attachments.  Second Hsu Decl. ¶ 12.  O'Brien contends that he did this for the Firm's benefit so

3

that his "most important emails" could be accessed in the future.  That makes no sense: the volume is way too large to be a collection of O'Brien's "most important" emails, and O'Brien does not claim that he told anyone at the Firm about the purported "benefit" he was providing.

O'Brien also admits to the December 16 download.  He concedes that he asked Jeremy Russo, Proskauer's then Director of Financial Planning and Analysis, for Russo's "entire year-end folder" of the Firm's financial information.  O'Brien further acknowledges that, with Russo's help, he downloaded the entire folder, consisting of over 1,000 of Proskauer's most sensitive and confidential documents, onto a USB in a file misnamed "2022 tax documents." O'Brien Decl. [ECF No. 32] ¶¶ 28, 33, 35.  He further admits that he then left the Firm with the USB and plugged it into a computer at home.  *Id.* ¶ 37.

O'Brien claims to not know why the file was given the misleading title, asserting that Russo named the file, *see id*. ¶ 36, and Russo has submitted a declaration purporting to confirm that he (Russo), not O'Brien, gave the file its misleading title.  The declaration lacks credibility, as it appears that Russo was O'Brien's co-conspirator.  Russo falsely told the Firm's Managing Partner that he first learned the news of O'Brien's resignation on a call with Proskauer's Chairman, Steven Ellis.  Second Grossman Decl. ¶ 7.  Handwritten notes left by Russo in his office, however, show that he actually only pretended to be surprised (in his words, he "act[ed] shocked") when Mr. Ellis called him to tell him that O'Brien had resigned.  *Id.* Ex. 1. Additionally, when the Firm's Managing Partner asked him on December 27, 2022 why he had named the file "2022 tax documents," given that it contains no tax documents, Russo was not able to provide any explanation at all, *see id.* ¶ 10 though, in his declaration, he now offers the non-credible explanation that he had been "thinking about" his personal taxes in December.

Russo Decl. [ECF No. 33] ¶ 11.  Russo, together with CFO Leigh Ann Whyte, both abruptly resigned within days of O'Brien's sudden resignation.

O'Brien also admits, as he must, that the Firm prohibits downloading of Firm information to external storage devices like USBs and that he therefore had to request a work-around from the Firm's Director of Technology Support, Kevin Polakoff.  O'Brien Decl. ¶¶ 29–31.  *See also* Hsu Decl. [ECF No. 38] Ex. 1 at 11.  O'Brien's narrative makes clear that, notwithstanding that he was violating Firm policy, he had announced his resignation and had already accepted a job at one of Proskauer's direct competitors, he never disclosed to the Firm's General Counsel, Chairman or Managing Partner that he was misappropriating the Firm's most sensitive information, and he never obtained authorization from them to take steps in violation of Firm policy.

The thrust of O'Brien's opposition is his claim that, while he admittedly circumvented the Firm's policies and downloaded confidential information to USBs, he did not do so for any nefarious reason, but rather so that he could refer to them if he needed to work on vacation.  This explanation is incredible for many reasons:

- First, the massive volume of material taken is far beyond what anyone could conceivably expect to need to refer to on vacation.

- Second, it is unnecessary to download Firm data to a USB in order to access it on vacation because as long as an employee can connect to the Firm's  network using WiFi, they can access any Firm information that they are authorized to view from anywhere in the world, Second Hsu Decl. ¶ 15.  Thus, the Firm's Director of Technology Support is unaware of any employee ever requesting permission to download Firm data to an external device in order to work while on vacation. Second Polakoff Decl. ¶ 9.

- Third, there was no need to download information to external storage devices because O'Brien could use WiFi to connect to the Firm's network from his vacation and access all of the Firm's information that way; the hotel at which he appears to have stayed is a five-star resort which touts its connectivity on its

5

website and even provides an "IT Butler" to assist guests.  Second Hsu Decl. ¶¶ 15, 17 & Ex. 4.

- <u>Fourth</u>, O'Brien's claim that he decided to download files to USBs because he had experienced connectivity problems in the past when vacationing outside the U.S., *see* O'Brien Decl. ¶ 22, is contradicted by the fact that he vacationed in the Caribbean earlier in 2022, Carbone Decl. ¶ 5, but did not download any Firm information to USBs in advance of that vacation and also did not, apparently, experience any connectivity problems.  Second Hsu Decl. ¶¶ 18–19.

