UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
PROSKAUER ROSE LLP, :
:
                Plaintiff, :
: 1:22-cv-10918-AT-SLC
     v. :
:
JONATHAN O'BRIEN, :
:
                Defendant. :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SECOND DECLARATION OF YONG C. HSU IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

I, Yong ("Ken") C. Hsu, declare as follows:

1. I am the Information Security and Technology Officer at plaintiff Proskauer Rose LLP ("Proskauer" or the "Firm"), an international law firm based in New York City. I have personal knowledge of the facts set forth herein and, if called to do so, could competently testify thereto.

2. I have worked at Proskauer since 2012 and have served in my current role since 2019. I report to the Firm's Chief Information Officer, who reports to the Firm's Chief Operating Officer, formerly defendant Jonathan O'Brien.

3. I have reviewed the declaration submitted by Mr. O'Brien in this matter on January 11, 2023 ("O'Brien Decl."), and I submit this reply declaration to address certain specific statements he makes therein.

**December 5, 2022 Email Bounce-Backs**

4. Mr. O'Brien contends that he reached out to the Firm's Director of Technology Support, Kevin Polakoff, on December 5, 2022, to inquire about transferring

files to a USB because he had "been struggling to email large files and had received a number of bounce backs, which Proskauer should be able to see in my Firm email." O'Brien Decl. ¶ 29.

5. Proskauer's IT department is able to track ingoing and outgoing materials to every Proskauer employee's email address via a "Message Tracking Result" report.

6. A true and correct copy of the Message Tracking Result report for Mr. O'Brien's Proskauer email on December 5, 2022 is attached as **Exhibit 1**.

7. On December 5, Proskauer's HelpDesk logged Mr. O'Brien's request for access to download files to removable media at approximately 1:09 p.m. EST, as explained by Mr. Polakoff in this December 27, 2022 declaration in this case. As reflected in the Message Tracking Result report, Mr. O'Brien did **not** receive any email bounce-backs prior to this request to download files.

8. At approximately 6:23 p.m. EST that same day, Mr. O'Brien attempted to send an email outside the firm and received **one** email bounce back, his first and only of that day.

9. That same day, at approximately 7:05 p.m. EST and 7:06 p.m. EST, Mr. O'Brien successfully emailed all of the files that had been attached to the single bounced back email by sending the files in two separate emails. Attached as **Exhibit 2** is a true and correct copy of the record of Mr. O'Brien's emails to the outside consultant on December 5, 2022.

**December 5 Download**

10. After receiving access to save files to removable media on December 5, Mr. O'Brien downloaded a PST file containing more than 34 gigabytes of emails, attachments, and other data from his Proskauer mailbox.

11. I understand that Mr. O'Brien contends that he downloaded this material to a USB in case he needed to refer to it while working on vacation. O'Brien Decl. ¶¶ 28, 57.

12. This would be an unusually large amount of data to download for that purpose. To provide a sense of volume, 34 gigabytes is enough space to account for approximately 10 million "basic" emails or over 60,000 emails with attachments.

13. There would also have been no reason for him to download these emails because they would all have been accessible to him on his firm-issued laptop without any need to connect to the Firm's network.

14. Additionally, as explained in my initial declaration, under Proskauer's Computer and Communications Use and Data Protection Policy (the "Data Protection Policy") employees are prohibited from copying data to external devices—whether to take with them on vacation or otherwise. *See* Hsu Decl. [ECF No. 9] ¶¶ 16. The Firm grants exceptions to those restrictions only for legitimate business reasons. *Id.* ¶ 18.

15. As long as an employee can connect to our network using WiFi, they can access any Firm information that they are authorized to view from anywhere in the world. Even without connecting, on a firm-issued laptop users, including Mr. O'Brien, can access their emails and any documents saved to the user's "my documents" or "my desktop" folders.

16. Mr. O'Brien contends that he was concerned that he would not be able to connect to the network using WiFi from his vacation in Mauritius.  O'Brien Decl. ¶ 22.

17. I have reviewed what I understand to be Mr. O'Brien's spouse's Instagram account (https://instagram.com/vobonline).  Photos posted on that account (copies of which are attached as **Exhibit 3**) bear geotags for the Shangri-La Resort in Mauritius (the "Resort") during Mr. O'Brien's December 2022 vacation.  According to that Resort's website (excerpts attached as **Exhibit 4**), it is a 5-star resort which "understand[s] how important **connectivity**, efficiency and comfort are to [its] guests" and provides among its guest amenities an "IT Butler" (emphasis added).  I contacted the Resort to inquire further and was assured that Wi-Fi signals with a speed of 20 Mbps are available at the Resort, as well as 4G connectivity.  In my experience, a speed of 20Mbps is sufficient for users to successfully connect to and access the Firm's network regardless of where in the world they are staying.

18. I am not aware of Mr. O'Brien ever before asking to download Firm data to an external device in advance of any of his previous vacations.

19. I understand that he was on vacation in the Caribbean in July 2022, but I am not aware that he asked to download Firm data to any external devices in advance of that vacation.  Nor do our records indicate that he inquired with us about any connectivity issues he experienced during that vacation.

4

**Emails Subject to Litigation Hold**

20. On December 6, 2022, one day after Mr. O'Brien downloaded the PST file, a litigation hold on Mr. O'Brien's mailbox was lifted, which resulted in more than 80 gigabytes of emails and other materials being deleted from Proskauer's systems.

21. In his declaration, Mr. O'Brien contends that he sought to have the hold lifted because, among other reasons, his email box had become "very unwieldly." O'Brien Decl. ¶ 42.  In fact, users of Proskauer's email system subject to a litigation hold can keep their inboxes neat and tidy: they can organize their emails into folders and they can even delete them from view, in which case they will be preserved in a folder not visible to the user.

**Mr. O'Brien's H Drive and Recycle Bin**

22. In my initial declaration (at paragraph 32), I explained that, within minutes of completing his December 16 download of 1,138 files, Mr. O'Brien manually deleted the entirety of his H drive (including all of those files and more than 1,700 others) and then immediately emptied his "recycling bin" (where all of these deleted files would otherwise have been stored).

23. In his Declaration, Mr. O'Brien says he has no recollection of doing these things, but that "it is possible" he did because he was "trying to clean up files."  O'Brien Decl. ¶¶ 54-55.

24. Deleting the contents of the H drive and then emptying the recycling bin require a user to take several affirmative steps.  In particular, Mr. O'Brien manually deleted most of the documents in his "my documents" folder on his office computer.

5

This folder is synchronized with his H drive.  He then immediately emptied the contents of his recycling bin.

      25. To do this, Mr. O'Brien (or someone helping him) would have to undertake at least nine separate mouse clicks.  It is not something that can be accomplished by accident.

      Executed at New York, New York on this 18th day of January 2023.  I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

                                              Yong C. Hsu