**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
PROSKAUER ROSE LLP,

                Plaintiff,

         v.

JONATHAN O'BRIEN,

                Defendant.

1:22-cv-10918-AT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**AMENDED COMPLAINT**

Plaintiff Proskauer Rose LLP ("Proskauer" or the "Firm"), by its undersigned attorneys, for its Amended Complaint against Jonathan O'Brien, alleges as follows:

**<u>NATURE OF THE ACTION</u>**

1. This is an action against Proskauer's former senior executive for theft of Proskauer's trade secrets and other confidential and proprietary information, breaches of his fiduciary duty, and conversion of Proskauer's funds.

2. Proskauer is an international law firm comprised of approximately 800 lawyers and approximately 650 non-lawyer employees. Until recently, Mr. O'Brien was Proskauer's Chief Operating Officer ("COO"). All non-lawyer employees report to the COO, who is the most senior non-lawyer employee at the Firm, reporting only to the Firm's Chair.

3. In approximately April 2022, Mr. O'Brien began negotiating a position for significantly higher compensation at a competing law firm. Because Mr. O'Brien deleted a substantial numbers of texts, emails, and other data *after* the commencement of this action, the

1

full range of his deceit, theft, and misappropriation is not yet known with precision. What is clear is that in the latter half of 2022, Mr. O'Brien hatched a plot to:

    a.    steal Proskauer trade secrets, in violation of applicable law;

    b.    abscond with overwhelming troves of other competitive, proprietary, and confidential information created by Proskauer at enormous expense, over a long period of time;

    c.    persuade other key executives to leave Proskauer with him and conspire with those executives surreptitiously to induce key members of Proskauer's finance team to leave with them, in violation of his fiduciary duties; and

    d.    mislead one or more of those subordinates about their career prospects at Proskauer, and to hurt them in their careers at Proskauer, with the goal of making them more vulnerable to the improper recruitment efforts.

4.    The group that Mr. O'Brien schemed to recruit included at least four core members of Proskauer's finance team, including Leigh Anne Whyte, the Firm's then-Chief Financial Officer ("CFO") and Mr. O'Brien's lieutenant who assisted him in breaching his fiduciary duties to the Firm, and Jeremy Russo, the Firm's then-Director of Financial Planning & Analysis ("FP&A"), who was Ms. Whyte's chief lieutenant at the Firm.

5.    Mr. O'Brien knew that Proskauer's trade secrets, including his access to them, would be highly useful to Proskauer's competitor, as they would enable that firm to effectively target and recruit Proskauer's most valuable partners, practice groups, and clients and provide a playbook for immediately upgrading that firm's strategic planning and financial analysis and thus, ultimately, its profitability.

6.      Mr. O'Brien concluded that his illicit acts would enable him and the staff he would bring to "hit the ground running" and to deliver outsize value to his new employer, a value likely to be reflected in his own initial and future compensation.  Notably in this regard, the employment offer that Mr. O'Brien received from the chair of the competing law firm consisted of annualized base compensation of $1.5 million as well as $2.2 million in bonuses payable from February 2023 through June 2023.

7.      Mr. O'Brien deceived others at Proskauer to circumvent the Firm's security and enable him to download an enormous volume of highly confidential and sensitive materials in violation of both his fiduciary duties and Firm policies.  The trade secret and other confidential information Mr. O'Brien stole from the Firm includes, among other things: (i) proprietary operational reports, models, and analyses; (ii) software and programming tools the Firm had developed to create proprietary reports and data matrices; (iii) other proprietary know-how; (iv) each partner's practice information, clients, financial performance, compensation, evaluations, and other highly confidential and competitively sensitive data; (v) the financial performance, profitability, and other key metrics of each department, practice group, and office; (vi) confidential strategies for lateral partner acquisitions; (vii) client metrics; (viii) critical, forward-looking strategic planning, including planning for the next fiscal year and recession planning; and (ix) massive amounts of other valuable confidential information.  In December 2022, Mr. O'Brien asked Mr. Russo to compile these vast troves of Firm trade secrets and confidential information, which Mr. O'Brien then downloaded to an external USB drive just days before both he and Ms. Whyte announced their resignations from the Firm.

8.      To bring this scheme to fruition, Mr. O'Brien exploited his authority as COO to override the Firm's internal controls.  Proskauer's computer and information systems are

programmed to prevent copying files and data onto removable storage media, like USB drives ("thumb drives" in common parlance).  That key security measure is intended, among other things, to prevent the theft of information concerning the Firm and its clients.  Mr. O'Brien overrode that security measure, telling an information technology employee that Mr. O'Brien needed to copy files to a removable USB drive to provide information to an outside Firm consultant.  Based on that explanation, Mr. O'Brien was granted an exception to this security measure.

9.     Mr. O'Brien's proffered reason for the exception was a lie.  The consultant never requested, and never received, a thumb drive from Mr. O'Brien or anyone else at the Firm.  Proskauer's records prove that Mr. O'Brien shared all of the information requested by the consultant via email.  Further, the information that Mr. O'Brien downloaded onto the USB drive was far more extensive than what had been requested by the consultant.

10.    Having secured the ability to copy data under false pretenses, Mr. O'Brien proceeded to steal the Firm's proprietary and confidential information—including trade secrets— by copying approximately 34 gigabytes of data onto two separate USB drives, first on December 5, 2022 and again on December 16, 2022, the latter just a few hours after he received payment of his annual bonus.

11.    The December 16 theft involved a compressed ".zip" file, falsely labeled "2022 tax documents."  Mr. O'Brien orchestrated the copying of over a thousand files into that .zip file, including some of the Firm's most confidential and sensitive information.  None (or virtually none) of the copied material had anything to do with taxes.  After copying that .zip file to a second USB drive, Mr. O'Brien deleted every file on his personal network drive (which contained the .zip folder as well as all the files within) and then immediately emptied the

computer's recycle bin (where deleted files are stored on a computer until emptied), attempting to conceal his theft.  This was no accident; Mr. O'Brien had to undertake multiple affirmative steps to accomplish it.

12.     Mr. O'Brien's scheme also included an effort to delete massive amounts of his Proskauer email.  For several years, Mr. O'Brien's emails had been subject to a "litigation hold" pursuant to Firm policy.  This meant that his emails could not be deleted as they might be evidence in potential litigation or investigations.  In December 2022—mere weeks before his resignation—Mr. O'Brien overrode the Firm's controls to unilaterally remove his litigation hold. In so doing, Mr. O'Brien circumvented the Firm's General Counsel, who is responsible for instituting and removing litigation holds, and directed one of the Firm's eDiscovery consultants, who ultimately reported to Mr. O'Brien, to lift his litigation hold.  She complied.  When a litigation hold is lifted, all emails subject to the hold that are older than one year are instantaneously deleted.  Mr. O'Brien also attempted to lift the litigation hold from Ms. Whyte's account, but abandoned those efforts after realizing he would need to involve the Firm's General Counsel.

13.     After his litigation hold was lifted, Mr. O'Brien also manually deleted thousands of other emails.  The result: Mr. O'Brien not only wrongfully spirited the Firm's proprietary information out of the Firm, but also deleted a substantial volume of other data by secretly lifting his litigation hold without proper authorization and then manually purging thousands of his remaining emails.

14.     While Mr. O'Brien was executing his scheme to steal Proskauer's confidential documents and trade secrets and cover his tracks, he and Ms. Whyte were also coordinating their departures from Proskauer and attempting to recruit a group of others, including Mr. Russo, to

join them at the competing law firm.  Mr. O'Brien and others working at his direction went so far as to withhold raises and promotions for key Proskauer employees as part of their annual year-end reviews, hoping to foster those employees' dissatisfaction with Proskauer and facilitate their recruitment to the competing firm.

15.    On December 16, 2022, Mr. Russo announced his resignation from Proskauer. Three days later, on December 19, Ms. Whyte submitted her resignation letter, stating that her last day at the Firm would be January 2, 2023.  The next day, on December 20, Mr. O'Brien told Proskauer that he would resign, effective January 6, 2023, and that he would be on vacation in Mauritius from the evening of December 21 through January 4.

16.    Mr. O'Brien's vacation schedule left essentially one full business day for transition.  Asked by the Firm's Managing Partner whether he would permit a greater amount of time to aid in the transition, Mr. O'Brien responded that he was an employee at will and could leave whenever he wished, adding "I owe the Firm nothing."  Ms. Whyte, who was in her native Australia when she resigned, similarly refused to remain at the Firm to ensure a smooth transition, stating to Firm leadership that she was "in need of a break" from work.

17.    When asked, Mr. O'Brien refused to tell the Firm where he would be working following his departure.  But he did tell one of his direct reports, the Chief Professional Resources Officer, that when the Firm's management found out where he was headed, they would be very angry.

18.    After commencing this action, Proskauer learned that Mr. O'Brien had agreed to join one of Proskauer's direct competitors as its chief operating officer.  The huge, vital trove of proprietary information that Mr. O'Brien misappropriated would be highly useful and extremely valuable to that firm and to Mr. O'Brien in his role there.

6

19.     On December 19, 2022, when Ms. Whyte resigned, she told Firm leadership that she had no employment plans after her departure and that she planned to take time off before making any decisions about future employment.  The contemporaneous text messages between Mr. O'Brien and Ms. Whyte reveal this to be a lie.  As the texts reprinted below make clear, well before making that misrepresentation, Ms. Whyte had fully "committed" to joining the competing law firm and, indeed, had already transferred her visa to that firm:

- 12/6/22 – Mr. O'Brien to chair of the competing law firm, at 6:04 pm:  "… [Ms. Whyte] is all in with us and looking forward to starting.  She has her new visa for [that firm], so when she leaves the US at the end of this week, the Proskauer one terminates.  So she really is committed now!"

- 12/10/22 – Mr. O'Brien and Ms. Whyte, concerning the background checks belatedly requested by the competing law firm as a condition of employment there:

  o  4:50 pm – Ms. Whyte:  "My visa has already been transferred!!!"

  o  5:13 pm – Ms. Whyte:  "So I've already transferred my visa, I've packed up my office, we've had 9000 meetings and calls with them, we've already been given 2 offer letters, we're literally about to resign, he [the chair of the competing firm ] asks us to sign this weekend and NOW they decide to run background checks???"