- <u>Fifth</u>, O'Brien does not claim that he ever before requested an exception to Firm policies prohibiting downloading of Firm information to external storage devices in order to work on vacation, despite his contention that he had experienced connectivity issues on vacation in the past.

- <u>Sixth</u>, that the first vacation for which O'Brien ever supposedly felt the need to download Firm information to USBs is the one he took after resigning and before he planned to join a direct competitor upon his return reeks of disingenuousness.

- <u>Seventh</u>, there was no need to download the 34 gigabyte PST file to a USB in order to access it on vacation because the same emails would have been accessible to O'Brien on his Firm-issued laptop even without connecting to the network.  Second Hsu Decl. ¶¶ 13, 15.

- <u>Eighth</u>, there was actually very little for O'Brien to do on vacation because the Firm's fiscal year closes on October 31, and in the quiet period after the close of the fiscal year, there is typically only minimal amounts of work for the Firm's finance and administrative leadership in late-December.  Second Grossman Decl. ¶¶ 3–4.  Indeed, O'Brien himself justifies his decision to give the Firm only one workday notice of his resignation on the basis that he "had already . . . provided for a smooth transition and departure."  O'Brien Decl. [ECF No. 32] ¶ 78.  Moreover, O'Brien did **not** download the materials that would actually have been relevant to the transition work that the Firm hoped he would assist with prior to the effective date of his resignation.  Second Grossman Decl. ¶ 5.

Apart from the facial implausibility of his "vacation" excuse, another fatal problem with O'Brien's story is the testimony and contemporaneous documentation of Mr. Polakoff.  O'Brien did not tell Mr. Polakoff that he needed an exception because he was going on vacation; to the contrary, he told Mr. Polakoff on two separate occasions that he needed to move files to a USB in order to facilitate the transfer of information to a consultant who was working for the Firm.

Mr. Polakoff then created two contemporaneous "tickets" of O'Brien's requests, which describe the reason for O'Brien's requests: "to download data from local drive to a USB to provide to consultants" (on December 5) and "to provide information to consultants" (on December 16). Polakoff Decl. [ECF No. 10] ¶¶ 4–11 & Exs. 1 and 2; Second Polakoff Decl. ¶¶ 4–7.  O'Brien attempts to explain away Mr. Polakoff's testimony and the contemporaneous corroborating tickets by arguing that Mr. Polakoff must have misunderstood.  This attempt to soften the blow of this damaging evidence is incredible on its face and is directly refuted by Mr. Polakoff's testimony and contemporaneous documentation.  Even in O'Brien's own account of his conversations with Mr. Polakoff, he admits that he asked for a work-around, he admits that he said he needed to transfer information to a consultant, and he does **not** claim that he said anything about a vacation.  O'Brien Decl. [ECF No. 32] ¶¶ 29–31; *see also* Second Polakoff Decl. ¶¶ 4–9.

It appears that O'Brien has come up with the new "vacation" story only because Proskauer's initial moving papers demonstrated the falsity of his original "consultant" story which he used to trick Mr. Polakoff into granting him the exception.

O'Brien also has demonstrably lied about why he reached out to Mr. Polakoff in the first place on December 5.  O'Brien claims that he called because he "was struggling to email large files and had received a number of bounce backs, which Proskauer should be able to see in my Firm email."  O'Brien Decl. [ECF No. 32] ¶ 29.  In fact, records reveal this to be just another false statement.  O'Brien had received **no** email bounce backs before he contacted Proskauer's HelpDesk with his first inquiry at or around 1:09 p.m. on December 5.  Second Hsu Decl. ¶ 7.  Instead, he received only one bounce back message (not "a number" of them) in the early evening of December 5, more than **five hours after** he called Mr. Polakoff, and he continued to

send multiple emails within minutes of receiving the one bounce back.  Second Hsu Decl. ¶¶ 8–9
& Exs. 1, 2.