20.     Proskauer first uncovered evidence of Mr. O'Brien's theft on the evening of December 20, 2022.  Since then, the Firm has worked to determine the extent of Mr. O'Brien's misconduct and that of the other parties involved in his conspiracy.  Through its investigation— which remains ongoing—Proskauer has discovered that on December 17, 2022, Mr. O'Brien copied to his personal computer the USB drive on which he had initially loaded the Firm's trade

secrets the day prior, thus creating a backup of the stolen material to assure his possession of it would remain secure.

21.     This Court entered a temporary restraining order in this case on December 28, 2022 (the "TRO").  Mr. O'Brien has violated that Court Order.  The TRO set a January 6, 2023 deadline for Mr. O'Brien to return "any and all of Proskauer's proprietary, confidential, and/or trade secret information (including copies thereof) that Mr. O'Brien and/or subordinates at his direction copied, printed or otherwise obtained from Proskauer's computer systems" (ECF No. 15 at 4).  However, subsequent investigation has confirmed Mr. O'Brien retained at least some of the data he purloined after that deadline.

22.     Proskauer has also discovered that in the hours and days after the initial Complaint was filed in this action, Mr. O'Brien deleted, among other things, hundreds of text messages and emails relevant to this lawsuit, as well as backup files containing the data stored on his Firm-issued iPhone.  Proskauer has been able to retrieve some, but not all, of the evidence Mr. O'Brien wrongfully spoliated.

23.     Through its continuing investigation after this lawsuit was filed, Proskauer has also discovered that Mr. O'Brien stole significant amounts of money from the Firm over a period of years through the submission of improper expense reimbursements, through gross exploitation of the Firm's charitable donations, and by causing the Firm to bankroll Ms. Whyte's personal expenses.  Because Mr. O'Brien was the most senior executive officer entrusted to oversee and administer the Firm's internal controls, he was uniquely positioned to be able to circumvent those controls without raising suspicion from others within the Firm.

* * * * *

8

24.     Mr. O'Brien enjoyed a position of exceptional power and authority, including the ability to: (i) access the most confidential and personal information of the Firm; (ii) participate in and influence the most sensitive financial, compensation, strategic, and other competitive planning of the Firm; (iii) establish (and override) critical systems; and (iv) otherwise sit at the center of trust in a firm with tens of thousands of clients, more than one thousand employees, and hundreds of partners.  He did so not just in any business entity, but in a law firm—where there is the most solemn obligation to preserve confidences and to safeguard the secrecy of all protected information.

25.     There is no benign explanation for Mr. O'Brien's conduct, and no legitimate purpose for which he could use the voluminous materials he stole.  That is why the Firm's policies (which Mr. O'Brien was in charge of administering) strictly prohibit such conduct and why the Firm's systems are designed to prevent it.

26.     The material Mr. O'Brien stole reflects some of the Firm's most sensitive personal, professional, confidential, and proprietary information.  While industry surveys report the gross revenues, expenses, profits, and profits per partner of competitive law firms, they do not reveal any of the past or future strategies of the firms, their individual partner-specific metrics relating to compensation, clients, and productivity, or any of the client-specific information underlying gross revenue figures.   No law firm would allow such specific information to be disclosed.

27.     With rare exceptions, even Proskauer partners do not have access to all the information Mr. O'Brien stole.

28.     The legal industry is in an era of intense competition for partner talent, clients, and profitability.  The methods and metrics by which partners are evaluated and compensated,

and the processes for doing so, are highly confidential and would be of great value to a competitor. They also are deeply personal and the disclosure of such information could be used to pressure, intimidate, and extort partners and the Firm.

29.     Proskauer is nearing its 150th anniversary and is unaware of any employee (much less a chief officer) ever acting in such a corrupt, debased, and illegal manner.

## THE PARTIES

30.     Proskauer Rose is an international law firm with its principal place of business at Eleven Times Square, New York, New York.

31.     Mr. O'Brien is a British citizen who resides in New York, New York, and Verplanck, New York. Mr. O'Brien was hired by the Firm in 2015 as its CFO, became the Firm's COO in 2017, and was fired by the Firm in December 2022 after his theft of trade secrets and other confidential information was discovered.

32.     Non-party Ms. Whyte, who is featured prominently in this Amended Complaint due to her knowledge of and involvement in Mr. O'Brien's misconduct, is an Australian citizen who resided in New York, New York, during the relevant time period. She was Proskauer's Chief Financial Officer from July 2018 until her resignation in December 2022. It is Proskauer's understanding that Ms. Whyte now resides permanently in Australia.

## JURISDICTION AND VENUE

33.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action seeks to enforce rights and remedies secured under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836, *et seq*.

34.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the New York law claims in this action.

35.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred in this judicial district.

## FACTS

### Background

**Proskauer's Leadership Structure**

36.     Proskauer is led by the Firm's Chair, an elected position voted on by the Firm's partners at fixed intervals.  The Chair works closely with the Firm's Managing Partner, who is appointed by the Chair and ratified by the Firm's seven-member Executive Committee ("EC"). The EC is comprised of the Firm's Chair and six partners who are elected by the Firm's partners and serve three-year staggered terms.  The EC is responsible for many critical governance, policy, and strategic issues, including the allocation of Firm profits among the partners, recommendations for the election of lateral partners, promotion of Firm associates to partner, and the Firm's strategic planning.

37.     During all relevant times, meetings of the EC were held regularly and attendance, particularly during discussion of the Firm's most confidential matters, was typically limited to EC members, the Chair, the Managing Partner, the Firm's General Counsel, and, starting in 2017, Mr. O'Brien in his capacity as COO.  Access to much of the information Mr. O'Brien stole had been restricted to Mr. O'Brien, the Chair, the Managing Partner, and members of the EC.  In certain cases, access had been restricted to just Mr. O'Brien, the Chair, and the Managing Partner.

**Mr. O'Brien's Role at Proskauer**

38.    In his role as the Firm's COO, Mr. O'Brien was responsible for all of the Firm's business support activities, including finance and financial strategy, accounting, taxes, benefit plans, professional resources, business development, real estate, operations, and information services.   He reported directly to the Firm's Chair and served on many of the Firm's most important committees, including the Benefits Committee (of which he was the Chair), Business Development Committee, Personnel Practices Committee, Retirement Plan Committee, and Crisis Management Committee (of which he was also the Chair).

39.    In addition to attending all EC meetings, Mr. O'Brien also had daily morning management meetings with the Chair and Managing Partner, during which the day's business was discussed, as well as short and long range financial, staffing, and strategic planning.

40.    Mr. O'Brien's tenure as COO spanned the tenures of two Proskauer Chairs and, during this time, he was privy to (usually as a participant) nearly every meaningful strategic decision at the Firm.   In fact, Mr. O'Brien was responsible for producing the financial analyses, projections, and backup data that the Chair, Managing Partner, and EC reviewed to make these decisions.   As one of the three key senior members of management, Mr. O'Brien had unfettered access to all Firm systems, records, and resources pertaining to the Firm's finances, operations, and strategic planning.

41.    Mr. O'Brien had a team of approximately 650 direct and indirect reports, including, among others, the Firm's Chief Financial Officer (Ms. Whyte), Chief Real Estate and Facilities Officer, Director of Human Resources, Chief Marketing Officer, Chief Information Officer, and Director of Internal Audit.   Among his myriad duties, Mr. O'Brien was responsible

each year for recommending raises and potential promotions for his subordinates to Proskauer's EC.

42.     Ms. Whyte reported directly to Mr. O'Brien, and they shared a close personal and professional relationship that preceded their employment at Proskauer.  As CFO, Ms. Whyte was responsible for overseeing all of the Firm's finance functions.  Throughout her employment at the Firm, Ms. Whyte had a team of over 150 direct and indirect reports, including, among others, Mr. Russo.

43.     Mr. O'Brien was required to comply with—and expressly acknowledged—the Firm's policies.  As Proskauer's COO, Mr. O'Brien also owed Proskauer fiduciary duties.

44.     In light of Mr. O'Brien's reprehensible misconduct as set forth herein, the Firm's EC voted to terminate Mr. O'Brien's employment upon the filing of this action.

**Mr. O'Brien's Misappropriation and Corresponding Deception**

**Documents Stolen by Mr. O'Brien**

45.     A document named "List.txt" on Mr. O'Brien's Firm computer, last modified on November 14, 2022, provides a summary of key categories of trade secret and confidential documents he stole:

- o      All FP&A reports
- o      Firm financials
- o      Department financials
- o      Practice financials
- o      Office financials
- o      Full black book disclosure
- •      Policies
- •      Finance Portal Docs
- •      Business of Law
- •      Cash Flow
- •      Expense Report – full GL
- •      PPP Forecast
- •      Billing Rates
- •      Black Book Binder (already printed)
- •      CCM reports
- •      Lateral Partner P&L
- •      Lateral Partner Template
- •      Client Ops – SPD, Countdown, Collections projs, B&C shortfall by day
- •      Pricing AFA guide

46. These materials are among the most confidential, competitively sensitive, and valuable materials Proskauer maintains.

47. The first item, "All FP&A Reports," refers to the regularly generated reports of Proskauer's FP&A Group. The FP&A Group is responsible for regularly creating 127 distinct types of reports, access to which is strictly limited to senior Firm personnel. These reports constitute the broadest swath of the Firm's confidential performance and projection data. The materials in these reports include, among other things, lawyer productivity reports, projections, budgets, profit analyses, and performance data, all of which provide detailed insight not only into the Firm's actual financial performance but also into how Firm management evaluates its performance and plans for the Firm's future.

48. The FP&A Reports are distinct from the "firm," "department," "practice," and "office" financials on the list, which provide confidential financial information about those different business units and offices.