      B.     <u>O'Brien Admits That He Unilaterally Decided That A Litigation Hold No Longer
Applied To Him, Without Discussion With The General Counsel, And Then
Deleted Thousands Of Emails Just Before Quitting</u>

     O'Brien admits that he orchestrated his own release from a litigation hold to which his
Proskauer email account was subject without receiving permission from, or even informing, the
General Counsel or anyone in the General Counsel's Office.  O'Brien Decl. [ECF No. 32] ¶ 42.
He claims that he did so in the interest of "housekeeping" because his email box had become
"unwieldy."  *Id.*  That explanation makes no sense given that he was about to resign and the
"unwieldy" nature of his Proskauer inbox was soon to be irrelevant to him.  In any event, a
litigation hold does not prevent email users from organizing their emails into folders and even
deleting them from the user's view.  Second Hsu Decl. ¶ 21.

     Equally incredible is O'Brien's effort to explain away (O'Brien Decl. [ECF No. 32]
¶¶ 54-55) his deletion of his entire H drive and subsequent emptying of his recycling bin just
minutes after his mass downloading on December 16.  To do this requires several intentional
steps.  It could not have happened by accident.  Second Hsu Decl. ¶¶ 22–25.

     As a senior leader in an international law firm, O'Brien understood that a litigation hold
is put into place when a business has a legal obligation to preserve documents and that there
could be dire adverse consequences, including sanctions, if the business deletes emails subject to
a hold.  O'Brien's contention that he thought it was permissible to disregard the hold and then
delete thousands of his emails based on what he claims was **his unilateral** view that the hold was
no longer necessary and his checking with Human Resources and an e-discovery consultant, but

with no discussion with the General Counsel, defies credulity.  His assertion that Firm policy and

practice allows personnel to make such decisions without consultation with the General Counsel,

in addition to being incredible on its face, is simply wrong, as the testimony of the Firm's

General Counsel makes clear.  Lederkramer Decl. ¶¶ 3–6.  O'Brien's unilateral decision to lift

the hold and then delete thousands of emails just days before he announced that he was leaving

Proskauer and planned to join a competing firm cannot be justified.

## II.     Proskauer Satisfies The Standard For Preliminary Injunctive Relief

### A.     O'Brien's Actions Satisfy Both The Federal And New York Standards For Misappropriation

O'Brien argues that he did not misappropriate Proskauer's data because he was

authorized to acquire and use the information as part of his job as Proskauer's COO.  Def. Br.

[ECF No. 31] at 13.  This argument is meritless.  The fact that O'Brien had access to Proskauer's

confidential information and authority to use it in furtherance of the Firm's business does not

immunize him from liability for **unauthorized** uses or transfers.  *See, e.g.*, *Town & Country*

*Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 222, 291 (S.D.N.Y. 2021) (holding that

defendants who "were given Plaintiffs' information by Plaintiffs openly during the course of

their relationship" may nonetheless be liable for misappropriation of a trade secret where such

information was used by Defendants beyond the scope necessary or permitted by the parties'

contract); *AUA Private Equity Partners, LLC v. Soto*, 2018 WL 1684339, at *7 (S.D.N.Y. Apr. 5,

2018) (misappropriation by acquisition plausibly alleged with claims that defendant "uploaded

[plaintiff's] trade secrets from her work laptop to her personal cloud-based storage without

[plaintiff's] permission and in direct violation of the confidentiality agreements that she signed").

O'Brien's downloads amount to misappropriation because Proskauer's "Computer and Communications Use and Data Protection Policy," which O'Brien acknowledged and participated in revising and implementing, *see* Hsu Decl. [ECF No. 38] ¶¶ 5, 7, Ex. 3, mandates that the Firm's Confidential Information should "not be accessed in the absence of a legitimate business need or firm objective," "should be kept within the Firm's secured Technology Resources, or its secured office premises, or its authorized offsite storage facilities," and "should not be transmitted via the Internet or wireless network" or "stored on a mobile device or removable media without encrypting Highly Sensitive Information using firm-approved encryption software and protocols." *See* Hsu Decl. [ECF No. 38] Ex. 1 at 11; *see also* Pl. Br. [ECF No. 6] at 16–17; *KCG Holdings, Inc. v. Khandekar*, 2020 WL 1189302, at *10 (S.D.N.Y. Mar. 12, 2020) (defendant used improper means to acquire and use trade secrets when, in violation of his employer policy, he copied files into his personal directory).