14

49.     The "Black Book Binder" is a detailed set of highly confidential and proprietary records relating to Proskauer partner compensation and allocation of the Firm's profits.   The binder details, among other things, a three-year report of a variety of financial, productivity, and other performance metrics on a partner-by-partner basis.   Partners do not have access to many aspects of this reporting, which is shared in its entirety only with the EC.   The "Black Book Binder" information is among the most protected, confidential information the Firm keeps.

50.     Other materials on the list included highly sensitive and proprietary information about the Firm's strategic planning and initiatives.   For example, the "Pricing AFA Guide" is a detailed memorandum outlining the Firm's strategy and policies with respect to alternative fee arrangements.   The "Lateral Partner P&L" and "Lateral Partner Template" include information about the Firm's assessment and recruiting of lateral partner candidates, including the metrics and other criteria the Firm considers in evaluating prospective lateral partners.

51.     The listed materials also include sensitive, confidential information related to the Firm's client relationships, profitability and profit margins, cash on hand, and financial forecasts.

52.     While all of these materials are securely kept electronically on Proskauer's systems, Mr. O'Brien apparently printed a hard copy of the highly confidential "Black Book Binder," and Mr. O'Brien also had hard copies of other confidential materials.   For example, in advance of partnership meetings, Mr. O'Brien received hard copies of the confidential materials to be presented at those meetings, including confidential financial performance and lawyer productivity data.

**Mr. O'Brien Lies**

53.     In late November 2022, Mr. O'Brien began compiling the files he planned to steal.   On Tuesday, November 29, 2022, Mr. O'Brien used his Firm computer to create a

Personal Storage Table ("PST") file, "Saved.pst."  A PST file is used to store copies of emails, calendar events, and other items within an email server.  That same day, Mr. O'Brien populated this file with approximately 32.7 gigabytes of emails, attachments, and other largely confidential information from his Proskauer mailbox.  At the time, the 32.7 gigabytes represented approximately one-third of the 100+ gigabytes in his Outlook mailbox.  As COO, Mr. O'Brien's mailbox contained a vast swath of sensitive and highly confidential Firm information.

54.    Having compiled significant amounts of the Firm's most confidential and proprietary information and data, Mr. O'Brien then proceeded to circumvent the Firm's security measures and download it.  To protect Proskauer's and its clients' data, since 2015 Proskauer has programmed its systems to prevent the use of removable media, such as thumb drives, to copy data from the Firm's systems.  The Firm also has a procedure for granting exceptions to this data security measure when needed for legitimate business reasons.

55.    As COO, Mr. O'Brien was aware of this data security measure and other Proskauer information security measures and policies.  He also knew he had no legitimate reason to seek an exception for use of removable media.

56.    Mr. O'Brien used deceit to facilitate and conceal his wrongful plan to steal confidential Firm information.  In November and December 2022, Mr. O'Brien and others at Proskauer were working with a business consultant pursuant to an agreement which, among other things, preserved the confidentiality of materials exchanged with the consultant.  The Firm provided confidential information to the consultant pursuant to this confidentiality agreement.  Mr. O'Brien used this consulting engagement as a cover for his theft.

57.     On December 5, 2022, Mr. O'Brien called Kevin Polakoff, the Firm's Director of Technology Support (and one of Mr. O'Brien's reports), and directed Mr. Polakoff to grant him an exception to the restriction that prevents copying data to removable media.

58.     Mr. O'Brien falsely represented to Mr. Polakoff that he needed to download information to a thumb drive to provide it to the external consultant.  In fact, Proskauer's consultant never asked Mr. O'Brien to send information on a thumb drive or any portable storage device, nor did the consultant ever receive a thumb drive or any portable storage device from Mr. O'Brien or anyone else at the Firm.  Email records prove that Mr. O'Brien shared all of the information requested by the consultant via email.  Further, the information that Mr. O'Brien downloaded onto the USB drive was far more extensive than what had been requested by or emailed to the consultant.  This was not the first time Mr. O'Brien invoked the Firm's consultant to facilitate his misconduct.  Mr. O'Brien previously submitted fraudulent expense reports to the Firm that stated Mr. O'Brien had dinners with this consultant in New York City on dates when the consultant was not physically present in New York.  In fact, Mr. O'Brien and the consultant have never met in person.

59.     Based on Mr. O'Brien's false representation, and having no reason to suspect wrongdoing by the Firm's COO (and his ultimate supervisor), Mr. Polakoff submitted a "Policy Exception" request on Mr. O'Brien's behalf, which his team granted.  Because Mr. O'Brien was the Firm's COO, Mr. Polakoff's team treated Mr. O'Brien's directive as fully authorized and complied—just as Mr. O'Brien expected they would.

60.     Later that day, on December 5 at 4:08 p.m., Mr. O'Brien copied "Saved.pst" (containing approximately 32.7 gigabytes of data) from his Firm computer to a Kingston USB thumb drive.

61.     Now armed with an efficient and clandestine way to steal the Firm's confidential information, Mr. O'Brien expanded the scope of this theft.  Three hours later, at 7:08 p.m., he copied more than 100 additional files to the thumb drive.  The files included many items from the "List.txt" file organized by subject matter into a series of 31 folders:



62.     These folders would have taken hours to create.  They include some of the Firm's most confidential, valuable, and proprietary financial analyses, and the systems, frameworks, and know-how needed to successfully run the Firm, a billion-dollar enterprise, of which Mr. O'Brien was an officer.

63.     The pilfered materials include a number of proprietary methodologies the Firm developed through significant effort and expense to maintain and enhance its position in the

highly competitive market for legal services.  For example, the "CCM" folder includes the Firm's own recently developed proprietary methodology for evaluating profitability, including by office, department, and practice group.  The documents in that folder include templates, partner training and presentation materials, presentations to the EC relating to the Firm's methodology, profitability benchmarks, and documents detailing the Firm's actual profit margins for 2022.  The folder includes material reflecting each of Proskauer's clients that generated over $50,000 in revenue (and associated margins), which is in effect the Firm's client list and constitutes competitively sensitive information.  The "Comp Models" folder includes the Firm's own compensation models that account for, among other things, the effects of bonuses and other variables on the Firm's financials.  "Budget," "Cash Flow," and "Recession Deck" contain detailed information about the Firm's assumptions, expenses, financial projections, and plans for changes in economic conditions, including strategic and contingency planning for a potential economic recession in 2023.

64.     Many of these folders contain "how to" tools and templates that would be useful to someone looking to replicate the Firm's proprietary operational reports, models, and analyses elsewhere.  This batch of stolen files also contains documents reflecting the Firm's proprietary strategic and financial analyses.  For example, the "AmLaw and PPP" folder includes analyses of the Firm's performance in widely publicized, industry-wide rankings, compared to a confidential list of peer firms created by Proskauer, and detailed highly confidential strategies for improving the Firm's relative performance.  The "Dept Financials," "Final Numbers," "Firm Financials," "Office Financials," and "Practice Financials" folders contain detailed performance metrics and other confidential financial information about those different business units.  Of note, among the documents stolen by Mr. O'Brien is a presentation detailing the content and functionality of a

secure website called the "Partner Portal," which the Firm uses to securely disseminate certain confidential information to the partnership.

65.    Clear evidence of the steps the Firm takes to protect its confidential information appears in one of the many documents in the "Policies" folder Mr. O'Brien stole, the "Internal Financial Data Disclosure Policy," which itself bears the legend "proprietary information of Proskauer Rose LLP."

66.    The Internal Financial Data Disclosure Policy provides strict access limitations to much of the information Mr. O'Brien stole, showing its proprietary value.  This policy includes a matrix that describes which Proskauer partners and employees have access to certain categories of internal financial information.  Only the Firm Chair, Managing Partner, and COO/CFO have unlimited access to all of Proskauer's internal financial data.

**Mr. O'Brien Improperly Removes Litigation Hold**

67.    Mr. O'Brien and Ms. Whyte were subject to various litigation holds while at the Firm.  A litigation hold preserves data relating to actual or potential litigation or investigations, and, among other things, prevents those subject to the hold from deleting any emails or files from their Proskauer Outlook mailboxes.  If a litigation hold is not in place, a Proskauer user's email inbox is subject to ordinary document retention policies, under which emails older than one year are automatically deleted, unless the user takes steps to archive them.

68.    Seeking the ability to destroy many of his emails, Mr. O'Brien had his litigation hold lifted—but not through proper means.

69.    On December 5, 2022, less than one hour after he copied the PST file to his thumb drive, Mr. O'Brien emailed a senior eDiscovery consultant who ultimately reports to him, and instructed her to release him from his litigation hold.

20

70.     Only the Firm's General Counsel is authorized to lift a litigation hold, as Mr. O'Brien knew from his years as COO.  Mr. O'Brien, however, studiously avoided the Firm's General Counsel in seeking to lift his hold.

71.     In connection with his request to lift the litigation hold, the eDiscovery consultant reminded Mr. O'Brien that emails older than one year not saved or archived would be deleted once the hold was lifted, and asked Mr. O'Brien if he had stored everything he needed which fell into that category.

72.     Mr. O'Brien assured the eDiscovery consultant that he had saved what he needed. Mr. O'Brien deceptively represented to the consultant that he was "on a clean-up mission," creating the misimpression that he was advancing the Firm's interests and complying with its policies rather than deleting emails both automatically and manually.

73.     The next morning, based on Mr. O'Brien's deceitful representation, the litigation hold was lifted.  As a consequence, everything over a year old in Mr. O'Brien's Outlook mailbox—approximately 80 gigabytes of emails and attachments—was instantly deleted.  After the litigation hold was lifted, Mr. O'Brien also manually deleted more than 2,000 emails from his Outlook mailbox.

74.     Ms. Whyte—apparently aware of Mr. O'Brien's scheme—texted Mr. O'Brien that same day: "Did you get all your emails deleted from litigation hold?"  Mr. O'Brien responded: "Yes – all were deleted today."