O'Brien was specifically **not authorized** to download Proskauer's materials onto external hard drives and **never received authorization to download the materials to take on vacation**. And, in all events, he was required to be granted specific exceptions to do so, which he did not receive in connection with his vacation and obtained through deceit and abuse of his position at the Firm. Pl. Br. [ECF No. 6] at 7, 13. Moreover, the timing of O'Brien's downloads—within days of resigning—is an important factor for courts when assessing potential trade secret misappropriation. *See* Pl. Br. [ECF No. 6] at 18–19; *Lumenate Techs., LP v. Integrated Data Storage, LLC*, 2013 WL 5974731, at *5 (N.D. Ill. Nov. 11, 2013) (finding that defendant misappropriated his employer's trade secrets based on evidence that the defendant downloaded data two days before resigning and then deleted the information).

O'Brien also meets the standard for misappropriation under New York common law. O'Brien could have already used Proskauer's trade secrets for his personal gain for a number of purposes without necessarily sharing Proskauer's trade secrets with a third party, including to improve his employment prospects. *KCG Holdings, Inc.*, 2020 WL 1189302, at *13 ("[C]ourts around the country have recognized that 'use' in the Restatement and in trade-secrets law generally is a very broad concept.") (quotations and citations omitted); Restatement 3d of Unfair Competition, § 49 cmt. c (1995) ("There are no technical limitations on the nature of the conduct that constitutes 'use' of a trade secret . . . As a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use.'").

B.     The Risk Of Imminent And Irreparable Harm Persists

O'Brien's argument that his return of his Firm-owned devices, as required by the TRO, removes any risk of irreparable harm is baseless. The risk remains. First, O'Brien admits to taking home with him the USBs containing Proskauer's trade secrets. O'Brien Decl. [ECF No. 32] ¶ 37. O'Brien had ample opportunity to transfer Proskauer's data onto any number of personal devices or online accounts, none of which are presently available to Proskauer. Given his multiple false statements (both in perpetrating his theft and in his declaration), he has also demonstrated that he cannot be trusted, and there is no reason to believe he will provide all of his personal devices or online accounts to his counsel for forensic inspection.

Second, O'Brien will no doubt seek new employment during the pendency of this case, and in doing so will have the opportunity to market and potentially share any Proskauer trade secrets saved on his personal devices on online accounts. That appears to have been O'Brien's

plan before the TRO, and there is no reason to believe he would not pick up where he left off once the TRO expires. *See Upjohn Co. v. Am. Home Prods. Corp.*, 598 F. Supp. 550, 554-55 (S.D.N.Y. 1984) ("Before a suit for injunctive relief can be dismissed as moot, the offending conduct must have ceased and the court must find that **there is no reasonable expectation that it will resume**.") (citations omitted) (emphasis added); *Payment All. Int'l, Inc. v. Ferreira*, 530 F. Supp. 2d 477, 480 (S.D.N.Y. 2007) ("[A]bsent a preliminary injunction, [plaintiff] will suffer irreparable harm because [defendant] will disclose trade secret information in his new employment with a direct competitor.").

Third, O'Brien actually has **not** complied with the TRO and, through his obstructionist conduct, is continuing to conceal potential evidence of irreparable harm. As set forth in the motion filed by the Firm on January 13, 2023 (ECF Nos. 36–39), O'Brien refuses to turn over the password to his Proskauer-owned-and-issued iPhone, although the requirement to do so was encompassed within the TRO. Remarkably, part of his excuse for blocking Proskauer's review of its own device is his admission that the device contains communications with the competitor law firm he was about to join which he does not want Proskauer to see. Hamid Decl. [ECF No. 39] Ex. 1. This obstruction in violation of both Firm policy and the TRO, is designed to prevent Proskauer from using the evidence on the iPhone in support of a preliminary injunction, and demonstrates the likelihood of ongoing misconduct and harm that O'Brien is trying to shield from view.

Fourth, though Proskauer has attempted to reach an agreement with O'Brien to facilitate the review of his personal devices, O'Brien has thwarted that process as well. Yesterday, he took the position that because the Firm was forced to file the motion to get the password for its own iPhone over O'Brien's meritless objection, O'Brien can no longer progress a protocol for

12

review of his personal devices until after he opposes that motion.  Saunders Decl. Ex. 1.  His obstruction of Proskauer's efforts to engage in a forensic review of his devices (even assuming he would give them all to his counsel for inspection, which is highly dubious) further demonstrates a likelihood of misconduct and harm, and the necessity of the preliminary injunction ordering O'Brien to "produce for inspection and imaging all computers and/or electronic devices belong to . . . him, including his home computer(s) and/or other electronic devices."  ECF No. 15 at 2.