75.     In addition to removing the litigation hold from his own email account, Mr. O'Brien attempted—at Ms. Whyte's request—to remove a similar hold from her account.  On December 10, 2022, Ms. Whyte texted Mr. O'Brien:  "Get me off that fucking hold!!!!."  On December 15, 2022, just days before both Ms. Whyte and Mr. O'Brien planned to resign, Ms.

Whyte followed up with Mr. O'Brien:  "What's happening with my litigation hold????  Please call me."  She then followed up again the next morning:  "WHAT IS HAPPENING WITH MY LITIGATION HOLD?????"  Mr. O'Brien responded, "You're definitely on one . . . I am trying to find out who initiated it."  Ms. Whyte asked, "How are we going to fix this before Monday??" (the day she was set to resign) and Mr. O'Brien responded, "Once I know [who initiated the hold], I will know how to get you off."  On Sunday, December 18, Mr. O'Brien informed Ms. Whyte that he would not be able to remove the hold from her email account because it would raise suspicion with Proskauer's General Counsel:  "Also I heard back from eDisocvery [sic]. [Your] hold relates to a claim brought by [individual].  To get it removed it needs [Proskauer's General Counsel's] permission.  So I wouldn't call attention to it."

**More Theft and More Lies**

76.     On December 7, 2022, Mr. O'Brien learned he would be receiving a sizable year-end bonus.  But, as COO, he knew that, as with all other employees, that money would not be deposited in his bank account until December 16.  So, he waited until then to make his next move.

77.     Mr. O'Brien, anxious to begin the next phase of his scheme, asked a subordinate to accelerate the payment so that he could receive his bonus on an earlier date.  After learning that she could not do so without involving additional personnel, he asked her to alert him as soon as the funds were sent to his account by the Firm's bank.  At 7:57 a.m. on December 16, she texted Mr. O'Brien that she "checked citibank [sic] and the wire left our account early in the morning."

78.     With his bonus confirmed, less than three hours later, at around 10:44 a.m., Mr. O'Brien and subordinates working at his direction created a compressed ".zip" file containing

1,187 files of Proskauer's proprietary data—approximately 1.45 gigabytes. Although Proskauer's forensic review of Mr. O'Brien's actions remains ongoing, the .zip file appears to have contained all of the materials in the 31 folders he copied on December 5, plus eight additional folders: Business of Law, Charitable, Compass, Expenses, Forecast, Surveys, Timetables, Notes, and Year-End.



79. This zip file was falsely labeled "2022 tax documents.zip." In fact, this voluminous trove of proprietary and confidential operational and business strategy materials had nothing to do with Proskauer's 2022 taxes.

80.     Key among the newly copied folders was the "Compass" folder.  The 833 files in this folder reveal how Proskauer performs all of its financial planning and analysis.  Not only does the folder contain confidential and proprietary reports, many of which are described above, it also contains hundreds of files with proprietary code and reusable scripts that the Firm itself had created, at tremendous effort and expense, to make its financial reporting more effective, efficient, and useful.

81.     Other notable documents in these new folders included proprietary processes, tools, and "know-how" that the Firm's finance team uses to close out the Firm's fiscal year and various templates for tracking a host of partner-specific metrics.  Among its peer firms, Proskauer has one of the most efficient billing and collection cycles, enhancing the Firm's profitability, and the materials taken by Mr. O'Brien provide a roadmap for how to replicate that class-leading efficiency elsewhere.  The additional folders created and downloaded by Mr. O'Brien also included various files reflecting Proskauer's expenses, including the Firm's capital expenditures, capital account balances, and capital expense planning for fiscal year 2023.

82.     The other 31 folders also contained documents that were not in the first set that Mr. O'Brien stole on December 5.  For example, the "Dashboards" folder contains information relating to newly-created, proprietary software tools (which the Firm refers to as "Dashboards") developed in 2022 and, in some cases, not yet fully completed or made available to Firm partners.  These Dashboards were developed over many months by the Firm's Finance group, using significant know-how and resources.  They are unique to the Firm's business and are valuable management tools.  The Dashboard file Mr. O'Brien stole contained folders entitled "Backup Codes," "Data Model," "Executive Dashboard User Guide," "Lawyer Performance Dashboard," "Lawyer Performance Dashboard Outstanding Items," and "Power BI Executive

Dashboard," which appears to be a Microsoft file for the code used to create one or more of the Dashboards.  Mr. O'Brien stole software code, data models, user guides, the Microsoft creation tool, and a list of outstanding items for the Dashboard under development.  There is no reasonable conclusion other than Mr. O'Brien intended to use (and possibly already used) this proprietary tool to benefit himself and the competitor law firm he planned to join.

83.     Also on December 16, Mr. O'Brien contacted Mr. Polakoff again to request another exception to the Firm's removable media policy.  Mr. O'Brien again lied to Mr. Polakoff as to why, this time telling Mr. Polakoff that he had forgotten to include a folder in the materials he had earlier prepared for the consultant.  This was a complete fabrication.  Mr. O'Brien's new .zip file, disguised with the false label "tax" information, contained more than one thousand files and numerous folders.  These materials were neither sent to nor intended for the Firm's consultant.

84.     Mr. O'Brien subsequently copied the "2022 tax documents.zip" file to a second USB thumb drive, a Verbatim "Store-N-Go."  Based on the Firm's review of its logs showing employee activity, Mr. O'Brien was assisted by several other Proskauer employees over whom he had supervisory authority, including Mr. Russo and an information technology specialist.  In enlisting Proskauer's personnel to assist with his corrupt scheme, Mr. O'Brien breached his fiduciary duties to the Firm and caused his subordinates to breach their fiduciary duties to the Firm as well.

85.     On January 11, 2023, Mr. O'Brien and Mr. Russo submitted sworn statements to the Court.  In their respective submissions, Mr. O'Brien and Mr. Russo admitted to downloading Proskauer's documents onto the USB drive but represented that: (i) the information downloaded was to be used by Mr. O'Brien on his vacation; (ii) they were unaware of any Proskauer code or

scripts in the folder, and inclusion of such code or scripts must have been an error or misunderstanding; and (iii) Mr. Russo accidentally mislabeled the folder "2022 tax documents.zip" because he was working on his personal tax documents at the time and was distracted by his own resignation from the Firm.  ECF Nos. 32–33.  But these representations are facially implausible and are contradicted by the evidence:

- Mr. O'Brien told Mr. Polakoff that he needed Proskauer's documents on a USB drive to transfer to the consultant, not to work on vacation.

- There is no need to copy files to an external device to access them on vacation, since employees can simply access the Firm's network remotely, as all other Firm employees routinely do while traveling and as Mr. O'Brien did during previous vacations he took during his tenure at the Firm.

- The volume of materials taken—approximately 34 gigabytes of data between the "Saved.pst" and "2022 tax documents" downloads (the equivalent of more than 10 million emails) and more than 1,000 additional documents—is larger by many multiples than the volume of materials that Mr. O'Brien could conceivably need while on his vacation.

- On December 17, 2022, at a time when both planned to join the same competing law firm, Mr. O'Brien texted Mr. Russo: "Hi Jeremy – I think I have everything saved on a USB that you wanted.  It's all in the MP folder.  Is there a recent file that I can check [] so we know I have the latest version?"  Mr. Russo responded, "Hi Jonathan.  Yes one I added yesterday was in a Charitable folder and file was FY22 October Charitable Contributions.  Also if there is a Compass folder with 3 sub folders FPA Reports, MWB Samples and SQL code Store Proc."  Accordingly, both Mr. O'Brien and Mr. Russo were explicitly aware that the downloaded materials included Proskauer's proprietary code ("SQL code Store

Proc"), directly refuting Mr. Russo's sworn declaration to the contrary.  ECF No. 33 ¶ 9.  Moreover, this exchange makes clear that the downloading had nothing to do with Mr. O'Brien's planned vacation.

- Mr. Russo or Mr. O'Brien intentionally mislabeled the folder "2022 tax documents.zip" to conceal the true nature of the downloaded materials and to conceal their misconduct from others.  In his submission to the Court, Mr. Russo declared that he had mislabeled the file accidentally because he had been working (*in December*) on his personal taxes and must have had them on his mind, ECF No. 33 ¶ 11.  Not only does that explanation defy common sense, it is contradicted by the explanation Mr. Russo provided when he was interviewed by the Firm on December 27, 2022.

86.     On December 17, 2022, Mr. O'Brien plugged the Verbatim "Store-N-Go" into his personal computer outside of the Proskauer network.  Mr. O'Brien swore under oath that he did so only to confirm that all of the contents were there, ECF No. 32 ¶ 37, but forensic analysis belies that explanation.  That analysis has confirmed that Mr. O'Brien in fact took affirmative steps to save the "2022 tax documents.zip" files to the "Documents" folder of his personal computer.

87.     Days later, on the morning of December 20, Mr. O'Brien told the Firm's Chair and Managing Partner that he would be leaving the Firm effective January 6, 2023.  He also told the Firm's Managing Partner that he would be departing the country the very next evening (December 21, 2022) to take paid vacation in Mauritius until the evening of January 4, 2023, and completing his employment at Proskauer immediately upon his return.

88.     Despite being asked by the Firm's Chair and Managing Partner during the course of several conversations on December 20, Mr. O'Brien refused to disclose where he would be working next.  But the following day, during the evening of December 21, Mr. O'Brien told the

Firm's Chief Professional Resources Officer that the Firm's management would be "mad" when it found out where he would be working next and that Mr. O'Brien did not know whether he would ever return to the office.

**Mr. O'Brien Deletes Evidence**

89.     Since filing its original Complaint in this lawsuit on December 27, 2022, Proskauer has continued its forensic investigation of Mr. O'Brien's misconduct.   That investigation has revealed that Mr. O'Brien took great pains to conceal his wrongdoing, including by deleting hundreds—and perhaps thousands—of relevant and incriminating text messages and emails from his Proskauer-issued iPhone.