C.    Proskauer's Irreparable Harm Outweighs O'Brien's Perceived Harm To His Career

For the reasons outlined above and in Proskauer's initial moving brief, Proskauer would risk irreparable harm if the preliminary injunction is denied.  Pl. Br. [ECF No. 6] at 20–22.  By contrast, O'Brien's only "harm" would be his continued enjoinment from using or disseminating Proskauer trade secrets.  *See Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 199–200 (E.D.N.Y. 2013) (the proposed injunction's balance of hardships weighed in favor of plaintiff because the potential "harm" caused by the injunction was merely preventing the defendants from continuing their "wrongful conduct").

O'Brien contends that a preliminary injunction will substantially harm his career prospects, but he also asserts that he is already "untouchable" as a job candidate and that his reputation has been "eviscerated" as a result of this lawsuit.  O'Brien Decl. ¶¶ 93, 97.  He has only himself to blame for any consequences he has experienced due to his misconduct being brought to light.  But more to the point, an injunction simply maintaining the status quo and preventing him from using or disclosing Proskauer's information, which he has no right to do in the first place, would not cause any incremental harm.

13

**III.    Proskauer Is Also Entitled To A Preliminary Injunction Under The "Serious Questions" Standard**

In the alternative, a preliminary injunction is warranted because Proskauer has demonstrated, in addition to irreparable harm, "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Ventura de Paulino v. N.Y.C. Dep't of Educ.*, 959 F.3d 519, 529 (2d Cir. 2020) (internal quotation marks omitted).  This alternative approach "permits a district court to grant a preliminary injunction . . . where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Spanski Enterprises, Inc. v. Telewizja Polska S.A.*, 832 F. App'x 723, 724 (2d Cir. 2020) (quotation omitted).

The Firm meets all the requirements for entry of a preliminary injunction under the alternative standard.  First, Proskauer has shown a danger of irreparable harm for the reasons discussed above and in its initial moving papers.  Second, although Proskauer respectfully submits that it has amply demonstrated a likelihood of success on the merits, if the Court believes that there are credibility disputes or other bases to find otherwise, Proskauer has, at the very least, raised serious questions going to the merits to make them a fair ground for litigation. Third, the balance of hardships is overwhelmingly in Proskauer's favor.  "The balance of hardships inquiry asks which of the two parties would suffer more grievously if the preliminary injunction motion were wrongly decided." *Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.,* 922 F. Supp. 2d 435, 444 (S.D.N.Y. 2013) (quoting *Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408, 411 (S.D.N.Y. 1999), *aff'd*, 764 F3d 210 (2d Cir. 2014)).  As detailed above and in Proskauer's initial moving brief, the hardship to Proskauer if its confidential information is not

14

protected far outweighs any possible hardship to O'Brien of being further enjoined from improper use or disclosure of that sensitive information to which he is not entitled.

## **CONCLUSION**

For the foregoing reasons, and those set forth in Proskauer's initial moving papers, Proskauer respectfully requests that the Court grant its motion for a preliminary injunction and such further relief as the Court deems just and proper .

    Dated:  New York, New York
            January 18, 2023

Respectfully submitted,

PROSKAUER ROSE LLP
Robert J. Cleary
    rjcleary@proskauer.com
Michael T. Mervis
    mmervis@proskauer.com
Jacob R. Butwin
    jbutwin@proskauer.com
Eleven Times Square
New York, New York 10036
(212) 969-3000

Timothy W. Mungovan
    tmungovan@proskauer.com
One International Place
Boston, Massachusetts 02110
(617) 526-9600

Kyle A. Casazza
    kcasazza@proskauer.com
2029 Century Park East, Suite 2400
Los Angeles, California 90067
(310) 557-2900

DEBEVOISE & PLIMPTON LLP

By: _/s/ Mark P. Goodman_____
Mark P. Goodman
    mpgoodman@debevoise.com
Jyotin Hamid
    jhamid@debevoise.com
Adam C. Saunders
    asaunders@debevoise.com
Jaime M. Fried
    jmfried@debevoise.com
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000

*Attorneys for Plaintiff Proskauer Rose LLP*