90.     On December 27, while Mr. O'Brien was on vacation in Mauritius, Proskauer interviewed Mr. Russo and Ms. Whyte concerning various aspects of Mr. O'Brien's misconduct. The Firm interviewed Mr. Russo between approximately 1:30 and 2 p.m. EST.  Following his interview, at 2:16 p.m. EST, Mr. Russo spoke to Ms. Whyte on a call lasting just 10 seconds, after which Ms. Whyte attempted to FaceTime Mr. O'Brien four times within a four-minute span (2:26 p.m. through 2:30 p.m. EST).  Ms. Whyte and Mr. O'Brien finally connected at 2:37 p.m. EST and spoke for nearly 14 minutes.

91.     Proskauer interviewed Ms. Whyte between approximately 3:20 and 4:04 p.m. EST.  Shortly after exiting her interview, Ms. Whyte tried calling Mr. O'Brien at 4:18 p.m. but failed to reach him.  Ms. Whyte and Mr. Russo then spoke again at 5:02 p.m. EST, this time for only 26 seconds.   After Proskauer filed its Complaint at 5:13 p.m., Ms. Whyte attempted to FaceTime Mr. O'Brien two times back-to-back, at 5:21 p.m.  Mr. O'Brien did not answer either call.  Mr. O'Brien returned Ms. Whyte's calls at 5:24 p.m., 11 minutes after the Complaint was filed, and the two had a FaceTime call that lasted over 10 minutes.  At 5:27 p.m. (2:27 a.m. in

Mauritius), and while still on the call with Ms. Whyte, Mr. O'Brien began deleting text messages from his iPhone.  Notably, the first messages he deleted included a December 17, 2022 thread with Mr. Russo in which Mr. O'Brien and Mr. Russo discussed the information that Mr. O'Brien had stolen, which Proskauer had inquired about in its interview with Ms. Whyte less than two hours earlier.

92.     Over the next two hours—from approximately 2:27 a.m. to approximately 4:27 a.m. in Mauritius—Mr. O'Brien erased hundreds if not thousands of text messages from his iPhone, constituting nearly all of the remaining messages on his iPhone and including communications with key witnesses, including Ms. Whyte, Mr. Russo, the chair of the competing law firm that Mr. O'Brien had agreed to join, and others.

93.     Through substantial effort and cost, Proskauer has been able to recover some of the deleted communications, though there are hundreds if not thousands more that have not been restored at this time.  Neither Proskauer nor its forensic vendor are able to determine the total volume of messages that Mr. O'Brien permanently deleted from the iPhone and, thus, may not be capable of being recovered.

94.     Forensic evidence further suggests that Mr. O'Brien erased all backups of his iPhone that could have retained communications or other data.  By default, an iPhone is programmed to automatically store a backup of its contents to the iCloud, or, when plugged into a user's computer and connected to iTunes, on that device.  For most users, this backup is rarely handled or considered unless needed, but in the event the user loses his or her iPhone or wishes to upgrade their phone, the backup can be accessed to restore all files from the old phone onto a brand-new phone.  When a user "restores" a new device from an earlier backup, user data and

settings from that older phone—*e.g.*, its contacts, pictures, texts, notes, message retention settings, etc.—are transferred over to the new device.

95.    Forensic records show that when Mr. O'Brien received a new iPhone from Proskauer, he configured that phone on or about November 19, 2022 by "restoring" it from a backup.  Forensic analysis also showed that the method of the restoration was iTunes and that his iCloud backup process was disabled on his iPhone.  This means that a backup file was present on Mr. O'Brien's computer at the time of restoration.  However, when Mr. O'Brien surrendered his personal devices and accounts on January 23, 2023 in response to the TRO, all records of the backup used to configure his iPhone in November were conspicuously absent, leaving Proskauer unable to review the backup to access any of the additional communications that Mr. O'Brien had intentionally deleted.

96.    Mr. O'Brien's Proskauer-issued iPhone linked not only to his work email, but to three personal email accounts as well—an MSN account, a Gmail account, and an RTM account. A forensic analysis of Mr. O'Brien's iPhone makes clear that Mr. O'Brien deleted emails from these accounts before he returned his Firm-issued iPhone to Proskauer pursuant to the TRO. That he did so is apparent from (i) the absence of emails Proskauer knows should exist since there were messages sent by Mr. O'Brien from his Proskauer email address to a personal email address; (ii) the low volume of emails generally; and (iii) the fact that the trash folders for the email accounts were empty.

**Mr. O'Brien Knew His Conduct Violated Firm Policies and Was Otherwise Wrongful**

97.    Mr. O'Brien knew what Proskauer's policies required, including the Firm's "Computer and Communications Use and Data Protection Policy" (the "CCUDP Policy").  The

CCUDP Policy governs employees' use of the Firm's technology resources, such as the systems and devices that connect to the Firm's network, and the Firm's connection methods, such as its wireless networks.  The CCUDP Policy also details the Firm's safeguards to protect Firm, client, lawyer, and employee data.  As COO, Mr. O'Brien personally reviewed and approved annual changes to the CCUDP Policy and was responsible for administering the CCUDP Policy within the Firm.

98.     Under Section 8.3 of the CCUDP Policy, Confidential Information includes, among other things:  (i) "firm trade secrets, methodologies, business strategies, business plans, information about clients, and other competitor-sensitive information"; (ii) Firm personnel and client lists; (iii) Firm development programs and unpublished marketing materials; (iv) Firm financial, operational, and accounting information; (v) other nonpublic information relating to the business operations of the Firm; and (vi) data that the Firm is obligated to keep confidential pursuant to an agreement.

99.     Section 9.1 of the CCUDP Policy states that the Firm's Confidential Information (as defined in the CCUDP Policy and including information related to "the internal business of the Firm") should "not be accessed in the absence of a legitimate business need or Firm objective" and that Confidential Information should not be disclosed to third parties and "should be kept within the Firm's secured Technology Resources, or its secured office premises, or its authorized offsite storage facilities" or "stored on a mobile device or removable media without encrypting Highly Sensitive Information using firm-approved encryption software and protocols."

100.    Mr. O'Brien was also required to comply with—and expressly acknowledge—a host of other policies, including, among others, the Firm's Compliance Policy.  That policy sets

31

forth rules with respect to the confidentiality of client affairs and compliance with applicable laws and regulations. It states that all client information, "whatever its source," should not be disclosed to any person other than persons in the Firm engaged in the representation of those clients. It also instructs personnel that the duty to preserve "continues after a lawyer or employee is no longer associated with the Firm."

101.   In addition, as an officer of the Firm, Mr. O'Brien knew it would be highly improper for a Firm employee to take Proskauer's trade secret information for his or her own use, including use with a Firm competitor. Indeed, Mr. O'Brien was responsible for supervising the Firm personnel charged with protecting Proskauer's most sensitive information and data from being stolen or otherwise misused. In short, Mr. O'Brien not only knew he was violating multiple Firm policies he was charged with administrating, he knew he was breaching the relationship of trust the Firm had with him as a Firm officer.

**Proskauer Has Robust Data Protection Systems**

102.   Consistent with the Firm's data protection policies, it has a robust system of measures to maintain secrecy of its confidential information. That system of controls has earned the Firm two prestigious certifications from the International Organization for Standardization ("ISO"). In 2015, Proskauer became one of the first law firms to receive the ISO 27001 certification, which provides an international methodology for the implementation, management, and maintenance of information security. In 2021, the Firm became one of the few law firms to receive the ISO 27701 certification, which provides specific requirements for establishing, implementing, maintaining, and continually improving data privacy systems.

103.   All users of Firm technology resources are uniquely identified and authenticated before being granted access to Firm information. Those resources include, without limitation,

desktops, laptop computers, and mobile devices, including iPhones and iPads.  Firm passwords have a required complexity and must be changed on a periodic basis.  When employees remotely access the Firm's network and files from outside the office, the user IDs and passwords are augmented with an additional, second factor authentication to further confirm the identity of the user accessing the system.

104.    Firm employees are provided with Firm-issued workstations (either desktops or laptops), and the Firm monitors the status and usage of those workstations on an ongoing basis. Beginning in 2020, Mr. O'Brien utilized four workstations:  (i) a Firm desktop in his New York office; (ii) a Firm laptop in his Manhattan apartment; (iii) a Firm laptop in his home in upstate New York; and (iv) an additional Microsoft Surface laptop that the Firm was testing for potential use by its employees.

105.    Proskauer implements detailed policies and technical controls to ensure that electronic communication with clients and any other third parties with regard to the Firm's business and client matters are transmitted only through the Firm's technology resources.  Firm computers and laptops must run Firm-approved antivirus software and any other protective software the Firm designates to protect against viruses, worms, Trojan horses, spyware, malware, key logging software and other harmful code.

106.    To further protect Proskauer's confidential information, the Firm's technology resources are continually monitored.  Intrusion Detection Systems are used to provide 24/7 monitoring and to audit records of unauthorized attempts to access the technology resources, as well as login failures, use of privileged accounts, changes to access modules or file permissions, modification to installed software or the operating system, and changes to user permissions or

privileges.  Security logs are maintained for at least 12 months.  Access to security logs is restricted to authorized personnel from the Firm's Information Systems Department.

107.    While employees must satisfy all of those authentication requirements to connect to the Firm's system, doing so does not grant them access to all Firm data.  Instead, the Firm has also implemented a system of restrictions to control and monitor employees' access and information rights.

108.    Firm data are primarily stored across three main platforms, all residing in the Firm's network:  (1) Filesite; (2) the R Drive; and (3) Sharepoint.

   a.  <u>Filesite</u>.  Filesite is a document management system.  It is an "open" system, which means access is generally not restricted unless a client asks that the Firm restrict its information, or users take steps to restrict access to individual files or folders.

   b.  <u>R Drive</u>.  The "R Drive" is a shared, network drive used by many of the Firm's departments, including business services teams such as Finance and Human Resources.  It is a restricted environment in which access to any particular folder must be affirmatively granted to a specific, authorized and authenticated user.  Because employees do not have access to materials on this drive absent such a grant, the folders and files are generally not password protected.  Some materials on the R Drive are, however, password protected due to the sensitive nature of the information.

   c.  <u>Sharepoint</u>.  Sharepoint is a system the Firm uses to host internal "portals," which are used as another way for various departments and groups within the Firm to share information across specific authorized and authenticated users.  Like the R

34

Drive, employees do not have access unless it has been specifically granted to them, and some materials within Sharepoint may also have additional access restrictions such as password protection or restrictions on downloading, saving, or printing.

109.    By virtue of his role as the Firm's COO, Mr. O'Brien had the requisite permissions to access the most sensitive of the Firm's information.

**Mr. O'Brien's Recruitment Efforts**

110.    In or around April 2022, if not earlier, Mr. O'Brien began to engage in discussions with one of Proskauer's competitors about potential employment.  Over the ensuing few months, Ms. Whyte was similarly approached for potential employment, both by Mr. O'Brien and by that law firm directly.

111.    The evidence from Proskauer's ongoing investigation indicates that at least three partners from the competing firm were involved directly in communications with Mr. O'Brien, Ms. Whyte, and perhaps other Proskauer employees.  The evidence further indicates that the three partners, and likely others from the competing firm, met and communicated internally concerning the recruitment of Mr. O'Brien, Ms. Whyte, and perhaps others at Proskauer.

112.    By that summer, Mr. O'Brien and Ms. Whyte had decided that they would both leave Proskauer in late December 2022 to join the competing law firm.

113.    Throughout the Fall of 2022, Mr. O'Brien and Ms. Whyte continued to engage in substantive conversations with the competing law firm, and began to discuss who else to recruit from their current Proskauer teams, notwithstanding the respective fiduciary duties—including

the duty of loyalty—each of them owed to Proskauer.  Mr. O'Brien thereby breached those duties.

114.    Evidence collected by Proskauer thus far demonstrates conclusively that by December, Mr. O'Brien and Ms. Whyte had finalized their plans to resign from Proskauer, recruited key Proskauer colleagues to join them, and created a list of other Proskauer personnel whom they would poach at a later date.

115.    For example, on December 2, 2022, Mr. O'Brien sent a text message to the chair of the competing law firm, stating:  "I have a question for you on some of the people Leigh Anne [Whyte] would like to bring for Finance—4 in total, but 1 is more urgent."  The "more urgent" person was likely Mr. Russo, who resigned within days of Ms. Whyte and Mr. O'Brien and actively assisted Mr. O'Brien's misappropriation of Proskauer's confidential and trade secret materials.  In a December 21 text message exchange, the chair of the competing law firm asked Mr. O'Brien about the Proskauer employees Mr. O'Brien had been recruiting to the competing law firm:  "How are you feeling about Jeremy [Russo] and the other core three?"

116.    In addition, Mr. O'Brien worked with the chair of the competing law firm to ensure that Ms. Whyte followed through with her plans to leave Proskauer for the competing law firm.  For example, on December 2, 2022, the chair of the competing firm texted Mr. O'Brien, "Hi Jonathan—nothing urgent but I wanted to strategize a bit re Leigh Anne—I think it is highly likely that Proskauer will aggressively try to keep her and I wanted to make sure we discussed approach when that happens in advance of giving notice[.]"  On December 14, 2022, Mr. O'Brien texted Ms. Whyte informing her that the chair of the competing firm "wanted to role-play scenarios where we resign and [Proskauer tries] to get us to stay."  Further, on December 16, 2022, the chair of the competing firm texted Mr. O'Brien, this time asking whether he and

36

Ms. Whyte had received their bonuses, to which Mr. O'Brien responded, "yes we did!  All set to start resigning on Monday."  And in the days that followed, Mr. O'Brien, in direct violation of his fiduciary duty to Proskauer, actively focused on ensuring that Ms. Whyte would fulfill her commitment to move with him to the competing firm and actively encouraged her to leave Proskauer, all while reporting back to the competing firm's chair about Ms. Whyte's state of mind and suggesting ways to "sweeten the deal" for her to leave Proskauer.  Indeed, Mr. O'Brien succeeded in having the competing firm offer Ms. Whyte the opportunity to spend three weeks in her native Australia every winter to help convince her to leave Proskauer for the competing firm.

117.    Mr. O'Brien likewise violated his fiduciary duties to Proskauer by working to ensure that Mr. Russo did not change his mind about leaving Proskauer for the competing firm. On December 20, 2022, Ms. Whyte texted Mr. O'Brien that "Steve[n Ellis, Proskauer's Chair] is now emailing [Russo] saying he wants to talk tomorrow morn."  Mr. O'Brien replied, "Do we need to call him, or will he be fine standing up for himself?"  Mr. O'Brien, in turn, updated the chair of the competing firm in real time, who questioned whether Mr. O'Brien felt "comfortable that Jeremy will not say anything[.]"  When Mr. Russo later fielded calls from members of Proskauer's EC (who were not aware at that time of the identity of the employer to which Mr. Russo was headed), Mr. O'Brien checked in with Mr. Russo repeatedly to make sure Mr. Russo would not reconsider his commitment to leaving Proskauer for the competing firm.

118.    Mr. O'Brien further breached his duty of loyalty by preventing certain Proskauer colleagues from receiving internal promotions, thereby sowing dissatisfaction among them and making it easier to recruit them from Proskauer.  In at least one instance, Mr. O'Brien shared with an employee who reported to him that she was eligible for a promotion.  In meetings with the Firm's Chair, however, Mr. O'Brien failed to advocate for the promotion, and then informed

the employee that she would not be receiving the promotion and falsely blamed Proskauer's management for the decision.  In another instance, Ms. Whyte asked Mr. O'Brien if he was successful in getting Firm management to reject a team member's promotion.  Through these efforts, Mr. O'Brien sought to harm Proskauer by manufacturing employee dissatisfaction with Firm management, which would facilitate those employees' eventual recruitment away from the Firm.

119.    Notably, Mr. O'Brien not only worked on behalf of the competing law firm to recruit away Proskauer employees during this time, but he also shared confidential information about a Proskauer recruiting initiative with the chair of the competing law firm, who then used that information to Proskauer's detriment.

**Ms. Whyte and Mr. Russo Lie About Their Roles in Mr. O'Brien's Scheme**

120.    After discovering evidence of Mr. O'Brien's theft on December 20, 2022, Proskauer commenced an internal investigation to uncover the full extent of Mr. O'Brien's misconduct.  In connection with that investigation and with no concrete reason at the time to believe the wrongdoing extended beyond Mr. O'Brien, Proskauer lawyers interviewed both Ms. Whyte and Mr. Russo.

121.    During a December 27, 2022 interview, Ms. Whyte made a number of statements to Proskauer lawyers regarding her lack of knowledge regarding Mr. O'Brien's recruitment of Proskauer employees to join the competing law firm which are directly contradicted by her own text messages and other evidence.  For example, Ms. Whyte falsely represented that she had not told Mr. O'Brien she was leaving the Firm until December 18, 2022—the day before she resigned.  Ms. Whyte also falsely stated that Mr. O'Brien never discussed his employment plans

with her and that she did not know Mr. O'Brien had resigned until she was told of his resignation by the Firm's Managing Partner on December 20, 2022.

122.   In fact, over many months, Mr. O'Brien and Ms. Whyte had engaged in extensive discussions about their departures from Proskauer, the timing of their respective resignations, their planned employment with the competitor law firm, and Mr. O'Brien's then-active recruitment of Proskauer employees to join them at the competitor law firm.

123.   During this same interview, Ms. Whyte falsely claimed she did not know Mr. Russo was going to resign until she received his resignation letter.  In fact, Ms. Whyte was well aware of Mr. O'Brien's efforts to recruit Mr. Russo and clearly planned for him to join them at the competing law firm.  And on December 14, 2022, Ms. Whyte confirmed in advance to Mr. O'Brien that Mr. Russo was going to resign two days later, on December 16.  In a subsequent interview, Ms. Whyte falsely claimed to be in the dark as to whether Mr. Russo received an offer from the other law firm.

124.   Mr. Russo likewise made a number of misrepresentations to the Firm during his December 27 interview.  Specifically, Mr. Russo falsely stated that:  (i) he had never mentioned to Mr. O'Brien that he planned to leave Proskauer; (ii) he did not have another job lined up; and (iii) he first learned of Mr. O'Brien's resignation after the fact in a phone call with the Firm's Chair on December 21, 2022.  Proskauer was not aware at the time that Mr. Russo planned to join a competing law firm and did not know the identity of the competing firm until weeks after the interview.

125.   In fact, Mr. O'Brien and Mr. Russo had been planning for Mr. Russo to resign from Proskauer and then join Mr. O'Brien and Ms. Whyte at the new firm.  As detailed in paragraphs 115–117 above, the chair of that firm asked repeatedly about Mr. Russo, with the

hope and expectation that Mr. Russo would be joining Mr. O'Brien and Ms. Whyte after he resigned from Proskauer. Text messages reveal that when Mr. Russo was contacted by Proskauer's Chair and Managing Partner asking him to reconsider his resignation, Mr. O'Brien checked in with Mr. Russo and asked Mr. Russo "Are you going to be ok facing off to him [*i.e.*, the Firm's Chair]?".

126.  Finally, Mr. Russo lied about his collaboration with Mr. O'Brien to steal Proskauer's trade secrets. In the December 27, 2022, interview, Mr. Russo falsely stated that he did not know Mr. O'Brien had downloaded Firm information to a USB drive. But on December 17, 2022—the day after Mr. O'Brien stole Proskauer's files and Mr. Russo tendered his resignation from the Firm—Mr. O'Brien texted with Mr. Russo to ensure he had "saved on a USB" all of the files Mr. Russo "wanted." Mr. Russo told Mr. O'Brien to check whether a folder containing "FPA Reports, MWB Samples and SQL code Store Proc" was saved to the USB drive. When Mr. O'Brien confirmed that he "got them all!," Mr. Russo responded "Awesome, thanks."

**Mr. O'Brien's Financial Fraud and Abuse**

127.  Mr. O'Brien's violation of the fiduciary duties he owed to the Firm did not stop at theft of Proskauer's trade secrets and recruitment of its employees on behalf of a competitor. Proskauer's investigation following his termination from the Firm has revealed that, over a course of years, Mr. O'Brien fraudulently sought and received reimbursement from Proskauer for expenses that had no legitimate business purpose or that were otherwise not reimbursable pursuant to Firm policy, including unauthorized contributions to a charity with which he was involved.

128.    Mr. O'Brien's expense abuses and reimbursement fraud were pervasive and protracted.  The policies Mr. O'Brien repeatedly violated were policies he was in charge of overseeing.  As the Firm's COO, Mr. O'Brien had overall responsibility for ensuring that all Firm policies were effectively implemented, and he was the approver for a number of them, including the Firm's Accounts Payable and Expense policies.

129.    In one example, Mr. O'Brien improperly caused the Firm to make numerous, sizeable donations to organizations in which he or his wife had a personal interest without disclosing them to—much less seeking approval for them from—the Firm's Chair, Managing Partner, or Executive Committee.  For instance, in contravention of Firm policy and practice and without seeking permission from anyone, from mid-2020 through mid-2022 Mr. O'Brien caused the Firm to donate approximately $142,500 to a charity with which Mr. O'Brien was personally involved.  Knowing these contributions would not be approved by the Firm in the ordinary course, Mr. O'Brien took steps to circumvent the Firm's internal controls.  Mr. O'Brien directed his subordinates to remove both his name and the contributions he caused the Firm to make from the charitable contributions report generated for the EC's review.

130.    Mr. O'Brien's deceptive conduct even extended to a payment made by the Firm to his wife, Vanessa O'Brien, a mountain climbing enthusiast and motivational speaker.  Proskauer asked Mrs. O'Brien to give a speech at the Firm's New York office in mid-November 2022 (ironically, at precisely the same time her husband was scheming to leave the Firm with a cadre of employees and to steal the Firm's trade secrets and other confidential information).  In discussions with Mrs. O'Brien and her representative, Mrs. O'Brien did not seek a speaker's fee, and instead, requested that the Firm purchase copies of Mrs. O'Brien's book, which it did—over one hundred copies.  However, Mr. O'Brien, on the Sunday of Thanksgiving weekend, submitted

41

a separate $19,500 invoice for Mrs. O'Brien's speech to the Firm's expense management system. Mr. O'Brien directed that his wife be set up as a vendor in the system without following the proper protocol for doing so and, with Ms. Whyte's assistance, attempted to hide that fact from Firm leadership.

131.    Not long after submitting the invoice, Mr. O'Brien texted Ms. Whyte expressing alarm that the Proskauer expense management system required Mr. O'Brien to approve his wife's invoice. He stated, "You've sent Vanessa's invoice to me to approve!!!!!!" In response, Ms. Whyte instructed Mr. O'Brien to ignore the approval request and instead devised a workaround by instructing a subordinate to "erase" the invoice from the expense management system and to send it to Ms. Whyte for her direct approval. Ms. Whyte then ordered the subordinate to input the payment directly into the Firm's billing software, thereby eliminating any accounting records connecting approval of the payment to Mr. O'Brien.

132.    Mr. O'Brien also directly assisted with (i) reimbursements by the Firm to Ms. Whyte for strictly personal expenses and for expenses that had no legitimate business purpose or were otherwise not reimbursable under Firm policy, and (ii) the Firm's direct payment of Ms. Whyte's personal expenses. As just one example, Ms. Whyte sought reimbursement from the Firm of approximately $17,000 for two roundtrip business-class flights for Ms. Whyte's family members to travel from Australia to New York. This international travel was for trips in November and December 2022, only a few weeks before Ms. Whyte and Mr. O'Brien resigned from the Firm—a departure they had been planning together for months. Mr. O'Brien directly approved these personal expenses for reimbursement in full by Proskauer.

133.    Proskauer's investigation into Mr. O'Brien's expense abuses is ongoing. Given Mr. O'Brien's broad access to Proskauer's financial systems, the extent and egregiousness of the

abuses already discovered, and the fact that they occurred over an extended period of time, it is likely that Proskauer will continue to uncover additional instances of fraud and theft.

**COUNT I**

**VIOLATION OF THE DEFEND TRADE SECRETS ACT
18 U.S.C. § 1836, *ET SEQ.***

134.   Proskauer repeats, re-alleges, and incorporates by reference paragraphs 1 through 133 above as if set forth fully herein.

135.   As set forth above, Proskauer owns various trade secrets within the meaning of the DTSA, 18 U.S.C. § 1839(3), which are critical to the success of its business, including, without limitation, the information described in paragraphs 45–53, 60–66, and 78–82 above.

136.   Proskauer's trade secrets relate to Proskauer's legal services used in interstate and foreign commerce.

137.   Proskauer's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.  Proskauer's trade secrets give it a competitive advantage over other law firms who do not have access to that trade secret information.  Proskauer's trade secrets are valuable and crucial to its business functions and competitive position as a law firm.  The trade secrets Mr. O'Brien misappropriated are of enormous potential value to a competing law firm or law firm consultant.  For example, they would allow Mr. O'Brien to replicate many of Proskauer's methods and practices for running the business of a large law firm.  As another example, they would give a competing law firm an unfair advantage in trying to lure Proskauer attorneys away from the Firm or target Firm clients. Disclosure to or use of Proskauer's trade secret information by other law firms would risk

43

destroying that competitive edge.  Proskauer has taken countless steps and made substantial efforts that are reasonable under the circumstances to maintain the secrecy of its trade secrets by, among other things, designing and implementing the extensive information security measures described in paragraphs 98–109 above, and requiring adherence to and acknowledgement of policies (including its CCUDP Policy and Compliance Policy) as conditions of continued employment by the Firm.

138.    Mr. O'Brien's actions as described herein constitute misappropriation within the meaning of the DTSA, 18 U.S.C. § 1839(5).

139.    Mr. O'Brien misappropriated Proskauer's trade secrets by knowingly acquiring them through improper means, including theft, misrepresentation, and breaches and inducement of breaches of duties to maintain the secrecy of Proskauer's trade secret information.   In wrongfully acquiring Proskauer's trade secrets, Mr. O'Brien not only knowingly violated multiple Firm policies governing the dissemination of electronically stored information, but also his fiduciary duties to the Firm as COO.

140.    Mr. O'Brien's acquisition of Proskauer's trade secrets was accomplished by a persistent pattern of deceiving a subordinate into granting him access to download data to removable media and then downloading and copying trade secrets from Proskauer's network to his own personal USB drives in violation of Firm policies and his fiduciary duties to the Firm.

141.    Mr. O'Brien also misappropriated Proskauer's trade secrets by using or disclosing them without Proskauer's consent.  At the times Mr. O'Brien copied Proskauer's trade secrets to his personal USB drives or otherwise used or disclosed them, he knew or had reason to know (i) that knowledge of those trade secrets was derived from his or others' use of improper means to acquire those trade secrets; (ii) that they were acquired under circumstances giving rise to a duty

44

to maintain the secrecy of the trade secrets or limit the use of the trade secrets; or (iii) that they were derived from or through a person who owed a duty to Proskauer to maintain the secrecy of the trade secrets or limit the use of the trade secrets.

142.     Mr. O'Brien's actions have harmed Proskauer and, unless permanently restrained, will further damage Proskauer in ways and to an extent that may not be proven with certainty, irreparably injuring Proskauer, leaving it without an adequate remedy at law.

143.     Proskauer is entitled to damages for actual losses caused by Mr. O'Brien's misappropriation of its trade secrets and damages for any unjust enrichment caused by Mr. O'Brien's misappropriation that is not addressed in computing its actual losses.   In the alternative, Proskauer is entitled to a reasonable royalty for Mr. O'Brien's misappropriation of its trade secrets.

144.     Mr. O'Brien's misappropriation of Proskauer's trade secrets was willful and malicious, entitling Proskauer to attorneys' fees and exemplary damages.

145.     Permanent injunctive relief is necessary to prevent irreparable harm and further disclosure or use of Proskauer's trade secrets.

## COUNT II

## MISAPPROPRIATION OF TRADE SECRETS UNDER
## NEW YORK COMMON LAW

146.     Proskauer repeats, re-alleges, and incorporates by reference paragraphs 1 through 145 above as if set forth fully herein.

147.     As set forth above, Proskauer owns various trade secrets critical to the success of its business, including, without limitation, the information described in paragraphs 45–53, 60–66, and 78–82 above, which constitute trade secrets under New York law.

148.    Proskauer's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.  Proskauer's trade secrets give it a competitive advantage over other law firms who do not have access to that trade secret information.  Proskauer's trade secrets are valuable and crucial to its business functions and competitive position as a law firm.  The trade secrets Mr. O'Brien misappropriated are of enormous potential value to a competing law firm or law firm consultant.  For example, they would allow Mr. O'Brien to replicate many of Proskauer's methods and practices for running the business of a large law firm.  As another example, they would give a competing law firm an unfair advantage in trying to lure Proskauer attorneys away from the Firm or target Firm clients. Disclosure or use of Proskauer's trade secret information to other law firms would risk destroying that competitive edge.  Proskauer has taken countless steps and made efforts that are reasonable under the circumstances to maintain the secrecy of its trade secrets by, among other things, designing and implementing the extensive information security measures described in paragraphs 98–109 above, and requiring adherence to and acknowledgement of policies (including its CCUDP Policy and Compliance Policy) as conditions of continued employment at the firm.

149.    By copying Proskauer's trade secrets to his personal USB drives, saving Proskauer's trade secrets to his personal computer, and engaging in other misconduct, Mr. O'Brien used Proskauer's trade secrets in breach of an agreement, confidence, or a duty, or as a result of discovery by improper means, including theft, misrepresentation, and breaches and inducement of breaches of duties to maintain the secrecy of Proskauer's trade secret information. It is a fair inference that Mr. O'Brien further used Proskauer's trade secrets, and his possession

of that trade secret information, to enhance his perceived value to the competing law firm he agreed to join and to secure the offer of employment he received from the competing law firm, as reflected in the outsized compensation package he was offered by the competing firm. Mr. O'Brien also used Proskauer's trade secrets when he shared with the competing law firm's chair confidential information about a Proskauer recruiting initiative, which the chair of that firm then used to Proskauer's detriment.

150.    Given the extensive nature of his misappropriation, coupled with his frequent secret and improper discussions over several months with the chair and other leaders of the competing firm he planned to join (including discussions about recruiting other Proskauer employees on the competitor's behalf, in clear violation of Mr. O'Brien's fiduciary duties), it is a fair inference that Mr. O'Brien shared additional Proskauer trade secrets with the competitor. However, because Mr. O'Brien deleted relevant evidence after this action was commenced, Proskauer requires further discovery to determine what other trade secret information Mr. O'Brien may have shared with others who used, are using, or may later use such information to the Firm's detriment.

151.    Mr. O'Brien's actions have harmed Proskauer and, unless permanently restrained, will further damage Proskauer in ways and to an extent that may not be proven with certainty, irreparably injuring Proskauer and leaving it without an adequate remedy at law. Proskauer is therefore entitled to permanent injunctive relief to prevent such irreparable harm.

152.    Proskauer is entitled to damages as a result of Mr. O'Brien's misappropriation to the extent its actual losses are calculable.

## COUNT III

## BREACH OF FIDUCIARY DUTY

153.    Proskauer repeats, re-alleges, and incorporates by reference paragraphs 1 through 152 above as if set forth fully herein.

154.    As a Proskauer officer and employee, Mr. O'Brien owed Proskauer an undivided duty of loyalty and was obligated to act in the best interests of Proskauer.

155.    Proskauer was entitled to place its trust and confidence in Mr. O'Brien and to expect him to act with the utmost good faith and candor toward it in carrying out his duties as COO.

156.    Proskauer relied on Mr. O'Brien's duty of loyalty, integrity, and faithful performance of his duties and responsibilities as an officer of the Firm.

157.    Mr. O'Brien knowingly and willingly breached those fiduciary duties by misappropriating Proskauer's trade secrets for his own personal gain through improper means, including through the use of deception and by violating Firm policies.

158.    Mr. O'Brien knowingly and willingly breached his fiduciary duties by recruiting other Proskauer employees on behalf of a competitor at a time when, as an officer of the Firm, he owed it a duty of undivided loyalty, by intentionally sowing dissatisfaction among other employees in order to facilitate further possible recruitment on behalf of the competitor, and by violating Firm policies by engaging in expense abuses and reimbursement fraud.

159.    As a direct and proximate result of Mr. O'Brien's disloyalty and breach of his fiduciary duties, Proskauer has been harmed.

## COUNT IV

## FAITHLESS SERVANT

160.    Proskauer repeats, re-alleges, and incorporates by reference paragraphs 1 through 159 above as if set forth fully herein.

161.    As a Proskauer officer and employee, Mr. O'Brien owed Proskauer an undivided duty of loyalty and was obligated to act in the best interests of Proskauer.

162.    Proskauer was entitled to place its trust and confidence in Mr. O'Brien and to expect him to act with the utmost good faith toward it in carrying out his duties as COO.

163.    Proskauer relied on Mr. O'Brien's duty of loyalty, integrity, and faithful performance of his duties and responsibilities.

164.    Mr. O'Brien performed his duties faithlessly for years by defrauding the Firm of money through expense abuses and reimbursement fraud.  His faithlessness took on a new dimension in 2022 when he began actively recruiting Proskauer employees on behalf of a competitor while still employed at the Firm as an officer and at the same time he was stealing vast troves of trade secret and other confidential and proprietary information.

165.    As a direct and proximate result of Mr. O'Brien's disloyalty, faithlessness, and breach of his duties, Proskauer has been harmed.

166.    Proskauer is entitled to disgorgement of all compensation paid to Mr. O'Brien after his acts of disloyalty began.

## COUNT V

## FRAUD

167.    Proskauer repeats, re-alleges, and incorporates by reference paragraphs 1 through 166 above as if set forth fully herein.

49

168.    Proskauer permits its employees to seek reimbursement for certain business-related expenses incurred in the course of the employees' duties on behalf of the Firm or where otherwise expressly permitted by Firm policy.   Proskauer does not pay employees' personal expenses.   As an officer of the Firm, Mr. O'Brien was aware of these policies and, in fact, was in charge of enforcing them within the Firm.

169.    Written Firm policy expressly requires that employees seeking reimbursement of their expenses identify the specific business purpose for which the expense was incurred.

170.    Mr. O'Brien submitted reimbursement requests for personal expenses which bore no relation to his duties at Proskauer, or caused Proskauer to pay expenses directly.   Mr. O'Brien approved similarly improper reimbursements and expense payments for Ms. Whyte.   In each case, Mr. O'Brien misrepresented to the Firm, in writing, that these expenses were proper for reimbursement under Firm policy or otherwise appropriate for Proskauer to pay directly.

171.    On multiple occasions, Mr. O'Brien misrepresented the nature of his expenses to seek reimbursement from the Firm.   For instance, Mr. O'Brien submitted expense reports to the Firm representing that dinners he had at restaurants in New York City were with a Firm consultant when they were not.

172.    Mr. O'Brien made these misrepresentations knowingly and for the purpose of inducing Proskauer to rely upon them, approve the reimbursement requests, and distribute Firm funds accordingly, or pay personal expenses directly.

173.    Proskauer justifiably relied on Mr. O'Brien's misrepresentations as it had no reason to suspect that its most senior officer would steal from or defraud the Firm.

174.    In other cases, Mr. O'Brien caused Proskauer to make charitable contributions that he knew were not approved by the Firm, violated Firm policy, and were in significant excess

of the maximum contributions permitted by the Firm.  Mr. O'Brien caused these contributions to be removed from the charitable giving report overseen by the Firm's EC, which represents a material omission of information that Mr. O'Brien had a duty to disclose.  Proskauer justifiably relied on Mr. O'Brien's misrepresentations and could not have known that information was withheld from the reports it trusted Mr. O'Brien and his subordinates to submit accurately and faithfully.

175.    As a direct and proximate result of Mr. O'Brien's misrepresentations and material omissions, Proskauer has been harmed.

176.    Proskauer is entitled to repayment of the improper reimbursements, expenses, and charitable contributions, and disgorgement of all compensation paid to Mr. O'Brien from the time his acts of disloyalty began.

## COUNT VI

## CONVERSION

177.    Proskauer repeats, re-alleges, and incorporates by reference paragraphs 1 through 176 above as if set forth fully herein.

178.    Proskauer had legal ownership and a superior right of possession to the Firm funds that were used to reimburse Mr. O'Brien's fraudulent expense reimbursement requests and to fund his improper charitable contributions.  The funds in question are a specific and identifiable amount, in excess of over $150,000.

179.    Through his deception and improper actions, Mr. O'Brien exercised unauthorized dominion over those funds that rightfully belonged to Proskauer by receiving and retaining disbursements to which he was not entitled under Firm policy, and by causing the Firm to pay personal expenses.

180.     Mr. O'Brien's unlawful possession and use of Proskauer's money was to the exclusion of Proskauer's rights to those funds.  Proskauer is not able to access and recoup the funds once it authorizes a reimbursement and pays via direct deposit to Mr. O'Brien's or another employee's bank account, nor can Proskauer access or recoup funds once they have been paid to a third-party.

181.     As a direct and proximate result of Mr. O'Brien's unauthorized actions, Proskauer has been harmed.

182.     Proskauer is entitled to repayment of the improper reimbursements, expenses, and charitable contributions, and disgorgement of all compensation paid to Mr. O'Brien from the time his acts of disloyalty began.

### **PRAYER FOR RELIEF**

Proskauer respectfully requests that this Court:

1.  Enter a judgment that Mr. O'Brien has:

    a.  violated the DTSA;

    b.  misappropriated Proskauer's trade secrets;

    c.  breached his fiduciary duties, including his duty of loyalty, to Proskauer;

    d.  persistently performed his duties faithlessly; and

    e.  committed acts of fraud and conversion.

2.  Enter a judgment that Mr. O'Brien's violations and breaches were willful and malicious;

3.  Enter a permanent injunction restraining Mr. O'Brien, and anyone acting in concert or participation with Mr. O'Brien, from further possession, misappropriation,

dissemination, copying, and use of any of Proskauer's proprietary, confidential and/or trade secret information, and requiring him to return to Proskauer all such information (including all copies and excerpts thereof) that are in his possession, custody, or control or are in the possession, custody, or control of anyone acting in concert or participation with Mr. O'Brien;

4. Award Proskauer:

     a.  compensatory and other damages in amounts to be determined at trial;

     b.  exemplary damages;

     c.  disgorgement damages;

     d.  restitution;

     e.  attorneys' fees;

     f.  costs of this litigation;

     g.  prejudgment interest (where applicable); and

     h.  such other legal and equitable relief as this Court deems just and proper.

Dated: New York, New York
       May 8, 2023

PROSKAUER ROSE LLP
Robert J. Cleary
   rjcleary@proskauer.com
Michael T. Mervis
   mmervis@proskauer.com
Jacob R. Butwin
   jbutwin@proskauer.com
Eleven Times Square
New York, New York 10036
(212) 969-3000

Timothy W. Mungovan

DEBEVOISE & PLIMPTON LLP

By: /s/ Mark P. Goodman
Mark P. Goodman
   mpgoodman@debevoise.com
Jyotin Hamid
   jhamid@debevoise.com
Adam C. Saunders
   asaunders@debevoise.com
Jaime M. Fried
   jmfried@debevoise.com
66 Hudson Boulevard

tmungovan@proskauer.com                    New York, New York 10001
One International Place                     (212) 909-6000
Boston, Massachusetts 02110
(617) 526-9600

Kyle A. Casazza
    kcasazza@proskauer.com
2029 Century Park East, Suite 2400
Los Angeles, California 90067
(310) 557-2900

*Attorneys for Plaintiff Proskauer Rose LLP*